# EXHIBIT 3

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 1 de 26
Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 2 of 105

**GOBIERNO DE PUERTO RICO**
**TRIBUNAL GENERAL DE JUSTICIA**
**TRIBUNAL DE PRIMERA INSTANCIA**
**SALA SUPERIOR DE SAN JUAN**

| | |
|---|---|
| HON. JENNIFFER GONZÁLEZ, GOBERNADORA DE PUERTO RICO; GOBIERNO DE PUERTO RICO<br><br>**DEMANDANTES**<br><br>v.<br><br>LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC<br><br>**DEMANDADOS**<br><br>v.<br><br>AUTORIDAD PARA LAS ALIANZAS PÚBLICO PRIVADAS; AUTORIDAD DE ENERGÍA ELÉCTRICA<br><br>**PARTES CON INTERÉS** | **CIVIL NÚM.**<br><br>**SALA:**<br><br>**SOBRE:**<br><br>**SENTENCIA DECLARATORIA** |

**DEMANDA**

**AL HONORABLE TRIBUNAL:**

**COMPARECEN** la Gobernadora de Puerto Rico, Hon. Jenniffer González ("Gobernadora"), y el Gobierno de Puerto Rico ("Estado"), en conjunto con la Honorable Gobernadora, salvo que otra cosa se indique, el ("Gobierno"), a través de la representación legal que suscribe, y muy respetuosamente **EXPONEN, ALEGAN Y SOLICITAN:**

## I. INTRODUCCIÓN

Mediante esta acción judicial se procura el auxilio urgente de este Honorable Tribunal para decretar la nulidad de cierta extensión indefinida del contrato interino mediante el cual Luma Energy, LLC, y Luma Energy Servco, LLC, (conjuntamente, "LUMA") opera provisionalmente el sistema de transmisión y distribución eléctrica de Puerto Rico. Dicha operación, actualmente, se conduce de conformidad con unos términos en extremo

1

onerosos, sin las métricas o contrapesos requeridos y en atención a una carta suscrita por LUMA, la Autoridad para las Alianzas Público Privadas ("APP") y la Autoridad de Energía Eléctrica ("AEE") de forma contraria a la legislación, en exceso de la autoridad que le fuera delegada por estas e invadiendo la autoridad soberana del Estado. A través de las actuaciones nulas que se reseñan en esta Demanda, el Pueblo de Puerto Rico, cuyos intereses representa el Gobierno, quedó indefinidamente atado a un contrato con LUMA de forma contraria a la ley y sin los mecanismos de supervisión y resolución que se habían diseñado para proteger el interés público. De esta manera, la ciudadanía ha estado sujeta a un servicio deficiente y oneroso, rendido en abierto menosprecio a las necesidades ciudadanas, la salud, seguridad y bienestar públicos y a los requisitos de ley. Esto situación ha perpetuado el detrimento del sistema eléctrico de Puerto Rico cuya infraestructura fue diseñada en la década del 1960.

En específico, se solicita que este Honorable Tribunal declare la nulidad de ciertos acuerdos recogidos en una carta del 30 de noviembre del 2022, suscrita por la APP, la AEE y LUMA ("Carta-Extensión"). Mediante dicha carta se pretendió extender *indefinidamente* un periodo breve y transitorio durante el cual LUMA operaría interinamente el Sistema. La Carta-Extensión fue otorgada en contravención de las disposiciones aplicables del sistema de transmisión y distribución eléctrica, sin cumplir con las métricas y parámetros de calidad acordados en el *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* ("T&D OMA") y a cambio de un pago significativamente mayor que el que se acordó en dicho contrato. La Carta-Extensión es nula, entre otros asuntos, dado a que, (a) no fue aprobada conforme a derecho por todas las personas y entidades cuyo aval es imprescindible de conformidad con la legislación aplicable; (b) no cuenta con un término específico, expreso y definido, según se requiere en toda alianza público privada; y (c) al no tener un término específico limitado invade prerrogativas que legislativamente solo pueden ejercer la Asamblea Legislativa y la Gobernadora mediante legislación para aprobar cualquier alianza pública-privada que pueda exceder de 50 años.

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 3 de 26

En ese sentido, el Gobierno comparece en esta Demanda para procurar la nulidad de la Carta-Extensión y así dar paso finalmente a la terminación de la defectuosa operación del sistema eléctrico por parte de LUMA. La comparecencia del Gobierno se basa tanto en el interés **soberano** de proteger el bienestar de sus ciudadanos, que son los principales afectados por la prolongada actuación deficiente de LUMA en virtud de la Carta-Extensión nula, como de defender las prerrogativas constitucionales de la Gobernadora de hacer cumplir las leyes estatuidas y aprobar o vetar los proyectos de ley relacionados con términos de alianzas público-privadas que pudieran exceder los límites y condiciones dispuestos en la *Ley de Alianzas Público Privadas*, Ley Núm. 29 de 8 de junio de 2009, según enmendada, 27 LPRA §§ 2601 *et seq.* ("Ley 29"), y la *Ley para Transformar el Sistema Eléctrico de Puerto Rico*, Ley Núm. 120 de 20 de junio de 2018, según enmendada, 22 LPRA § 1111 *et seq.* ("Ley 120"). Igualmente, la Demanda se presenta ya que el Gobierno de Puerto Rico tiene el deber constitucional de salvaguardar el orden público, proteger la vida, la seguridad y los bienes de sus ciudadanos. En su virtud, desde el 9 de enero de 2025 se aprobó la OE 2025-005 "Orden Ejecutiva de la Gobernadora de Puerto Rico, Hon. Jenniffer A. González Colón, para establecer la Oficina del Zar de Energía". Posteriormente, el 2 de abril de 2025, la Gobernadora emitió la OE 2025-016, "Orden Ejecutiva de la Gobernadora de Puerto Rico, Hon Jenniffer A. González Colón, para modificar el Estado de Emergencia Energética de Puerto Rico, Alinear las Prioridades con la Declaración de Emergencia Energética Nacional y Reparación sobre el Sistema para Aumentar la Capacidad de Generación". Evidentemente, con la aprobación de la OE 2025-005 y la OE 2025-016 quedó claro que el Gobierno decretó un estado de emergencia energética de Puerto Rico, que requiere la intervención del Gobierno de Puerto Rico para realizar los trabajos de reparación sobre el sistema. Véase, OE 2020-005 y OE 2025-016. Particularmente, ambas órdenes ejecutivas están dirigidas a resolver la emergencia energética y poder brindar un servicio esencial a la población.

Huelga señalar que, el 11 de diciembre de 2025, la Autoridad de Alianzas Público Privadas ("APP") y la Autoridad de Energía Eléctrica ("AEE") presentaron una Demanda y un recurso de certificación interjurisdiccional ante el Tribunal Supremo de Puerto Rico,

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 4 de 26

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 5 of 105

para que fuera ese foro, en función de su rol como máximo intérprete del derecho en nuestro ordenamiento, quien atendiera de manera prioritaria y en primera instancia las cuestiones jurídicas planteadas en la *Demanda (*el "Caso de Nulidad").[1] Dichas cuestiones planteaban asuntos no solo del más alto interés público, sino que involucraban controversias novedosas y de suma importancia respecto al alcance de la Ley 29 y la Ley 120, como a la estructuración de las alianzas público privadas en nuestra jurisdicción. Dicho recurso de certificación aún está pendiente ante la consideración de nuestro más alto foro judicial.

Sin embargo, acaecido lo anterior, el 15 de diciembre de 2025, LUMA presentó una notificación de remoción del Caso de Nulidad de este Honorable Foro a la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico ("Tribunal Federal"). Mediante esta actuación, LUMA –invocando argumentos de dudosa solvencia jurídica– no sólo remitió el Caso de Nulidad ante el Tribunal Federal para que éste asumiera jurisdicción sobre el mismo, sino que efectivamente paralizó los procedimientos atinentes a dicho caso ante este Honorable Foro. Ante ese escenario, la pendencia del caso y los procesos ante el Tribunal Federal relacionados con este resulta evidente que actualmente existe una incertidumbre jurídica en torno a la validez de la Carta de Extensión en controversia que debe ser atendida con urgencia por este. El Gobierno de Puerto Rico coincide con la APP y la AEE quienes puesto en controversia el derecho de LUMA a operar el Sistema. Y es que, la consecuencia de la nulidad de la Carta-Extensión reseñada, según se detalla en la *Demanda* del Caso de Nulidad, sería que tanto el *Puerto Rico Transmission and Distribution System Supplemental Terms Agreement* ("*Supplemental Agreement*"), contratos bajo los que LUMA ostenta su rol como operador del Sistema, habrían expirado a tenor con sus propios términos. Empero, indistintamente de los méritos de las reclamaciones de la *Demanda* en el Caso de Nulidad, dado a que existe una situación de emergencia energética, es preciso, que el Gobierno de Puerto Rico bajo su poder de *parens patriae* solicite en el Foro local también la nulidad de la Carta de

---

[1] De conformidad con la Regla 8.3 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 8.3, se adoptan por referencia las alegaciones formuladas en la *Demanda Jurada* en el caso civil número SJ2025CV11093. Véase caso civil número SJ2025CV11093, SUMAC, núm. 1.

4

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc: Exhibit 3 complaint with exhibits Page 6 of 105

Extensión. Definitivamente, la incertidumbre jurídica señalada anteriormente, y las consecuencias que acarrea la nulidad justifican la comparecencia e intervención del Gobierno ante este Honorable Foro quien es intérprete del derecho contractual local. En su consecuencia, el Estado solicita que se dicte Sentencia Declaratoria, en particular al amparo del interés *parens patriae*.

La atención inmediata que requiere esta situación no se puede remediar mediante otra acción que no sea una pronta sentencia declaratoria de nulidad de la Carta-Extensión, suscrita de manera ultra vires y contraviniendo el derecho puertorriqueño. Cabe destacar, que la declaración de nulidad de la Carta-Extensión necesariamente conlleva un reconocimiento del fin automático del acuerdo interino mediante el cual LUMA pretende operar el sistema eléctrico y ser acreedora de derechos bajo el T&D OMA, así como del propio T&D OMA. Consecuentemente, se solicita con el mayor respeto a este Ilustre Foro que: (a) declare la nulidad de la Carta-Extensión; y; (b) declare, la terminación del *T&D OMA*, ambos de 22 de junio de 2020, **conforme a sus propios términos**.

La sentencia declaratoria solicitada es necesaria para reivindicar las leyes de Puerto Rico, en particular el esquema legal aplicable a las transacciones de la AEE, así como a la contratación gubernamental, y **las prerrogativas constitucionales del Gobierno**, el estado de emergencia energética y, sobre todo, para proteger la salud, bienestar y seguridad pública. La intervención de este Honorable es indispensable para evitar que se perpetúe una transacción radicalmente nula, inválida, contraria a la ley y a la política pública de Puerto Rico y altamente perjudicial al Pueblo de Puerto Rico.

## II.   JURISDICCIÓN Y COMPETENCIA

Este Honorable Tribunal tiene jurisdicción para atender el caso de epígrafe en virtud de la Regla 3.1 de las Reglas de Procedimiento Civil de Puerto Rico de 2009, 32 LPRA Ap. V, R. 3.1 y el Art. 5.001 de la *Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003*, Ley Núm. 201-2003, según enmendada, 4 LPRA sec. 25a("*Ley de la Judicatura*"). La competencia de este Honorable Tribunal sobre el pleito de epígrafe surge en virtud de la Regla 3.2 de las de Procedimiento Civil de Puerto Rico de 2009, 32 LPRA

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 6 de 26

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 7 of 105

Ap. V, R. 3.2, y el Art. 5.003 de la *Ley de la Judicatura*, 4 LPRA sec. 25c.

### III. PARTES

1. La parte demandante es la Gobernadora de Puerto Rico, Hon. Jenniffer González, en su capacidad oficial, y el Gobierno de Puerto Rico, creado por la Constitución de Puerto Rico, con capacidad para demandar y ser demandado. El Gobierno comparece representado por la Secretaria del Departamento de Justicia, Hon. Lourdes L. Gómez Torres. Por virtud de la *Ley Orgánica del Departamento de Justicia*, Ley Núm. 205- 2004, 3 LPRA sec. 291, *et. seq.*, la Secretaria de Justicia es la encargada de representar a las agencias y funcionarios en procesos civiles instados en los tribunales u otros foros en o fuera de Puerto Rico. Su dirección física es: Calle César González, esquina Ave. Jesús T. Piñeiro, San Juan, Puerto Rico, con dirección postal: P.O. Box 9020192, San Juan, Puerto Rico 00902-0192. El número de teléfono del Departamento de Justicia es: 787-721-2900.

2. La codemandada LUMA Energy, LLC, es una compañía de responsabilidad limitada, organizada bajo las leyes del Gobierno de Puerto Rico, con el número de registro en el Departamento de Estado 439372. Su dirección física es 1110 Ave. Ponce de León, Pda. 16 1/2, Edif. NEOS - Ofic. 607, San Juan, Puerto Rico, 00907.

3. La codemandada LUMA Energy Servco, LLC, es una compañía de responsabilidad limitada organizada bajos las leyes del Gobierno de Puerto Rico, con el número de registro en el Departamento de Estado 439373. Su dirección física es: 1110 Ave. Ponce de León, Pda. 16 1/2, Edif. NEOS - Ofic. 607, San Juan, Puerto Rico, 00907.

4. LUMA Energy, LLC y LUMA Energy Servco, LLC, son firmantes de la Carta-Extensión que es nula, según se explica a continuación, y tienen el deber de participar en un proceso de transición ordenada, deber cuyo cumplimiento se exige en esta Demanda. Ambas operan el sistema de distribución y transmisión de energía eléctrica de Puerto Rico al presente en virtud de la nula Carta-Extensión. De ahí que ambas sean demandadas en este proceso.

5. Se incluye además como partes con interés a las otras dos firmantes de la nula Carta-Extensión, a la APP y a la AEE, que ya reconocieron tal nulidad. Dichas partes con interés, además, deben participar del proceso de transición ordenada. cuyo cumplimiento

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc: Exhibit 3 complaint with exhibits Page 8 of 105

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 7 de 26

se exige judicialmente mediante esta Demanda. Se trata de partes indispensables en este litigio, por lo que han sido acumuladas en esta Demanda. Por otro lado, la APP y la AEE son partes de los contratos en función de los cuales LUMA asumió el control de la operación y el mantenimiento del Sistema.

6. La APP es una corporación pública del Gobierno de Puerto Rico adscrita a la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico, creada en virtud de la Ley 29. Su dirección física es: Banco Gubernamental de Fomento, Centro Gubernamental Minillas (Roberto Sánchez Vilella) Ave. De Diego, Pda 22 Santurce, Puerto Rico 00907.Su dirección postal es: P.O. Box 42001, San Juan, Puerto Rico 00940-2001.

7. La AEE es una corporación pública creada en virtud de la Ley Núm. 83 de 2 de mayo de 1941. Por virtud de la Sección 5 (d) de su ley habilitadora, tiene la capacidad para demandar y ser demandada. Su dirección física es: 1110 Ave. Ponce de León, Edificio Neos, piso 8 Oficina 801 Santurce. Su dirección postal es: P.O. Box 364267 Santurce, Puerto Rico 00936-4267.

## IV. RELACIÓN DE HECHOS [2]

8. El 22 de junio de 2020, la APP, como Administradora, la AEE, como Dueña, y LUMA, como Operador, suscribieron el T&D OMA, mediante el cual LUMA asumiría la administración, operación y mantenimiento del sistema de transmisión y distribución eléctrica de Puerto Rico.[3] Véase, enlace nota alcalce #3, T&D OMA a la pág. 61 y 315.

9. El T&D OMA contemplaba que el control operacional del Sistema sería transferido a LUMA una vez se cumpliera con una serie de requisitos ("*Service Commencement Date Conditions*"), que incluían el que la AEE saliera del proceso de quiebras bajo el Título III del *Puerto Rico Oversight, Management, Economic Stability Act*, 48 USC § 2101 et seq. ("PROMESA"). Véase, T&D OMA, T&D OMA a la pág. 61 y 315.

10. En vista de que la AEE no podía cumplir con los Service Commencement Date Conditions mientras el proceso de quiebra continuara activo, la AEE, la APP y LUMA

---

[2] Para una relación más detallada de los hechos atinentes a la relación entre la APP, la AEE y LUMA, véase caso civil número SJ2025CV11093, SUMAC, núm. 1, en las págs. 6-12, ¶¶ 3.1-3.26. Véase, además, *supra*, nota al calce número 2.

[3] Véase, https://docs.pr.gov/files/P3-PublicaPrivadas/Projects/Projects/TD%20-%20LUMA/OM%20Agreement/executed-consolidated-om-agreement-td.pdf

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 9 of 105

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 8 de 26

acordaron suscribir, el mismo 22 de junio de 2020, el *Supplemental Agreement*. Ese documento permitía a LUMA operar de manera transitoria el sistema de transmisión y distribución durante período interino mientras la AEE permanecía en su proceso de quiebra. Véase Anejo 1, sección 2.2, a la pág. 3.

11. Tanto el T&D OMA como el Supplemental Agreement fueron evaluados y aprobados por (a) las respectivas Juntas de Directores de la APP y la AEE, contando con el voto afirmativo de los representantes del interés público en la Junta de la APP, (b) el Negociado de Energía de Puerto Rico ("Negociado"), que confirió su aval por vía del Certificado de Cumplimiento de Energía, y (c) la persona en quien delegó la entonces Gobernadora de Puerto Rico, Hon. Wanda Vázquez.

12. Según sus propios términos y naturaleza, el Supplemental Agreement se realizó con la intención de que se comenzara a brindar el servicio acordado en el T&D OMA de forma temporera, hasta un término de dieciocho (18) meses, comenzando a partir del 1 de junio de 2021. Véase Anejo 1, sección 7.1, a la pág. 11.

13. En virtud de su naturaleza temporera, en lo que se determinaba si se cumplían las condiciones para entrar en vigor el T&D OMA, el *Supplemental Agreement* proveyó para un pago de una tarifa fija anual de $115 millones, en vez de una tarifa mixta con un pago anual más bajo ($70 millones en el primer año) y una posibilidad de pagos adicionales conforme al cumplimiento con ciertas métricas definidas (de un máximo de $13 millones adicionales en el primer año, sujeto a que LUMA cumpliera con dichas métricas). Durante ese periodo interino –que se vislumbró y aprobó como uno breve– LUMA no estaría sujeta a las mismas métricas de desempeño que aplican en el T&D OMA.

> Cabe notar que las cifras de $70 millones en pago fijo bajo el T&D OMA y $115 millones –sin métricas– bajo el *Supplemental Agreement* son en base a cálculos del 2020, pero están sujetas a ajustes por concepto de inflación. Así, al presente LUMA está recibiendo $139 millones anuales como pago bajo el *Supplemental Agreement*, en lugar de los $70 millones (sujetos a ajuste para inflación) que le corresponderían bajo el T&D OMA, con una posibilidad de hasta $13 millones (también sujetos a ajuste) por incentivos en la medida que LUMA demostrase cumplimiento con ciertas métricas. Véase, enlace T&D OMA , sección 3.3, a la pág. 317.

14. La diferencia en pagos a LUMA acrecienta con cada año, en la medida que tanto bajo el T&D OMA como bajo el Supplemental Agreement, como se mencionó, los pagos

8

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 10 of 105

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 9 de 26

se ajustan por razón de inflación. En tanto la base del Supplemental Agreement ($115 millones, que según ajustados al presente es $139 millones) es mayor que la base fija bajo el T&D OMA ($70 millones, sujeto a ajuste por inflación; con la posibilidad de unos millones adicionales sujetos al cumplimiento con unas métricas de desempeño que LUMA no está cumpliendo), el impacto del aumento por inflación es mayor para el Supplemental Agreement y, por tanto, acrecienta la diferencia entre lo que LUMA recibe bajo el Supplemental Agreement (sin métricas de desempeño) con lo que habría recibido bajo el T&D OMA (sujeto a métricas de desempeño).

15. Asimismo, en consideración de su carácter interino y provisional, el *Supplemental Agreement* estableció una cláusula de terminación automática. Dicha cláusula indicaba que tanto el Supplemental Agreement, como el T&D OMA:

> **shall automatically terminate without further action** by Operator [LUMA]…**in the event that the Service Commencement Date does not occur on or prior to the date that is eighteen (18) months after the Supplemental Agreement Effective Date** (such date, the "Interim Period Termination Date"), which Interim Period Termination Date may, if requested by Administrator, be extended by the mutual agreement of the Parties prior to the then-current Interim Period Termination Date. Véase, enlace nota alcalce 1, sección 7.1, a la pág. 12.

16. Dado que el *Supplemental Agreement Effective Date* fue el 1 de junio de 2021[4], el término de dieciocho (18) meses culminó el 30 de noviembre de 2022, fecha en la cual se produjo la terminación automática tanto del T&D OMA como del Supplemental Agreement.

17. No obstante, el 30 de noviembre de 2022, el mismo día en que sucedió la terminación automática, la APP, la AEE y LUMA suscribieron la Carta-Extensión por virtud de la cual pretendieron de forma nula e inválida, en violación a las leyes y la Constitución de Puerto Rico, extender indefinidamente el Supplemetal Agreement. Esencialmente, la Carta-Extensión eliminó la terminación automática de dieciocho (18) meses y la sustituyó por un plazo indefinido condicionado a la culminación de dos

---

[4] El *Supplemental Agreement Effective Date* quedó formalmente establecido como el 1 de junio de 2021, mediante un Limited Waiver ejecutado por la APP, la AEE y LUMA en esa misma fecha, en el cual las partes acordaron expresamente que tanto el *Supplemental Agreement Effective Date* como el *Interim Period Service Commencement Date* serían el 1 de junio de 2021. Véase, Anejo 2.

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 10 de 26

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 11 of 105

eventos: (1) la salida de la AEE del caso de Título III y (2) a que el plan de ajuste fuese "reasonably acceptable to Operator [LUMA]." Véase Anejo 3.

18. En lo aquí pertinente, la Carta-Extensión, Anejo 4, pretendía enmendar el Supplemental Agreement de la siguiente manera:

> In accordance with the express terms of Section 7.1 (a) of the Supplemental Agreement, Administrator hereby requests an extension of the Interim Period Termination Date to the date on which the following Service Commencement Date Conditions shall have been satisfied or waived: (i) the Title III Exit shall have occurred; and (ii) the Title III Plan and order of the Title III Court confirming same shall be reasonably acceptable to Operator.

19. Así las cosas, a diferencia del diseño original, la Carta-Extensión enmendó los términos y condiciones del Supplemental Agreement, dejó de fijar una fecha cierta de terminación y colocó la continuación del contrato bajo criterios dependientes a la voluntad exclusiva de LUMA. Véase Anejo 3. De esta manera, entre otras cosas, eliminó de facto la facultad resolutoria que el Supplemental Agreement confería expresamente a la APP y a la AEE, convirtiendo para todo efecto práctico el contrato en cuestión en uno de tiempo indefinido.

20. Nótese, además, que la Carta-Extensión en cuestión no fue aprobada por los dos representantes del interés público que componen la Junta de Directores de la APP, según lo requería la Ley 120. Dicha Carta-Extensión tampoco contó con la emisión de un Certificado de Cumplimiento Energético requerido por dicho estatuto.

21. Así, la Carta-Extensión se ejecutó sin obtener el Certificado de Cumplimiento Energético requerido por la Ley 120 como condición indispensable para otorgar o perfeccionar cualquier modificación a las transacciones de la AEE. Como cuestión del esquema legal aprobado por la Asamblea Legislativa y la Gobernadora, dicho certificado es indispensable para cualquier transacción de la AEE, como lo es -o pretendió ser- la Carta-Extensión. Véase 22 LPRA §1118(a).

22. De igual manera, la Carta-Extensión nunca fue sometida para evaluación y la aprobación por legislación que exige el Artículo 10(e) de la Ley 29. La Carta-Extensión eliminó la terminación automática de dieciocho (18) meses, creó un plazo indefinido y alteró la estructura original de derechos y obligaciones entre las partes. Al tener un

10

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 11 de 26

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 12 of 105

término indefinido, la Carta-Extensión violenta el requisito indispensable dispuesto en la Ley 29 de que toda alianza tenga un término definido y, además, la limitación de que dicho término sea menor de 50 años. Con ello no sólo se incurrió en un acto radicalmente nulo, por ser contrario a la ley y al orden público, sino que las autoridades envueltas excedieron los límites de la autoridad que le fuera delegada por vía de la Ley 29. Además, al disponer un término indefinido, se comprende un término que puede ser mayor de 50 años, lo que a su vez invade las prerrogativas del Gobierno de Puerto Rico. <u>Véase</u> 27 LPRA § 2609(a)(iii) y (e).

23. El que la Carta-Extensión ignore tales límites temporales y, en vez, opte por la indefinición en sí amerita la declaración de su nulidad. Pretender avalar una prolongación indefinida del Supplemental Agreement crea las condiciones para que se exceda el término máximo de cincuenta (50) años previsto en la Ley 29. Las alianzas público privadas, como la que afecta el sistema de transmisión y distribución eléctrica, tienen que estar sujetas a términos fijos y precisos que permitan dar certeza a los gastos y las relaciones jurídicas creadas mediante el esquema previsto en la Ley 29 para la prestación de servicios esenciales para el Gobierno de Puerto Rico. . Exhibit 6.

24. La Carta-Extensión no fue sometida a, ni cuenta con el aval de la Honorable Gobernadora, ni consta tal aval de su predecesor.

25. El 11 de diciembre de 2025, además, la APP y la AEE presentaron un recurso de certificación intrajurisdiccional ante el Tribunal Supremo, actualmente pendiente de expedición, conforme al cual solicitaron que dicho foro, en su función como máximo intérprete judicial en nuestro ordenamiento, dirimiera en primera instancia las controversias planteadas en la *Demanda Jurada*, dado su carácter novedoso y el impacto de las mismas sobre el interés público.

26. El 15 de diciembre de 2025, LUMA presentó una notificación de remoción ante el Tribunal Federal para que éste asumiera jurisdicción sobre el Caso de Nulidad y el mismo fuese atendido como parte incidental al proceso de la AEE bajo el Título III de PROMESA.

11

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 12 de 26

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 13 of 105

27. Acaecido lo anterior, el Caso de Nulidad está actualmente paralizado, a la espera de que el Tribunal Federal tome una determinación sobre el ejercicio de su jurisdicción como parte del proceso que se lleva a cabo bajo el Título III de PROMESA.

28. No obstante, de los hechos anteriormente reseñados se desprende que existe una controversia real y clara entre la APP, la AEE y LUMA respecto a la validez de la Carta-Extensión y la propia continuidad de LUMA como operadora del Sistema. La resolución de esta controversia, además de afectar al interés público, amenaza con trastocar la estabilidad de la operación y el mantenimiento del Sistema.

29. En todo caso, indistintamente de los méritos de las contenciones de las partes involucradas en el Caso de Nulidad, lo cierto es que la pendencia de este crea incertidumbre respecto a la integridad del Sistema, su operación y su mantenimiento. Ello, toda vez que la resolución de las controversias aducidas en el Caso de Nulidad sea por este Honorable Foro o por el Tribunal Federal podría acarrear el final de la gestión de LUMA como operador del Sistema. Esta posibilidad, además de los efectos disruptivos de la litigación en ciernes sobre el Sistema, también pone en entredicho la continuidad e integridad del servicio eléctrico en Puerto Rico. lo que, a su vez, repercutiría sobre la vida, la propiedad y la salud de todos los puertorriqueños.

## V. DERECHO APLICABLE

### A. LEGITIMACIÓN ACTIVA

30. El Gobierno tiene legitimación activa para instar este litigio en virtud de su interés cuasi soberano en el bienestar de la ciudanía, incluyendo la salud, seguridad y bienestar económico. Todo ello queda impactado por la operación del sistema eléctrico por un operador que está ejerciendo funciones en virtud de una extensión nula e ilegal y descansando en la falta de controles y métricas para prestar un servicio oneroso y defectuoso, que pone en riesgo la salud y seguridad, además de perjudicar la economía.

31. No hay duda de que el Gobierno tiene un interés cuasi soberano en la salud y bienestar -tanto físico como económico- de sus residentes. Véase Alfred L. Snapp & Son v. Puerto Rico, 458 US 592, 607 (1982). Ese interés cuasi soberano, su autoridad de *parens patriae*, dota al Gobierno de legitimación activa. Véase *id*., a las págs. 600-609. De ahí que

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 13 de 26

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 14 of 105

se le haya reconocido al Gobierno legitimación activa para litigar acciones en protección y beneficio de los intereses de sus ciudadanos, tanto en virtud de cierta legislación federal como de legislación de Puerto Rico. Véase *id*.; Municipalities of Bayamón v. Exxon Mobil Corp., Informe y Recomendación del Hon. Magistrado Héctor L. Ramos-Vega de 20 de febrero de 2025 en el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico, Civil No. 22-1550, a la pág. 32 (rechazado en otros aspectos por la Hon. Sylvia Carreño-Coll).

32. Además, el Gobierno tiene legitimación activa para defender sus prerrogativas. En particular, la Honorable Gobernadora tiene legitimación activa para vindicar sus prerrogativas constitucionales. Véase Acevedo Vilá v. Aponte Hernández, 168 DPR 443, 453 (2006). La Gobernadora de Puerto Rico tiene la facultad y prerrogativa de "cumplir y hacer cumplir las leyes", así como de "sancionar o desaprobar… los proyectos de ley aprobados por la Asamblea Legislativa". Const. de Puerto Rico, Art. IV, §4. La Honorable Gobernadora busca con este litigio reivindicar ambas prerrogativas, la de hacer cumplir las leyes, en particular, la Ley 29 y la Ley 120 en lo que a transacciones de la AEE respecta, así como la de aprobar o desaprobar leyes, en particular, en cuanto a cualquier potencial término de un contrato de alianza de la AEE con LUMA que pueda exceder 50 años.

33. El Gobierno también tiene legitimación activa para instar esta reclamación puesto que la Carta-Extensión es nula por ser contraria a la ley y al orden público. El Gobierno, como interesado, puede solicitar la declaración de nulidad. Véase Código Civil de 2020, Arts. 341-343, 31 LPRA §§ 6311-6313.

**B. PROCEDENCIA DE LA SENTENCIA DECLARATORIA**

34. La Regla 59 de Procedimiento Civil autoriza a los tribunales a emitir sentencias declaratorias respecto a la validez de contratos escritos y las relaciones jurídicas que de ellos se deriven. El propósito de esta figura procesal es disipar la incertidumbre y estabilizar las relaciones jurídicas, sin necesidad de que medie un daño consumado. La persona que presenta una solicitud de sentencia declaratoria debe tener legitimación activa, como es el caso aquí, por lo que deberá establecer la existencia o inminencia de un daño real y claro. Debe tratarse de una controversia real justiciable que requiera un

13

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 14 de 26

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 15 of 105

pronunciamiento judicial. <u>Véase</u> *Asociación de Guardias Penales v. Sec. de Justicia*, 87 DPR 711 (1963).

35. La sentencia declaratoria es procedente cuando permite finalizar situaciones de incertidumbre en cuanto a derechos. El Tribunal Supremo ha resuelto que "[es] aquella que se dicta en un proceso en el cual los hechos alegados demuestran que existe una controversia sustancial entre partes que tienen intereses legales adversos, sin que medie lesión previa de los mismos con el propósito de disipar la incertidumbre jurídica y contribuir a la paz social". *Suárez v. C.E.E.*, 163 DPR 347, 354 (2004); <u>véase</u>, además, Rafael Hernández Colón, PRÁCTICA JURÍDICA DE PUERTO RICO: DERECHO PROCESAL CIVIL, 5ta ed., cap. 60, pág. 560 (LexisNexis 2010).

36. Se trata de un recurso extraordinario, que "puede ser dictado en todo proceso judicial donde los hechos alegados demuestran que existe una controversia sustancial entre partes que tienen intereses legales adversos". <u>Véase</u> *DACO v. LUMA Energy, LLC et al*, CT-2025-003, Opinión del 1 de diciembre de 2025, a la pág. 36 (comillas internas y citas legales omitidas). La declaración puede ser, en su forma y efectos, afirmativa o negativa, y tendrá la eficacia y vigor de las resoluciones o sentencias definitivas. Esta puede tener una función inmunizadora. <u>Véase</u> Cuevas Segarra, TRATADO DE DERECHO PROCESAL CIVIL vol. V, cap. IX, pág. 1791 (Publicaciones JTS 2010). De hecho, la "declaración de nulidad de un documento es una de las formas más antiguas de sentencia declaratoria." *Llopiz v. Arburua*, 72 DPR 531, 536 (1951).

37. Así pues, puede ser considerada, dilucidada y adjudicada mediante sentencia declaratoria una divergencia en el alcance de una cláusula de un contrato, sin que otros procesos pendientes sean impedimento. <u>Véase</u> *Arecibo Bldg. Corp. v. Tribunal Superior*, 101 DPR 720 (1973). Además, se puede obtener una determinación sobre la validez de un contrato escrito y los derechos, estados y demás relaciones jurídicas que de este se deriven. <u>Véase</u> *Llopiz v. Arburua*, supra, pág. 535.

### C. LEY 29 (LEY DE ALIANZAS PÚBLICO PRIVADAS)

38. La APP es una criatura del Estado, creada en virtud de legislación especial, la Ley 29, para que cumpliera una política pública del Gobierno de Puerto Rico de favorecer y

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 15 de 26

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 16 of 105

promover el establecimiento de alianzas público privadas <u>dentro del margen de los requisitos impuestos en dicha Ley y cualquier otra aplicable.</u>Mediante la Ley 29 se le delegaron ciertas facultades a la APP para escoger, negociar, encarrillar y supervisar las alianzas público privadas, todo ello dentro de las limitaciones y condiciones impuestas en la referida legislación. Entre otras cosas, la Ley 29 circunscribe el ejercicio de la autoridad de la APP a que se tomen decisiones o se hagan acuerdos o se tomen actuaciones a través de su Junta de Directores, cuyo quórum y capacidad decisional se rigen por mayoría simple, salvo disposición expresa en contrario. La actuación de APP como ente contratante -incluyendo su consentimiento a enmiendas contractuales- solo puede perfeccionarse mediante la aprobación de dicha Junta. <u>Véase</u> 27 LPRA §2604.

39. Además, y en lo que a la aprobación de alianzas público privadas concierne, la Ley 29 dispone de un proceso específico para la negociación y eventual selección de proponentes a través de un Comité de Alianza, cuya formación y composición también están reglamentadas en la Ley. Conforme a la Ley 29, una vez el Comité de Alianza selecciona a un proponente para una transacción de alianza público privada, el informe de alianza ("Partnership Report") y el acuerdo resultante deben ser sometidos para aprobación a la Junta de APP y a la junta de gobierno de la entidad gubernamental correspondiente, previo a su aprobación por el Gobernador o Gobernadora (o funcionario en quien ella delegue) y adjudicación final. <u>Véase</u> 27 LPRA §2608(*g*).

40. Por otro lado, en término sustantivos, la Ley 29 dispone ciertas cláusulas que han de ser necesariamente incluidas en un contrato de alianza público privada. <u>Véase </u>27 LPRA § 2609. Por ejemplo, se exige que los contratos contengan el término de duración de la alianza de la que se trate. El mismo no podrá exceder los cincuenta (50) años. <u>Véase </u>27 LPRA § 2609(a)(iii) ("Un Contrato de Alianza otorgado bajo las disposiciones de esta Ley [29] deberá contener, en la medida en que sea aplicable, disposiciones sobre: . . . [e]l término de la Alianza, el cual en caso de concesiones no podrá exceder el término dispuesto en el Artículo 10(e) de esta Ley . . . .".); <u>*id.,*</u> § 2609(e) ("El término de un Contrato de Alianza otorgado bajo esta Ley [29] será aquel que la Autoridad entienda que cumple

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 16 de 26

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 17 of 105

con los mejores intereses del Pueblo de Puerto Rico, pero en ningún caso podrá exceder de cincuenta (50) años.

41. No obstante, dichos Contratos de Alianza podrán extenderse, previa evaluación en sus méritos y resultados de eficiencia y efectividad, por términos sucesivos que en el agregado no excedan de veinticinco (25) años adicionales . . . Dicha extensión tendrá que ser aprobada mediante legislación").

42. Cualquier Contrato de Alianza -o enmienda o extensión al mismo- que contravenga esos términos es un acto contrario a la Ley y que excede la autoridad delegada de la APP.

D. **LEY 120 (LEY PARA TRANSFORMAR EL SISTEMA ELÉCTRICO DE PUERTO RICO)**

43. La Ley 120, que provee el marco legal específico para los contratos de alianza público privada para transformar el sistema energético, dispone categóricamente que prevalecerá sobre cualquier otra ley en caso de inconsistencia. Ello incluye la posibilidad de prevalecer sobre la Ley 29 en caso de inconsistencia.

44. La intención legislativa primordial de la Ley 120 es asegurar un proceso justo y transparente y proteger el interés público en todo momento. A esos efectos, la Ley 120 considera de máxima importancia la transparencia y dispone expresamente que toda alianza público privada debe estar "revestida de un alto interés público", garantizando que el Estado no renuncie a su responsabilidad de proteger dicho interés.

45. La Ley 120 establece un régimen especial para las transacciones relacionadas con la AEE. Así, la Sección 10(b) de dicho estatuto provee un régimen de votación especial para las transacciones de la AEE aprobadas bajo el Artículo 9(g)(iii) de la Ley 29. Conforme a dicha Sección 10(b), la aprobación por la Junta de APP de toda transacción de la AEE aprobada bajo el procedimiento del Artículo 9(g)(iii) de la Ley 29 "requerirá el voto afirmativo de ambos representantes del interés público", estableciendo además que la abstención se contabilizará como voto en contra. Así, la Ley 120 cualifica los requisitos de votación de la Junta de APP en lo que se refiere a la aprobación de alianzas público privadas que involucren a la AEE. Véase 22 LPRA §1120(b).

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 17 de 26

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 18 of 105

46. La Ley 120 requiere, además, que cualquier transacción de la AEE, incluyendo enmiendas a esta cuente con el aval del Negociado, específicamente con un Certificado de Cumplimiento de Energía. "Todo contrato relacionado a una Transacción de la AEE **requerirá** de un Certificado de Cumplimiento de Energía." 22 LPRA § 1115(g) (Art. 5(g) de la Ley 120) (énfasis suplido). El Tribunal Supremo recientemente, al decretar nula cierta inmunidad concedida por el Negociado a LUMA por exceder la autoridad que le fuera delegada y ser contraria al esquema legal para las transacciones de la AEE, repasó el hecho de que el referido Certificado de Cumplimiento de Energía es necesario "para que [una transacción de la AEE] se perfeccione". *DACO v. LUMA Energy, supra,* a la pág. 22.

47. Cualquier transacción de la AEE que se apruebe sin cumplir con los requisitos de la Ley 120 es contraria a derecho, radicalmente nula y *ultra vires*.

## E. NORMAS GENERALES DE CONTRATACIÓN GUBERNAMENTAL

48. La Constitución de Puerto Rico dispone expresamente que "sólo se dispondrá de las propiedades y fondos públicos para fines públicos… y en todo caso por autoridad de ley". Const. de Puerto Rico, Art. VI, § 9.

49. Los contratos que se pagan con fondos públicos, como lo es el caso que nos ocupa, están revestidos del más alto interés público y sujetos "a la aplicación rigurosa de todas las normas pertinentes a la contratación y desembolso de esos fondos". *De Jesús González v. AC,* 148 DPR 255, 268 (1999) (citas omitidas) (énfasis suplido). El fin es "proteger el interés público en los dineros del pueblo y no a las partes contratantes". *Id*.; *Cordero González v. Mun. Guánica,* 170 DPR 237, 249 (2007) (citas omitidas).

50. El ordenamiento sustantivo también es claro: nuestro Código Civil, en su artículo 1232, dispone que los contratos no pueden ser contrarios a la moral, las leyes o el orden público. Cualquier contrato que contravenga estas normas carece de validez jurídica y está sujeto a ser declarado nulo por los tribunales.

51. Así, el Estado está obligado, por imperativo constitucional y estatutario, a cumplir estrictamente con los controles y requisitos que la ley impone para la erogación de fondos

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 19 of 105

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 18 de 26

públicos, y que los contratos que los contravengan son nulos e inexistentes. Véase *Rodríguez Ramos v. E.L.A.*, 190 DPR 448 (2014).

52. De esa normativa se desprende que ni las agencias ni los funcionarios pueden, mediante contratos, órdenes ejecutivas o prácticas administrativas, dejar sin efecto o eludir las salvaguardas legales diseñadas para proteger el interés público. En consecuencia, una carta o enmienda contractual no puede utilizarse válidamente para violentar o exceder las limitaciones de ley, ni despojar al Estado de mecanismos de protección previstos en el marco legal aplicable. La contratación no puede contravenir la política pública y los principios de sana administración de los fondos públicos.

Además, los contratos gubernamentales, como los demás contratos, tienen que ser conformes con la ley, moral y orden público. En el Código Civil de 2020, además, se dispone que cualquier acto jurídico –lo que incluye un contrato — es nulo, y no meramente anulable, "si es contrario a la ley imperativa, la moral o el orden público". 31 LPRA § 6312(d) (Art. 342(d) del Código Civil de 2020).

53. Cuando un acto es nulo, como la Carta-Extensión, su nulidad puede ser solicitada por "cualquier interesado", siempre que no haya "actuado con mala fe para lograr un provecho". 31 LPRA § 6313. Incluso, "debe declararse de oficio por el tribunal si resulta manifiesta" la nulidad, como es el caso de la Carta-Extensión. *Id*. (Art. 343 del Código Civil de 2020).

### F. CAUSAS DE NULIDAD Y REMEDIOS DECLARATORIOS

54. A la luz de los hechos expuestos en la Sección IV y del marco jurídico reseñado en la Sección V, procede que este Honorable Tribunal declare la nulidad de la Carta-Extensión del 30 de noviembre de 2022. Esto, haber sido otorgada sin las aprobaciones requeridas por ley, por alterar ilícitamente una protección esencial al interés público, por ser contraria a las disposiciones sustantivas de la Ley 29 y la Ley 120, por introducir una cláusula potestativa prohibida por el Código Civil y por ser una actuación *ultra vires* que excede la autoridad delegada e invade las prerrogativas del Gobierno y de la Honorable Gobernadora. Veamos.

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 19 de 26
Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 20 of 105

## G. FALTA DE APROBACIÓN VÁLIDA DE LA JUNTA DE APP

55. De la secuencia de hechos reseñada surge que la Carta-Extensión del 30 de noviembre de 2022 constituyó una modificación sustantiva del acuerdo original. Mediante la Carta-Extensión, la AEE, la APP y LUMA alteraron de manera fundamental el diseño contractual previamente acordado al eliminar la terminación automática de dieciocho (18) meses y sustituirla por un período de vigencia indefinido sujeto a condiciones externas, futuras e inciertas, y, entre ellas, al arbitrio de LUMA. Esta modificación implicó una variación significativa en los derechos, obligaciones y mecanismos de protección establecidos originalmente en el Supplemental Agreement y en el propio marco normativo bajo el cual fue aprobado.

56. En virtud de los términos acordados en la Carta-Extensión, tanto la AEE como APP renunciaron de forma nula a la facultad resolutoria originalmente incorporada a la sección 7.1(a) del Supplemental Agreement, sustituyendo de forma ultra vires un término fijo y perentorio de dieciocho (18) meses por un plazo indeterminado dependiente de condiciones ajenas al control del Estado.

57. El breve plazo del Supplemental Agreement y la capacidad para resolverlo al transcurso de un plazo definido y corto era un componente esencial en dicho acuerdo. Según se desprende de la relación de hechos y de los acuerdos, el Supplemental Agreement beneficia a LUMA en perjuicio de las demás partes y del Pueblo, confiriéndole un pago fijo, sin condiciones o métricas de desempeño, sustancialmente mayor que el pago al que tenía derecho al iniciarse el T&D OMA. Esa situación solo era factible si el Supplemental Agreement se sujetaba a un término definido y de muy corta duración, para darle paso al T&D OMA, con sus correspondientes salvaguardas y pagos menores, en poco tiempo.

58. El plazo limitado y breve previsto en el Supplemental Agreement es esencial en vista de la falta de métricas y contrapesos y para proteger al erario público, de conformidad con la sección 9 del Art. VI de la Constitución de Puerto Rico.

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 21 of 105

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 20 de 26

LUMA pretende mantener indefinidamente el Supplemental Agreement, que la beneficia exclusivamente a ella, en perjuicio del Gobierno y el Pueblo de Puerto Rico. Sin embargo, la pretensión de LUMA es insostenible como cuestión de derecho y de justicia sustancial. La modificación introducida mediante la Carta-Extensión conlleva que la extensión no pueda considerarse una gestión menor o accesoria del contrato original. Por el contrario, se alteran elementos esenciales del acuerdo aprobado bajo el Artículo 9(g)(iii) de la Ley 29 -incluyendo su término fijo, su facultad resolutoria y la estructura de equilibrio entre las partes. Así, la Carta-Extensión pasó a constituir una modificación contractual de una transacción de la AEE en el sentido contemplado por la Ley 120.

59. En virtud de la Sección 10(b) de la Ley 120, toda aprobación por la Junta de APP de una transacción de la AEE requiere el voto afirmativo de ambos representantes del interés público, y dispone, además, que la abstención de cualquiera de ellos se computará como voto en contra.

60. Según reflejan las minutas de la Reunión Extraordinaria 2022-17, ambos representantes se abstuvieron de votar. Conforme al texto expreso de la Sección 10(b), dichas abstenciones deben considerarse como votos en contra y, en ausencia de los votos afirmativos requeridos, APP no contaba con la aprobación válida necesaria para autorizar la modificación del Supplemental Agreement.

61. Por consiguiente, tanto la Resolución 2022-60, como la Carta-Extensión, fueron suscritas sin cumplir con el procedimiento exigido por las leyes especiales aplicables, por lo que deben considerarse actos *ultra vires* y nulos y no surtieron efecto alguno en cuanto a la modificación o extensión del Supplemental Agreement.

## G. AUSENCIA DE CERTIFICADO DE CUMPLIMIENTO ENERGÉTICO

62. Las modificaciones sustantivas en la Carta-Extensión desencadenaron la aplicación obligatoria de todos los requisitos estatutarios y regulatorios que la Ley 120 y la Ley 29 imponen para las transacciones energéticas de la AEE. Entre estos requisitos se encuentra la obtención del Certificado de Cumplimiento Energético del Negociado.

63. La Ley 120, en sus Artículos 5(g) y 8(a), exige la otorgación de un Certificado de Cumplimiento Energético como condición indispensable para la aprobación,

20

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 21 de 26
Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 22 of 105

otorgamiento o perfeccionamiento de cualquier transacción de la AEE, así como cualquier modificación a ésta. Así, por ejemplo, el Artículo 5(g) dispone, en parte, que, "[u]na vez emitido el Certificado de Cumplimiento de Energía, cualquier enmienda al Contrato Preliminar requerirá de la emisión de un nuevo Certificado de Cumplimiento de Energía".

64. La emisión de dicho Certificado es un requisito indispensable para la validez de un contrato –o modificación a un contrato- de alianza de la AEE. Así lo dispone la Ley 120 en su Sección 8(a), en donde sujeta la autoridad de la AEE a llevar a cabo transacciones bajo la ley a que se "emita el correspondiente Certificado de Cumplimiento de Energía". Así lo destacó el Tribunal Supremo recientemente, al declarar que "una vez la AAPP ejecuta una transacción de la AEE, es necesario que el NEPR emita un Certificado de Cumplimiento de Energía para que ésta se perfeccione". *DACO v. LUMA Energy, LLC*, *supra*, a la pág. 22 (énfasis suplido).

65. En este caso, dicho certificado nunca fue solicitado ni emitido, y el Negociado no evaluó la extensión propuesta. La ausencia de este requisito obligatorio implica que la Carta-Extensión se formalizó al margen del proceso regulatorio aplicable y carece de validez jurídica.

## H. AUSENCIA DE TÉRMINO DEFINIDO Y APROBACIÓN LEGISLATIVA

66. Además, la Carta-Extensión es nula por incumplir con las disposiciones legales en cuanto a parámetros temporales y los términos de duración máxima de las alianzas público privadas.

67. La Carta-Extensión provee una extensión indefinida, por lo que es contraria a la Ley 29. Dicha ley, en su artículo 10(e), requiere que los contratos de alianza tengan un término definido, que tiene que ser de menos de 50 años. Véase 27 LPRA § 2609(e) ("El término de un Contrato de Alianza otorgado bajo esta Ley será aquel que la Autoridad entienda que cumple con los mejores intereses del Pueblo de Puerto Rico, pero en ningún caso podrá exceder de cincuenta (50) años"). Al no exponer un término fijo, la APP incumplió con esta disposición y excedió la autoridad que le fuera delegada en la Ley 29. Por tanto, la Carta-Extensión es nula.

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 22 de 26
Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 23 of 105

68. Además, y en tanto la extensión es indefinida y comprende un periodo potencial de más de cincuenta (50) años, la extensión es nula por otra razón. No es producto de una evaluación de los méritos y resultados de LUMA, ni cuenta con el aval por legislación que exige la Ley 29 para las extensiones a contratos por encima del término inicial de la alianza, que en ningún caso podrá exceder cincuenta (50) años. Véase 27 LPRA § 2609(e) ("No obstante, dichos Contratos de Alianza podrán extenderse, previa evaluación de sus méritos y resultados de eficiencia y efectividad, por términos sucesivos que en el agregado no excedan de … 25 años adicionales… Dicha extensión tendrá que ser aprobada mediante legislación".).

69. No existe una evaluación de los méritos y resultados de eficiencia y efectividad de LUMA que justificara extender el término conforme a la Ley 29. Tampoco se aprobó legislación para aprobar una extensión que implica un término indefinido y, por tanto, que puede abarcar más de 50 años. La Carta Extensión es nula por ser contraria a -y un ejercicio en exceso de las facultades delegadas en- la Ley 29.

70. La pretensión de extender el Supplemental Agreement –con términos económicos más onerosos y sin la misma protección de métricas que confiere el T&D OMA– sin término fijo, en un plazo indefinido que como tal puede abarcar un término mayor del que la legislación permite, es una actuación *ultra vires* e invade las prerrogativas del Gobierno, en particular de la Honorable Gobernadora.

71. El Tribunal Supremo, tan reciente como el 1 de diciembre de 2025, invalidó otra disposición relativa a la contratación con LUMA precisamente por haber excedido la autoridad delegada en el esquema legislativo aplicable a las transacciones de la AEE, así como violentar la separación de poderes al atribuirse la agencia (en ese caso, el Negociado) facultades que no le corresponden, sino que sólo pueden ser ejercidas por vía de legislación. Véase *DACO v. LUMA Energy, LLC, supra.* Al igual que con la concesión de inmunidad que resultó invalidada en el reciente caso de *DACO v. LUMA Energy*, LLC, la facultad de conceder un término que pueda abarcar más de 50 años es una que excede la delegación a APP y que sólo puede ser ejercida por vía de legislación. De ahí que, al

22

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 23 de 26

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 24 of 105

igual que en el citado caso, proceda decretar la nulidad de la actuación impugnada, la Carta-Extensión.

## I. INCUMPLIMIENTO CON DISPOSICIONES DEL CÓDIGO CIVIL

72. En tanto la Carta-Extensión es incompatible con y contraria a la legislación especial que faculta para entrar y modificar alianzas público privadas, está claro que se trata de una actuación nula.

73. El Gobierno es parte interesada, que no participó de mala fe, y solicita una declaración de nulidad a esos efectos.

74. Además, la Carta-Extensión eliminó la facultad resolutoria automática contenida en la Sección 7.1(a) del Supplemental Agreement, que protegía al interés público de un período interino ilimitado, y la sustituyó por un término indefinido sujeto a la ocurrencia de condiciones externas: la culminación del caso de Título III y la aceptación de un plan de ajuste que fuese "reasonably acceptable to Operator [LUMA]".

75. Esa modificación benefició exclusivamente a LUMA, pues le garantizó un control indefinido del sistema y le eliminó la cláusula resolutoria, sin que APP o la AEE recibieran contraprestación adicional alguna. La nulidad es tanto más evidente porque se comprometieron fondos públicos mediante el proceder impropio.

76. Esta renuncia al derecho de resolución sin que la AEE ni APP recibieran contraprestación alguna constituye un negocio jurídico sin causa lícita, en contravención de los principios del Código Civil aplicables a los contratos y de las limitaciones que rigen la contratación gubernamental. Bajo el Código Civil, un negocio jurídico que supone la renuncia de un derecho esencial de una parte sin causa ni beneficio correlativo carece de causa lícita y es nulo. Véase Art. 270, 275, 276 y 342 del Código Civil, 31 L.P.R.A. §§ 6141, 6146, 6147 y 6312.

77. La Carta-Extensión también condicionó la efectividad del T&D OMA a que el plan de ajuste de la AEE fuese "reasonably acceptable to Operator." Este lenguaje confiere a LUMA la facultad exclusiva de decidir si el contrato continúa o no y si el T&D OMA habrá de entrar en vigor, según su propio criterio subjetivo. Dicho de otra forma, el

23

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 24 de 26

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 25 of 105

lenguaje citado condiciona la satisfacción de la condición cuyo cumplimento sería necesario para la entrada en vigor del T&D OMA al mero arbitrio y la potestad de LUMA.

78. El Artículo 304 del Código Civil prohíbe las obligaciones y las condiciones suspensivas puramente potestativas, es decir, aquellas que dependen únicamente de la voluntad del deudor. Véase 31 LPRA § 6242. Igualmente, nuestro ordenamiento no avala que, al tratarse de condiciones suspensivas que, valga la redundancia, condicionan la entrada en vigor y eficacia de una obligación (el T&D OMA, en este caso), el cumplimiento de la obligación dependa única y exclusivamente de la voluntad y potestad de una de las partes sujeta a tal condición (en este caso, LUMA).

79. La jurisprudencia del Tribunal Supremo en *Jarra Corp. v. Axxis Corp.*, 155 DPR 764 (2001), reiteró que una persona no puede quedar obligada cuando la obligación depende de que, a su arbitrio, decida si desea estar obligada. En este caso, Puerto Rico quedó vinculado a un contrato donde LUMA, como operador, retuvo el poder de desentenderse de la relación contractual a su conveniencia y de sujetar, a su arbitrio y exclusiva potestad, la entrada en vigor del T&D OMA. Por consiguiente, la cláusula que pretendió extender el Supplemental Agreement indefinidamente es nula de pleno derecho y ello, a su vez, contamina la validez de la Carta-Extensión en su totalidad.

80. En consideración de los hechos y los argumentos discutidos, respetuosamente se solicita que este Honorable dicte sentencia declaratoria. En específico, se solicita que se declare que la Carta-Extensión de fecha 30 de noviembre de 2022 es nula, inválida y carente de efecto jurídico. Además, que decrete que como consecuencia de la nulidad de la Carta-Extensión, continúa vigente la disposición original del Supplemental Agreement, Sección 7.1(a), la cual disponía la terminación automática de dicho acuerdo y del OMA a los dieciocho (18) meses, esto es, el 30 de noviembre de 2022, si no ocurría la fecha de comienzo de servicio. Por tanto, conforme al mecanismo de terminación automática del Supplemental Agreement, tanto el Supplemental Agreement como el T&D OMA quedaron resueltos de pleno al expirar el periodo interino de dieciocho (18) meses, al no cumplirse las condiciones allí dispuestas, ni haberse acordado una extensión válida. Y que, se acuerdo con lo dispuesto en el T&D OMA, en su Artículo 16, LUMA

24

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 25 de 26

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 26 of 105

mantiene la obligación de colaborar en el proceso de transición ordenado, incluyendo la entrega de datos operacionales, expedientes, sistemas de clientes y coordinación de personal, aun en el escenario de terminación automática.

## VI. SÚPLICA

**POR TODO LO CUAL**, respetuosamente, se solicita de este Honorable Tribunal que, en protección del interés público y del ordenamiento jurídico del Gobierno de Puerto Rico, dicte sentencia declaratoria a su favor. En específico, se solicita que se declare que:

a. La Carta-Extensión de fecha 30 de noviembre de 2022 es nula, inválida y carente de efecto jurídico.

b. Como consecuencia de la nulidad de la Carta-Extensión, continúa vigente la disposición original del Supplemental Agreement, Sección 7.1(a), la cual disponía la terminación automática de dicho acuerdo y del OMA a los dieciocho (18) meses, esto es, el 30 de noviembre de 2022, si no ocurría la fecha de comienzo de servicio.

c. Conforme al mecanismo de terminación automática del Supplemental Agreement, tanto el Supplemental Agreement como el T&D OMA quedaron resueltos de pleno al expirar el periodo interino de dieciocho (18) meses, al no cumplirse las condiciones allí dispuestas, ni haberse acordado una extensión válida.

d. De acuerdo con lo dispuesto en el T&D OMA, en su Artículo 16, LUMA mantiene la obligación de colaborar en el proceso de transición ordenado, incluyendo la entrega de datos operacionales, expedientes, sistemas de clientes y coordinación de personal, aun en el escenario de terminación automática.

e. A tenor con las alegaciones que anteceden, y para asegurar la transición ordenada del sistema eléctrico, esencial para la salud, seguridad y estabilidad pública, este Honorable ordene cualquier otro remedio adicional que estime justo y equitativo para proteger el interés público, incluyendo medidas para garantizar una transición ordenada y transparente de la operación del sistema de transmisión y distribución eléctrico de Puerto Rico.

**RESPETUOSAMENTE PRESENTADA**.

En San Juan, Puerto Rico el 16 de diciembre de 2025.

**LOURDES L. GÓMEZ TORRES**
Secretaria de Justicia

*f/ Tania L. Fernández Medero*
**TANIA L. FERNÁNDEZ MEDERO**
Secretaria Auxiliar de lo Civil
RÚA 16013
tfernandez@justicia.pr.gov

*f/Samuel Wiscovitch Corali*
**SAMUEL WISCOVITCH CORALI**
Subsecretario Auxiliar de lo Civil
RÚA 12070
samuel.wiscovitch@justicia.pr.gov

*f/Lorna M. Rivera Franco*
**LORNA M. RIVERA FRANCO**
RÚA 21237
Directora
División de Recursos Extraordinarios,
Política Pública y Ambiental

*f/Wilda Irizarry Toro*
**WILDA IRIZARRY TORO**
RÚA 21366
wilda.irizarry@justicia.pr.gov

*f/Devin E. Santana Torres*
**DEVIN E. SANTANA TORRES**
RÚA 23734
devin.santana@justicia.pr.gov

Departamento de Justicia
Secretaría Auxiliar de lo Civil
División de Recursos Extraordinarios,
Política Pública y Ambiental
Apartado 9020192
San Juan, Puerto Rico 00902-0192
787-721-2900 Exts. 1401, 1404, 1407

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 28 of 105

*Execution Version*

CONFIDENTIAL

## PUERTO RICO TRANSMISSION AND DISTRIBUTION SYSTEM
## SUPPLEMENTAL TERMS AGREEMENT

This PUERTO RICO TRANSMISSION AND DISTRIBUTION SYSTEM SUPPLEMENTAL TERMS AGREEMENT (this "Supplemental Agreement") is made and entered into as of this 22nd day of June, 2020 by and among: (i) the Puerto Rico Electric Power Authority ("Owner"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by Act No. 83 of the Legislative Assembly of Puerto Rico, enacted on May 2, 1941; (ii) the Puerto Rico Public-Private Partnerships Authority ("Administrator"), a public corporation of the Commonwealth of Puerto Rico, created by Act No. 29 of the Legislative Assembly of Puerto Rico, enacted on June 8, 2009; (iii) LUMA Energy, LLC ("ManagementCo"), a limited liability company organized under the laws of Puerto Rico; and (iv) LUMA Energy ServCo, LLC ("ServCo" and, together with ManagementCo, "Operator" and, together with Owner, Administrator and ManagementCo, the "Parties" and each a "Party"), a limited liability company organized under the laws of Puerto Rico. Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in Article 1 (*Definitions; Interpretation*), and any such capitalized terms used herein but not defined herein shall have the respective meanings ascribed to them in the O&M Agreement, as the same may be amended or supplemented by this Supplemental Agreement.

## RECITALS

**WHEREAS**, the Parties are party to that certain Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement, dated as of the date hereof (as amended, supplemented or restated from time to time in accordance with its terms, the "O&M Agreement");

**WHEREAS**, the Parties have agreed to enter into this Supplemental Agreement, which shall be applicable to the Parties only upon the Supplemental Agreement Effective Date and for the duration of the Interim Period, including through the date of any termination of the O&M Agreement during the Interim Period pursuant to the terms of this Supplemental Agreement;

**WHEREAS**, all conditions to the Effective Date of the O&M Agreement have been satisfied as of the date hereof; and

**WHEREAS**, the Parties' execution, delivery and performance of this Supplemental Agreement have been authorized and/or approved by all Governmental Bodies required to have authorized and/or approved the Parties' execution, delivery and performance of the O&M Agreement as a condition to the Effective Date, including by the FOMB.

**NOW THEREFORE**, in consideration of the mutual covenants, representations, warranties and agreements contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties covenant and agree as follows:

CONFIDENTIAL

# ARTICLE 1
## DEFINITIONS; INTERPRETATION

**Section 1.1 Definitions**. As used in this Supplemental Agreement, the following capitalized terms have the respective meanings set forth below.

"Administrator" has the meaning set forth in the introductory paragraph.

"Interim Costs and Expenses" has the meaning set forth in Section 3.4 (*Operator's Title III Costs and Expenses*).

"Interim Period" has the meaning set forth in Section 2.4 (*Term*).

"Interim Period Service Commencement Date" has the meaning set forth in Section 2.3 (*Interim Period Service Commencement Date*).

"Interim Period Service Fee" has the meaning set forth in Section 3.3 (*Operator's Compensation*).

"Interim Period Services" has the meaning set forth in Section 3.1 (*Operator's Services During Interim Period*).

"Interim Period Termination Date" has the meaning set forth in Section 7.1(a) (*Additional Termination Events – Interim Period Termination Date*).

"ManagementCo" has the meaning set forth in the introductory paragraph.

"O&M Agreement" has the meaning set forth in the Recitals.

"Operator" has the meaning set forth in the introductory paragraph.

"Owner" has the meaning set forth in the introductory paragraph.

"Party" has the meaning set forth in the introductory paragraph.

"ServCo" has the meaning set forth in the introductory paragraph.

"Service Fee" has the meaning set forth in Section 3.3 (*Operator's Compensation*).

"Supplemental Agreement" has the meaning set forth in the introductory paragraph.

"Supplemental Agreement Effective Date" has the meaning set forth in Section 2.2 (*Effectiveness*).

"Supplemental Agreement Reliance Letter" means a letter from tax counsel, substantially in the form set forth in Exhibit B hereto (*Form of Supplemental Agreement Reliance Letter*) that shall accompany a Supplemental Agreement Tax Opinion and shall permit Operator to rely on such Supplemental Agreement Tax Opinion.

2

CONFIDENTIAL

"Supplemental Agreement Tax Opinion" means an opinion, substantially in the form set forth in Exhibit A hereto (*Form of Supplemental Agreement Tax Opinion*), of Nixon Peabody LLP as counsel to the FOMB or other tax counsel reasonably acceptable to Administrator, rendered in connection with this Supplemental Agreement and providing that neither this Supplemental Agreement nor any provision hereof, nor the O&M Agreement nor any provision thereof, nor the performance by each Party of its obligations hereunder and thereunder during the Interim Period (including Operator's administration of the System Contracts), adversely affects the exclusion from gross income of interest on obligations of Owner, its Affiliates or another Governmental Body for federal income tax purposes under the Internal Revenue Code.

**Section 1.2    Interpretation; Construction**. Section 1.2 (*Interpretation; Construction*) of the O&M Agreement is incorporated herein by reference, *mutatis mutandis*.

## ARTICLE 2
## EFFECT OF AGREEMENT; EFFECTIVENESS; TERM

**Section 2.1    Effect of this Supplemental Agreement**. This Supplemental Agreement constitutes an integral part of the O&M Agreement. On and after the Supplemental Agreement Effective Date, each reference in the O&M Agreement to "this Agreement," "hereunder," "hereof" or "herein" shall mean and be a reference to the O&M Agreement, as supplemented and amended by this Supplemental Agreement, unless the context otherwise requires. The Parties hereby agree that this Supplemental Agreement constitutes an amendment to the O&M Agreement and constitutes and shall be deemed a Transaction Document. The O&M Agreement, except as supplemented and amended by this Supplemental Agreement, is in full force and effect and is in all respects hereby ratified and confirmed. In the event of any conflict during the Interim Period between a provision of the O&M Agreement and a provision of this Supplemental Agreement, the provisions of this Supplemental Agreement shall control.

**Section 2.2    Supplemental Agreement Effective Date; Agreement Regarding Service Commencement Date**. This Supplemental Agreement shall automatically become effective, without further action by the Parties, on the date on which all Service Commencement Date Conditions shall have been satisfied or waived in accordance with the requirements of the O&M Agreement, except that the Title III Exit shall have not yet occurred and the Tax Opinion and Reliance Letter required by Section 4.5(v) (*Conditions Precedent to Service Commencement Date – Tax Opinion*) of the O&M Agreement shall have not yet been delivered (such date, if it occurs, the "Supplemental Agreement Effective Date"). If the Supplemental Agreement Effective Date does not occur, this Supplemental Agreement shall not become effective and shall be deemed void *ab initio* and terminated automatically without any further action by the Parties. Upon the occurrence of the Supplemental Agreement Effective Date, notwithstanding anything to the contrary in the O&M Agreement, the Parties agree that the Service Commencement Date shall not be deemed to have occurred and that this Supplemental Agreement shall govern the process for determining whether the Service Commencement Date has occurred.

**Section 2.3    Interim Period Service Commencement Date**. The "Interim Period Service Commencement Date" shall be the first (1st) Business Day of a calendar month that is at least three (3) Business Days following the date on which the Administrator delivers a certificate

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 4 de 24

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 31 of 105

CONFIDENTIAL

to Operator confirming that the following conditions have been met to the satisfaction of each of Operator and Administrator:

(a)     the O&M Agreement shall remain in full force and effect, subject to this Supplemental Agreement;

(b)     the Title III Court shall have entered, on a final and non-appealable basis, an order or orders (i) to the extent required by Applicable Law, authorizing Owner's entry into and performance of this Supplemental Agreement, and (ii) granting administrative expense treatment for any amounts required to be paid by Owner under this Supplemental Agreement and the O&M Agreement during the Interim Period, and in the case of each of (i) and (ii), such approvals and orders shall be reasonably acceptable to Operator;

(c)     a number of Owner Employees and Other Employees necessary for Operator to perform the Interim Period Services shall have accepted offers to commence employment as ServCo Employees beginning on the Interim Period Service Commencement Date and, without limiting the generality of the foregoing, Owner shall have provided communications to all Owner Employees regarding Owner's pension obligations going forward reasonably acceptable to Owner and Operator;

(d)     Owner shall have provided Operator with written notice of the System Contracts and Generation Supply Contracts that have been assumed and those that have been rejected as at the Interim Period Service Commencement Date;

(e)     all Service Accounts shall have been established, and all Service Accounts other than the Contingency Reserve Account shall have been funded, in each case as required by Section 4.7 (*Establishment and Funding of Service Accounts*);

(f)     Owner shall have received a Supplemental Agreement Tax Opinion and ManagementCo shall have received a Supplemental Agreement Reliance Letter, at the expense of Owner or Administrator; and

(g)     all Service Commencement Date Conditions, other than delivery of the Tax Opinion and Reliance Letter required by Section 4.5(v) (*Conditions Precedent to Service Commencement Date – Tax Opinion*) of the O&M Agreement, shall have been satisfied after giving effect to the amendments to the O&M Agreement set forth herein.

**Section 2.4     Term**. This Supplemental Agreement shall be in effect from the Supplemental Agreement Effective Date through the earlier of (a) the Service Commencement Date and (b) the Interim Period Termination Date (such period of time, the "Interim Period"), unless earlier terminated in accordance with the terms hereof. Notwithstanding anything to the contrary herein or in the Transaction Documents, the occurrence of the Interim Period shall not in any way reduce or be applied against the Initial Term.

CONFIDENTIAL

# ARTICLE 3
## INTERIM PERIOD SERVICES; COMPENSATION; COSTS AND EXPENSES

**Section 3.1    Operator's Services During Interim Period**. Commencing on the Interim Period Service Commencement Date and for the duration of the Interim Period thereafter, subject to the terms and conditions of this Supplemental Agreement and for the compensation described herein, Operator shall perform all services with respect to the T&D System constituting O&M Services under the O&M Agreement (the "Interim Period Services"), notwithstanding the fact that the Service Commencement Date has not yet occurred. Operator shall perform the Interim Period Services subject to the terms and conditions of the O&M Agreement, except as the same may be amended or supplemented by this Supplemental Agreement. For purposes of the foregoing sentence, each term and condition with respect to the O&M Services referring to "during each Contract Year," "after the Service Commencement Date" or any similar term, shall be read to refer to the Interim Period and Interim Period Service Commencement Date, as applicable, with respect to the Interim Period Services.

**Section 3.2    System Contracts and Generation Supply Contracts**. During the Interim Period, Sections 4.3(d) (*Owner and Administrator Responsibilities – Additional System Contracts and Generation Supply Contracts*) and 4.3(e) (*Owner and Administrator Responsibilities – Notices with respect to System Contracts and Generation Supply Contracts*) of the O&M Agreement shall continue to apply to System Contracts and Generation Supply Contracts that have not yet been assumed or rejected in the Title III Case.

**Section 3.3    Operator's Compensation**. In addition to Owner's funding or payment of T&D Pass-Through Expenditures, Generation Pass-Through Expenditures, Capital Improvements, Outage Event Costs and any other amounts that become due and owing to Operator hereunder and under the O&M Agreement (other than the Service Fee, as defined in the O&M Agreement), as compensation for Operator's performance of the Interim Period Services, and solely for the duration of the Interim Period, Owner shall pay ManagementCo an annual fixed management service fee  equal to One Hundred Fifteen Million Dollars (US$115,000,000.00) in 2020 Dollars, such amount to be adjusted for inflation in the manner set forth in Annex VIII (Service Fee) to the O&M Agreement on the Interim Period Service Commencement Date and each twelve (12) month anniversary of the Interim Period Service Commencement Date thereafter (such fee, as adjusted, the "Interim Period Service Fee").  The Interim Period Service Fee shall be invoiced and paid on the same terms as the Fixed Fee as set forth in the O&M Agreement, provided that notwithstanding anything to the contrary in the O&M Agreement, the Interim Period Service Fee shall be paid in monthly installments, each due and payable by Owner monthly in advance on the first Business Day of each month following the month in which Operator has submitted an invoice pursuant to Section 7.1(b)(iii) (*Service Fee – Fixed Fee*) of the O&M Agreement, which invoice shall specify the monthly portion of the Interim Period Service Fee for the next succeeding month.

**Section 3.4    Operator's Title III Costs and Expenses**. Without limitation or duplication of Owner's indemnification obligation in Section 18.2(a)(ix) (*Indemnification by Owner – Generally*) of the O&M Agreement, during the Interim Period, all of the following (without duplication) shall be considered T&D Pass-Through Expenditures and shall be deemed administrative expenses of Owner: all costs and expenses, including Fees-and-Costs, arising from, related to or in connection with any participation by Operator in, or any other action taken by

5

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 6 de 24

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 33 of 105

CONFIDENTIAL

Operator in connection with, PROMESA, the Title III Case or any other Legal Proceeding related thereto ("Interim Costs and Expenses"). Notwithstanding anything to the contrary herein or in the O&M Agreement, (a) Operator's inclusion in any applicable Operating Budget of any line item related to the Interim Costs and Expenses shall not be held against Operator for purposes of determining whether an Operator Event of Default has occurred, (b) any Interim Costs and Expenses in excess of the applicable Operating Budget line item shall not be counted against any limitation on Excess Expenditures and (c) all Interim Costs and Expenses shall be deemed to be included in the applicable Operating Budget regardless of whether such Interim Costs and Expenses are delineated in such Operating Budget.

Section 3.5    Administrative Expense Treatment. All amounts payable by Owner to Operator hereunder and under the O&M Agreement during the Interim Period shall be deemed to be administrative expenses of Owner.

Section 3.6    Contract Principles. Each of the Parties hereby agrees, during the Interim Period, to uphold the principles of good faith and fair dealing in performing their obligations throughout the term of and under this Supplemental Agreement, and that any dispute with respect to the interpretation of this Supplemental Agreement or the O&M Agreement shall be determined consistent with the foregoing.

## ARTICLE 4
## ADJUSTMENTS TO O&M AGREEMENT

Section 4.1    Effect of Amendments and Modifications. Any amendments or supplements to the O&M Agreement made herein shall be effective only during the Interim Period, provided that such amendments or supplements shall survive if the O&M Agreement is terminated during the Interim Period pursuant to the terms of this Supplemental Agreement.

Section 4.2    Defined Terms. Section 1.1 (Definitions) of the O&M Agreement is amended by making the changes below.

(a)    Additional Defined Terms. The following defined terms are added to Section 1.1 (Definitions) of the O&M Agreement in the appropriate alphabetical order:

"Interim Costs and Expenses" has the meaning set forth in the Supplemental Agreement.

"Interim Period" has the meaning set forth in the Supplemental Agreement.

"Interim Period Service Commencement Date" has the meaning set forth in the Supplemental Agreement.

"Interim Period Service Fee" has the meaning set forth in the Supplemental Agreement.

"Material Adverse Effect" means a material adverse effect on (i) the ability of Operator or Owner, as applicable, to perform its obligations under the Supplemental Agreement and/or this Agreement or (ii) the rights of

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 7 de 24

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 34 of 105

CONFIDENTIAL

Operator or Owner, as applicable, under the Supplemental Agreement and/or this Agreement.

"Postpetition Financing" means any financing facility entered into by Owner during the administration of the Title III Case pursuant to section 364 of the Bankruptcy Code, provided that any Liens or priority payment terms granted under such facility under section 364(c) or (d) of the Bankruptcy Code shall be subject and subordinate to any amounts required to be paid by Owner under this Agreement.

"Supplemental Agreement" means that certain Supplemental Terms Agreement among the Parties, dated as of the Effective Date.

(b)     Change in Law. The definition of "Change in Law" is amended by:

(i)     adding the following text as a new clause (iv):

"any event or circumstance, or order or judgment of any Governmental Body, requiring Operator or any Operator Related Parties to become a party to any Legal Proceeding related to the Title III Case or if Operator commences or becomes a party to any action or contested matter in the Title III Case in order to protect its rights under the Supplemental Agreement."; and

(ii)     inserting the following text immediately preceding the period at the end of the proviso:

", except where arising out of the Title III Case".

(c)     Force Majeure Event. The definition of "Force Majeure Event" is amended by:

(i)     deleting and restating the text of clause (I) as follows:

"strikes, boycotts, work stoppages, lockouts or other labor or employment disputes or disturbances with respect to the employees of ServCo occurring during the Interim Period; and"

(ii)     deleting the text "increases in wage rates of Operator's employees and Subcontractors, insurance costs," in clause (2);

(iii)     adding the word "and" to the end of clause (8);

(iv)     deleting the text "; and" at the end of clause (9) and replacing it with "."; and

(v)     deleting clause (10).

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 8 de 24

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc: Exhibit 3 complaint with exhibits Page 35 of 105

CONFIDENTIAL

(d) Operator Termination Fee. The definition of "Operator Termination Fee" is amended by adding the following text immediately preceding the period at the end of such definition:

"provided, that during the Interim Period, the Operator Termination Fee shall equal the Interim Period Service Fee".

(e) Permitted Liens. The definition of "Permitted Liens" is amended by deleting and restating the text thereof as follows:

""Permitted Liens" means (i) Liens arising by operation of law that are either contested in good faith and for which Operator or any Subcontractor has established adequate reserves or that are discharged promptly, (ii) Liens existing as of the Effective Date, if any, (iii) Liens that result from any act or omission by any Owner Related Party, Administrator or any other Governmental Body, (iv) purchase money Liens or similar Liens securing rental payments under capital lease arrangements, (v) Liens to secure Postpetition Financing, and (vi) Liens on System Revenues specified in or permitted under any Title III Plan and its related implementing documents, provided that in the case of each of clauses (v) and (vi), such Permitted Liens would not reasonably be expected to have a Material Adverse Effect on the rights of Operator hereunder or the ability of Owner or Operator to perform their respective obligations under this Agreement.".

(f) Service Fee. The definition of "Service Fee" is amended by adding the following text immediately preceding the period at the end of such definition:

"provided, that during the Interim Period, no Service Fee shall be payable hereunder and, in lieu thereof, the Interim Period Service Fee shall be payable, subject to the terms and conditions of the Supplemental Agreement.

(g) Transaction Documents. The definition of "Transaction Documents" is amended by adding the following text after the words "means this Agreement,":

"the Supplemental Agreement,".

**Section 4.3 Ownership of System Revenues**. Section 3.2 (*Engagement of Operator*) of the O&M Agreement is amended by deleting the text reading "(subject only to Liens on System Revenues specified in the Title III Plan and the related disclosure statement)" and replacing it with the following text:

"(subject only to Permitted Liens)".

**Section 4.4 Tax Assurance**. Section 4.5(t) (*Conditions Precedent to Service Commencement Date - Tax Matters*) of the O&M Agreement is amended by adding the following text after the words "the Service Fee" in each of clauses (i) and (ii):

8

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 9 de 24

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 36 of 105

CONFIDENTIAL

"(including the Interim Period Service Fee)".

**Section 4.5    Front-End Transition Service Fixed Fee**. Section 4.6(b) (*Front-End Transition Period Compensation - Front-End Transition Service Fee*) is amended by deleting the text "Service Commencement Date" in the two places where it appears in clause (iii)(B) and replacing it with the following text:

"Interim Period Service Commencement Date".

**Section 4.6    Collection of Charges**. Section 5.3(b) (*Billing and Collection – Collection of Charges*) of the O&M Agreement is amended by deleting the text reading "(subject only to Liens on System Revenues specified in the Title III Plan and the related disclosure statement)" and replacing it with the following text:

"(subject only to Permitted Liens)".

**Section 4.7    Establishment and Funding of Service Accounts**.

(a)    <u>Contingency Reserve Account</u>.  Notwithstanding anything to the contrary in the O&M Agreement, Owner shall (i) establish the Contingency Reserve Account not less than ten (10) Business Days prior to the Interim Period Service Commencement Date, (ii) no later than the tenth (10th) Business Day of each month during the Interim Period (beginning in the month in which the Interim Period Service Commencement Date occurs) Owner shall fund the Contingency Reserve Account in an amount equal to 1/24 of the Contingency Reserve Amount, (iii) following any withdrawal from the Contingency Reserve Account during the Interim Period, Owner shall replenish the Contingency Reserve Account by depositing no later than the tenth (10th) Business Day of each month (beginning in the month following that in which the withdrawal occurred) the amount withdrawn, which shall be in addition to the funding required by the preceding clause (ii), and (iv) the failure to fund and replenish the Contingency Reserve Account as required by this Section shall constitute an Owner Event of Default. For the avoidance of doubt, except as amended by this Section, the provisions of Section 7.5(f) (*Service Accounts - Contingency Reserve Account*) of the O&M Agreement continue to apply.

(b)    <u>All Other Service Accounts</u>. Notwithstanding anything to the contrary in the O&M Agreement, Owner shall establish each Service Account other than the Contingency Reserve Account, and shall fund each such Service Account other than the Contingency Reserve Account, in the full amount required by the O&M Agreement to be in place as of the Service Commencement Date, in each case not less than ten (10) Business Days prior to the Interim Period Service Commencement Date.

**Section 4.8    Owner Event of Default**. Section 14.3(c) (*Events of Default by Owner – Failure to Perform a Material Obligation*) of the O&M Agreement is amended by deleting the text reading "including the obligation to keep System Revenues free and clear of Liens other than Liens specified in the Title III Plan and the related disclosure statement" and replacing it with the following text:

"including the obligation to keep System Revenues free and clear of Liens other than Permitted Liens".

9

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 10 de 24

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 37 of 105

CONFIDENTIAL

**Section 4.9** **Back-End Transition Services**.

(a) <u>Specific Amendments to O&M Agreement</u>.

(i) In Section 14.6(b) (*Remedies Upon Early Termination – Back-End Transition Service Fee*) of the O&M Agreement, prior to the words "Section 14.2", the following words are inserted: "the Supplemental Agreement,".

(ii) In Section 16.1 (*Successor Operator*) of the O&M Agreement: (A) the words "Interim Period" should be added before the words "Service Commencement Date" in two places; and (B) after the words "Article 14 (*Events of Default; Remedies*)" in clause (i) thereof, the following words are inserted: ", or Administrator's receipt of a termination notice from Operator under the Supplemental Agreement (or upon the automatic termination of this Agreement pursuant to the terms of the Supplemental Agreement),".

(b) <u>Back-End Transition Period Compensation</u>. If the Back-End Transition Commencement Date occurs as a result of the termination of the O&M Agreement pursuant to this Supplemental Agreement, then notwithstanding anything to the contrary in the O&M Agreement, Operator shall invoice Owner on or prior to the tenth (10th) day of each month for both (i) the prior calendar month's or months' Back-End Transition Services and the corresponding Back-End Transition Service Fee, as applicable, to the extent not previously paid, and (ii) the next succeeding month's anticipated Back-End Transition Services and the corresponding Back-End Transition Service Fee. Owner shall pay the Back-End Transition Service Fee monthly in advance on the first Business Day of each calendar month, subject to deduction by the amount of any overage in the Back-End Transition Service Fee paid by Owner in the previous month. The Back-End Transition Service Fee shall be prorated for any partial monthly period during the Back-End Transition Period.

**Section 4.10** **Indemnification**. Section 18.2(a) (*Indemnification by Owner – Generally*) of the O&M Agreement is amended to delete the word "or" immediately preceding clause (viii), and to insert the following text immediately preceding the period at the end of such section:

"; or (ix) all claims brought against Operator after the Interim Period Service Commencement Date by any creditor or other Person (A) in connection with or related to the Title III Case or (B) in connection with or arising out of the negotiation and execution of the Supplemental Agreement.".

**Section 4.11** **Representations and Warranties of Owner**. Section 19.1(h) (*Charges*) of the O&M Agreement is amended by deleting the text reading "other than those specified in or permitted under any Title III Plan and its related implementing documents" and replacing it with the following text:

"other than Permitted Liens".

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 11 de 24

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc: Exhibit 3 complaint with exhibits Page 38 of 105

CONFIDENTIAL

# ARTICLE 5
## RESPONSIBILITIES OF OWNER AND ADMINISTRATOR

**Section 5.1 Responsibilities of Owner and Administrator**. In addition to and not in limitation of their respective responsibilities set forth in the O&M Agreement, each of Owner and Administrator, as applicable, shall (a) exercise all reasonable efforts to cause the Title III Exit to occur as promptly as possible after the Supplemental Agreement Effective Date, (b) keep Operator informed with respect to the Title III Case, (c) provide Operator with copies of all of Owner's financial statements and reports concurrently with its provision of same to the Title III Court or any creditors, (d) agree to Operator's assertion of standing and appearance in the Title III Case and (e) allow Operator to speak on behalf of Owner with respect to the Interim Period Services. Neither Owner nor Administrator shall take any steps to appoint Operator or any Affiliate of Operator as a receiver in the Title III Case without the prior written consent of Operator in its sole and absolute discretion, and notwithstanding anything to the contrary in the O&M Agreement, any other Transaction Document or any other document, neither Operator nor any Affiliate of Operator shall have any obligation to act as a receiver in the Title III Case without its prior written consent in its sole and absolute discretion.

# ARTICLE 6
## CLOSING THE INTERIM PERIOD

**Section 6.1 Confirming Service Commencement Date**. The Parties agree that, notwithstanding anything to the contrary in the O&M Agreement, in order for the Service Commencement Date to occur, all Service Commencement Date Conditions must be satisfied or waived in accordance with their terms and for purposes of the foregoing, in addition to the Service Commencement Date Conditions set forth in the O&M Agreement, it shall be a Service Commencement Date Condition that the Title III Exit shall have occurred and that the Title III Plan and order of the Title III Court confirming same shall be reasonably acceptable to Operator. The Parties shall follow the process set forth in the O&M Agreement for establishing the Service Commencement Date, upon which date this Supplemental Agreement shall terminate and be null and void.

# ARTICLE 7
## TERMINATION

**Section 7.1 Additional Termination Events and Rights**.

(a) <u>Interim Period Termination Date</u>. This Supplemental Agreement and the O&M Agreement shall automatically terminate without further action by Operator, and without need for a court decision or arbitral award confirming such termination, in the event that the Service Commencement Date does not occur on or prior to the date that is eighteen (18) months after the Supplemental Agreement Effective Date (such date, the "<u>Interim Period Termination Date</u>"), which Interim Period Termination Date may, if requested by Administrator, be extended by the mutual agreement of the Parties prior to the then-current Interim Period Termination Date.

(b) <u>Operator Termination Right Due to Material Adverse Effect</u>. In addition to Operator's termination rights set forth in the O&M Agreement, which shall continue to apply,

11

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 12 de 24

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 39 of 105

CONFIDENTIAL

Operator may terminate this Supplemental Agreement and the O&M Agreement during the Interim Period upon the occurrence of a Material Adverse Effect arising out of the Title III Case as a result of a filing in the Title III Case or a ruling or order of the Title III Court, upon not less than one hundred twenty (120) days prior written notice to Administrator, without need for a court decision or arbitral award confirming Operator's right to terminate.

(c) Cross-Termination. In the event that, during the Interim Period, either Operator or Administrator exercises its rights to terminate the O&M Agreement pursuant to the terms thereof, this Supplemental Agreement shall terminate concurrently with the termination of the O&M Agreement.

(d) No Termination or Liquidated Damages Under O&M Agreement for Failure of Service Commencement Date Conditions. From and after the Interim Period Service Commencement Date and continuing after the Service Commencement Date, each Party hereby permanently waives its rights and remedies set forth in Section 4.8 (*Failure of Service Commencement Date Conditions*) of the O&M Agreement, except that any Delay Liquidated Damages that may have accrued and become payable thereunder prior to the Interim Period Service Commencement Date shall continue to be payable and shall be paid pursuant to the terms thereof.

**Section 7.2 Remedies Upon Early Termination**.

(a) Accrued and Unpaid Amounts. In addition to the payment of all accrued and unpaid amounts required to be paid by Owner under the O&M Agreement, in the event of an early termination of this Supplemental Agreement and the O&M Agreement, Owner shall indefeasibly pay any accrued and unpaid amounts required to be paid to Operator pursuant to this Supplemental Agreement, including the Interim Period Service Fee, in each case, as of the effective date of such termination.

(b) Back-End Transition Service Fee. In the event of an early termination of this Supplemental Agreement and the O&M Agreement pursuant to Section 7.1 of this Supplemental Agreement (*Additional Termination Events and Rights*), and if Operator is performing the Back-End Transition Services, Owner shall be responsible for payment of the Back-End Transition Service Fee, which shall be deemed to be an administrative expense of Owner.

(c) Termination Fee.

(i) Notwithstanding anything to the contrary in the O&M Agreement, in the event this Supplemental Agreement and the O&M Agreement are terminated pursuant to Section 7.1(a) of this Supplemental Agreement (*Additional Termination Events and Rights – Interim Period Termination Date*), Owner shall pay Operator the Operator Termination Fee, which shall be deemed to be an administrative expense of Owner.

(ii) The Parties hereby acknowledge and agree that, notwithstanding anything to the contrary in this Supplemental Agreement or the O&M Agreement, in the event this Supplemental Agreement and the O&M Agreement are terminated pursuant to Section 7.1(a) (*Additional Termination Events and Rights – Interim Period Termination Date*), Operator's damages would be difficult or impossible to quantify with reasonable certainty, and accordingly,

CONFIDENTIAL

the payment to Operator of the Operator Termination Fee (x) is a payment of liquidated damages (and not penalties), which is based on the Parties' best estimate of damages Operator would suffer or incur, and (y) shall constitute Operator's sole and exclusive remedy for all monetary damages, costs, losses and expenses of whatever type or nature arising from or related to this Supplemental Agreement due to the events described in this sentence, with any and all other rights and remedies hereunder, at law, in equity or otherwise, being herein irrevocably waived by the Operator.

(iii)    Each of Administrator and Owner hereby irrevocably waives any right it may have to raise as a defense that the Operator Termination Fee is excessive or punitive.

## ARTICLE 8
## REPRESENTATIONS AND WARRANTIES

Section 8.1    **Representations and Warranties of Owner**. Owner hereby represents and warrants to Operator that:

(a)    Existence and Powers. Owner is a public corporation and instrumentality of the Commonwealth duly organized, validly existing and in good standing under the laws of the Commonwealth. Owner has the required corporate power and authority to enter into this Supplemental Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby. Administrator has the required corporate power and authority to carry out its obligations under this Supplemental Agreement and on behalf of Owner, including the power and authority to bind Owner with respect to any matter contemplated under this Supplemental Agreement.

(b)    Due Authorization and Binding Obligation. The execution and delivery by Owner of this Supplemental Agreement, the performance by Owner of its obligations hereunder and the consummation by Owner of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on the part of Owner. This Supplemental Agreement has been duly and validly executed and delivered by Owner, and (assuming due authorization, execution and delivery by Operator) this Supplemental Agreement constitutes a legal, valid and binding obligation of Owner enforceable against Owner in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)    No Conflicts. Neither the execution, delivery or performance by Owner of this Supplemental Agreement, nor the consummation of the transactions contemplated hereby will: (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of Owner; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to Owner; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or (D) require the consent of any other Person under, any material contract to which Owner is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of Owner.

13

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 14 de 24

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 41 of 105

CONFIDENTIAL

(d)      No Consents. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Owner in connection with (i) the execution and delivery of this Supplemental Agreement or (ii) the performance by Owner of its obligations hereunder, except (A) such as have been duly obtained or made and (B) in the case of clause (ii), for those Governmental Approvals to be obtained after the Effective Date but before the Interim Period Service Commencement Date.

(e)      No Litigation. There is no action, suit or other proceeding, at law or in equity, before or by any court or Governmental Body pending against Owner or, to Owner's knowledge, threatened against Owner, which if determined adversely against Owner would reasonably be expected to materially and adversely affect (i) the validity or enforceability of this Supplemental Agreement or (ii) the performance by Owner or Operator of their respective obligations hereunder.

(f)      No Legal Prohibition. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by Owner of this Supplemental Agreement and the transactions contemplated hereby.

Section 8.2      Representations and Warranties of Operator. Operator hereby represents and warrants to Owner that:

(a)      Existence and Powers. ManagementCo is a limited liability company duly organized, validly existing and in good standing under the laws of Puerto Rico, and is qualified to do business and in good standing in the Commonwealth. ServCo is a limited liability company duly organized, validly existing and in good standing under the laws of Puerto Rico, and is qualified to do business and in good standing in the Commonwealth. Each of ManagementCo and ServCo has the required corporate power and authority to enter into this Supplemental Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby.

(b)      Due Authorization and Binding Obligation. The execution and delivery by Operator of this Supplemental Agreement, the performance by Operator of its obligations hereunder and the consummation by Operator of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on the part of Operator. This Supplemental Agreement has been duly and validly executed and delivered by Operator, and (assuming due authorization, execution and delivery by Owner) this Supplemental Agreement constitutes a legal, valid and binding obligation of Operator enforceable against Operator in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)      No Conflicts. Neither the execution, delivery or performance by Operator of this Supplemental Agreement, nor the consummation of the transactions contemplated hereby will:  (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of Operator; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to Operator; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or

14

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 15 de 24

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc: Exhibit 3 complaint with exhibits Page 42 of 105

CONFIDENTIAL

(D) require the consent of any other Person under, any material contract to which Operator is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of Operator.

(d)    No Consents. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Operator in connection with (i) the execution and delivery of this Supplemental Agreement or (ii) the performance by Operator of its obligations hereunder, except (A) such as have been duly obtained or made and (B) in the case of clause (ii), for those Governmental Approvals to be obtained after the Effective Date but before the Interim Period Service Commencement Date.

(e)    No Litigation. There is no action, suit or other proceeding, at law or in equity, before or by any court or Governmental Body pending against Operator or, to Operator's knowledge, threatened against Operator, which if determined adversely against Operator would reasonably be expected to materially and adversely affect (i) the validity or enforceability of this Supplemental Agreement or (ii) the performance by Operator or Owner of their respective obligations hereunder.

(f)    No Legal Prohibition. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by Operator of this Supplemental Agreement and the transactions contemplated hereby.

## ARTICLE 9
## DISPUTE RESOLUTION

**Section 9.1    Disputes**. Any dispute among the Parties arising out of, relating to or in connection with this Supplemental Agreement or the existence, interpretation, breach, termination or validity thereof shall constitute a Dispute and shall be resolved pursuant to the Dispute Resolution Procedure.

## ARTICLE 10
## MISCELLANEOUS

**Section 10.1   Fees and Expenses; Notices; Amendments; Relationship of the Parties**. Sections 20.1 (*Fees and Expenses*), 20.2 (*Notices*), 20.3 (*Amendments*) and 20.5 (*Relationship of the Parties*) of the O&M Agreement are incorporated herein by reference, *mutatis mutandis*.

**Section 10.2   Entire Agreement**. This Supplemental Agreement, together with the O&M Agreement, constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any and all prior oral or written agreements, understandings, proposals, representations or warranties relating to this Supplemental Agreement. Without limiting the generality of the foregoing, this Supplemental Agreement taken together with the O&M Agreement shall completely and fully supersede all other understandings and agreements among the Parties with respect to such transactions, including those contained in the RFP, the Proposal by Operator or its Affiliate and any amendments or supplements to the RFP or the Proposal. If this Supplemental Agreement does not become effective pursuant to its terms, then this Supplemental Agreement shall not be deemed to amend or supplement the O&M Agreement and shall not be consulted or used by the Parties to interpret any terms or conditions of the O&M Agreement.

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 16 de 24

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 43 of 105

CONFIDENTIAL

**Section 10.3    Assignment and Transfer**.

(a)    By Operator. Operator shall not assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Supplemental Agreement except to the same Person or Persons to which it assigns, transfers, conveys, leases, encumbers or otherwise disposes of its rights or obligations under the O&M Agreement, provided such action is permitted by the O&M Agreement.

(b)    By Owner. Owner shall not assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Supplemental Agreement except to the same Person or Persons to which it assigns, transfers, conveys, leases, encumbers or otherwise disposes of its rights or obligations under the O&M Agreement, provided such action is permitted by the O&M Agreement.

**Section 10.4    Interest on Overdue Obligations; Waivers; Severability; Survival; No Third Party Beneficiaries; Remedies; Counterparts; Office of the Comptroller; Governing Law; Commonwealth Obligations**. Sections 20.7 (*Interest on Overdue Obligations*), 20.8 (*Waivers*), 20.9 (*Severability*), 20.10 (*Survival*), 20.11 (*No Third Party Beneficiaries*), 20.12 (*Remedies*), 20.13 (*Counterparts*), 20.14 (*Office of the Comptroller*), 20.15 (*Governing Law*) and 20.16 (Commonwealth Obligations) of the O&M Agreement are incorporated herein by reference, *mutatis mutandis*.

[*Signatures follow on next page*]

16

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 17 de 24

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 44 of 105

CONFIDENTIAL

**IN WITNESS WHEREOF**, Owner, Administrator, ManagementCo and ServCo each has caused this Supplemental Agreement to be duly executed as of the day and year first above written.

**PUERTO RICO ELECTRIC POWER AUTHORITY**

By:
Name: *Jose Ortiz*
Title: *CEO*

**PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY, solely in its capacity as ADMINISTRATOR**

By:
Name: *Fermin Fontanes Goma*
Title: *Executive Director*

**LUMA ENERGY, LLC**

By:
Name: *Wayne Stensby*
Title: *President & CEO*

By:
Name: *Gerald A Dukey*
Title: *Senior Vice President*

**LUMA ENERGY SERVCO, LLC**

By:
Name: *Wayne Stensby*
Title: *President & CEO*

By:
Name: *Gerald A Doley Jr*
Title: *Senior Vice President*

*[Signature Page to Puerto Rico Transmission and Distribution System Supplemental Terms Agreement]*

CONFIDENTIAL

## Exhibit A

## Form of Supplemental Agreement Tax Opinion

_____, 202_

Ladies and Gentlemen:

We have served as tax counsel to the Federal Oversight and Management Board ("FOMB") with respect to the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement dated as of ____, 2020 (the "Agreement") by and among the Puerto Rico Electric Power Authority (the "Authority"), as owner, the Puerto Rico Public-Private Partnerships Authority, as administrator (the "Administrator"), _____ ("ManagementCo"), and _____ ("ServCo" and, together with ManagementCo, the "Operator" and, collectively with the Authority and the Administrator, the "Parties"). Pursuant to the terms of the Agreement, the Operator will provide operation and management services relating to the Authority's transmission and distribution system (the "T&D System"). In addition, pursuant to the Puerto Rico Transmission and Distribution System Supplemental Terms Agreement dated as of ____, 2020 (the "Supplemental Agreement") by and among the Parties, the Operator is commencing the O&M Services as of the date hereof, although the Service Commencement Date has not occurred. The Authority, its Affiliates, and other Governmental Bodies currently have outstanding obligations the interest on which is excluded from gross income for federal income tax purposes (the "Existing Bonds"). On the date of issuance of each of the bond issues comprising the Existing Bonds, the respective bond counsel for each such issuance delivered an opinion (each an "Approving Opinion") that interest on the related Existing Bonds is excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code (the "Code"). Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

This opinion is being delivered in accordance with Section 2.3(f) of the Supplemental Agreement.

In rendering the opinion set forth herein, we have reviewed (i) the Agreement, including the exhibits thereto, (ii) the Supplemental Agreement, (iii) the System Contracts in effect as of the date hereof, (iv) the opinion of Sargent and Lundy or another nationally recognized engineering firm acceptable to the Parties, dated ____, 202_, which sets forth, among other things, the reasonably expected weighted average economic life of the T&D System, and (v) such other opinions, certificates and documents as have been provided to us by the Authority and others in connection with the Agreement. We have also relied upon the facts set forth in the representations made by the Parties to the Agreement and such other documents and opinions to the extent we deemed necessary to render the opinions set forth herein. We have not undertaken an independent audit or investigation of the matters set forth in any of the foregoing and our opinion assumes the accuracy of the information and any conclusions set forth therein and compliance with any covenants and directions set forth in said documents, including the Agreement.

CONFIDENTIAL

In addition, the Code and the Revenue Procedure (as defined below), impose certain requirements that must be met subsequent to the issuance and delivery of the Existing Bonds and subsequent to the execution of the Agreement for interest on the Existing Bonds thereon to be and remain excluded from gross income for federal income tax purposes. Noncompliance with such requirements could cause the interest on the Existing Bonds to be included in gross income for federal income tax purposes retroactive to the date of issue of each issue of the Existing Bonds.

Section 103 of the Code provides generally that interest on a "private activity bond" is not excluded from gross income. Section 141 of the Code, in part, provides that a private activity bond is an obligation issued as part of an issue that meets the private business tests. Under the private business tests, bonds are treated as private activity bonds if the issue of which those bonds are a part satisfy both the private business use test and the private security or payment test. The private business use test is met if more than 10 percent of the proceeds of an issue are used in the trade or business of a nongovernmental person ("private business use"). Under Treasury regulation section 1.141-3, private business use can result from the use of the facilities financed by the issue, including as a result of a lease of such property to a nongovernmental person or a management contract with respect to such property. The private security or payment test is generally met if the payment of the principal of, or the interest on, more than 10 percent of the proceeds of an issue is (under the terms of such issue or any underlying arrangement) directly or indirectly: (A) secured by any interest in property used or to be used for a private business use, or payments in respect of such property, or (B) to be derived from payments (whether or not to the issuer) in respect of property, or borrowed money, used or to be used for a private business use.

Under Treasury regulation section 1.141-3(b)(4), a management contract with respect to financed property may result in private business use of that property, based on all of the facts and circumstances. The regulations provide that a management contract with respect to financed property generally results in private business use of that property if the contract provides for compensation for services rendered with compensation based, in whole or in part, on a share of net profits from the operation of the facility, or if the service provider is treated as the lessee or owner of financed property for federal income tax purposes.

Treasury regulation section 1.141-3 defines a management contract as a management, service, or incentive payment contract between a governmental person and a service provider under which the service provider provides services involving all, a portion of, or any function of, a facility. For example, a contract for the provision of management services for an entire hospital, a contract for management services for a specific department of a hospital, and an incentive payment contract for physician services to patients of a hospital are each treated as a management contract.

In Revenue Procedure 2017-13 (the "Revenue Procedure") the Internal Revenue Service provided a safe harbor under which a management contract can be treated as not resulting in private business use. The Revenue Procedure refers to the governmental owner of the related facilities as the "qualified user" and the manager or operator as the "service provider." Under the Revenue Procedure, a management contract that satisfies the following conditions will not be treated as resulting in private business use:

A-2

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 20 de 24

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 47 of 105

CONFIDENTIAL

(1) The payments to the service provider under the contract must be reasonable compensation for services rendered during the term of the contract. "Compensation" includes payments to reimburse actual and direct expenses paid by the service provider and related administrative overhead expenses of the service provider.

(2) The contract must not provide to the service provider a share of net profits from the operation of the managed property. Compensation to the service provider will not be treated as providing a share of net profits if no element of the compensation takes into account, or is contingent upon, either the managed property's net profits or both the managed property's revenues and expenses (other than any reimbursements of direct and actual expenses paid by the service provider to unrelated third parties) for any fiscal period. For this purpose, the elements of the compensation are the eligibility for, the amount of, and the timing of the payment of the compensation. Incentive compensation is not treated as providing a share of net profits if eligibility is determined by the service provider's performance in meeting one or more standards that measure quality of services, performance or productivity.

(3) The contract must not, in substance, impose upon the service provider the burden of bearing any share of net losses from the operation of the managed property.

(4) The term of the contract, as of the beginning of the term of the contract, including all renewal options must not be greater than the lesser of 30 years or 80 percent of the weighted average reasonably expected economic life of the managed property.

(5) The qualified user must exercise a significant degree of control over the use of the managed property. This control requirement is met if the contract requires the qualified user to approve the annual budget of the managed property, capital expenditures with respect to the managed property, each disposition of property that is part of the managed property, rates charged for the use of the managed property, and the general nature and type of use of the managed property (for example, the type of services).

(6) The qualified user must bear the risk of loss upon damage or destruction of the managed property (for example, due to force majeure).

(7) The service provider must agree that it is not entitled to and will not take any tax position that is inconsistent with being a service provider to the qualified user with respect to the managed property. For example, the service provider must agree not to claim any depreciation or amortization deduction, investment tax credit, or deduction for any payment as rent with respect to the managed property.

(8) The service provider must not have any role or relationship with the qualified user that, in effect, substantially limits the qualified user's ability to exercise its rights under the contract, based on all the facts and circumstances. A service provider will not be treated as having a role or relationship prohibited by this provision if: (a) no more than 20 percent of the voting power of the governing body of the qualified user is vested in the directors, officers, shareholders, partners, members, and employees of the service provider, in the aggregate; (b) the governing body of the qualified user does not include

A-3

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 21 de 24

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 48 of 105

CONFIDENTIAL

the chief executive officer of the service provider or the chairperson (or equivalent executive) of the service provider's governing body; and (c) the chief executive officer of the service provider is not the chief executive officer of the qualified user or any of the qualified user's related parties.

Based upon our review of the foregoing documents, and assuming the accuracy of the information and certifications, and compliance with the covenants, representations, and directions set forth therein, and assuming compliance with the terms of the Supplemental Agreement, we are of the opinion that neither the Supplemental Agreement nor any provision thereof, nor the performance by each Party to the Supplemental Agreement of its respective obligations thereunder (including Operator's administration of the System Contracts), adversely affects the exclusion from gross income of interest on the Existing Bonds of the Authority, its Affiliates or another Governmental Body for federal income tax purposes under Section 103 of the Code.

This opinion is limited to the specific matter addressed herein and shall not be construed as confirming or restating the Approving Opinions. We have not been engaged to, nor have we undertaken to, determine whether the interest on the Existing Bonds continues to qualify as of this date for exclusion from gross income for federal income tax purposes. Accordingly, we express no opinion on such matter.

This opinion is delivered as of the date hereof and relates solely to the Internal Revenue Code and Treasury regulations as in effect on the date hereof. We disclaim any obligation to advise you or any other person of developments of law or fact covered by this opinion that may occur after the date hereof, including any amendments made subsequent to the date hereof to the documents described above. Furthermore, we express no opinion as to any federal, state or local tax law consequences with respect to the Existing Bonds, or the interest thereon, if any action is taken with respect to the Supplemental Agreement or the proceeds thereof upon the advice or approval of other counsel.

A-4

CONFIDENTIAL

This opinion is being delivered by us as tax counsel to the FOMB in connection with the Supplemental Agreement and may not be relied upon by any other person, or used or reproduced for any other purpose, without our prior written consent.

Sincerely,

Nixon Peabody LLP

A-5

CONFIDENTIAL

## Exhibit B

## Form of Supplemental Agreement Reliance Letter

\_\_\_\_\_, 2020

Puerto Rico Transmission and Distribution System Supplemental Terms
Agreement dated as of \_\_\_\_, 202\_

Ladies and Gentlemen:

In connection with the execution of the Puerto Rico Transmission and Distribution System Supplemental Terms Agreement dated as of \_\_\_\_, 202\_ by and among the Puerto Rico Electric Power Authority, the Puerto Rico Public-Private Partnerships Authority, _____, and _____ (the "Supplemental Agreement") we have delivered our final legal opinion relating to the impact of the Supplemental Agreement on the federal income tax status of interest on bonds issued by the Authority, its Affiliates, and other Governmental Bodies (the "Bonds"), dated the date hereof and addressed to the Federal Oversight and Management Board. Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Supplemental Agreement.

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 24 de 24

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 51 of 105

CONFIDENTIAL

You may rely on said opinion as though the same were addressed to you. No attorney-client relationship has existed or exists between any addressee of this letter and our firm in connection with the Supplemental Agreement or the Bonds or by virtue of this letter.

Very truly yours,

B-2

*Execution Version*

**LIMITED WAIVER** in connection with the T&D O&M Agreement and the Supplemental Terms Agreement (each as defined below), dated as of June 1, 2021 (this "Waiver"), by and among (i) Puerto Rico Electric Power Authority ("Owner"), (ii) the Puerto Rico Public-Private Partnerships Authority ("Administrator"), (iii) LUMA Energy, LLC ("ManagementCo") and LUMA Energy ServCo, LLC ("ServCo" and, together with ManagementCo, "Operator" and, together with Owner, Administrator and ManagementCo, the "Parties"). Capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the T&D O&M Agreement or the Supplemental Terms Agreement, as applicable.

## PRELIMINARY STATEMENTS

A.    Reference is made to: (1) that certain Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement dated as of June 22, 2020 (as amended, modified or supplemented from time to time in accordance with its terms, the "T&D O&M Agreement") by and among the Parties, pursuant to the terms of which Operator will take over the management, operation, maintenance, repair, restoration and replacement of the T&D System; and (2) that certain Puerto Rico Transmission and Distribution System Supplemental Terms Agreement dated as of June 22, 2020 (as amended, modified or supplemented from time to time in accordance with its terms, the "Supplemental Terms Agreement" and, together with the T&D O&M Agreement the "Transaction Documents") by and among the Parties, which Supplemental Terms Agreement constitutes an integral part of the T&D O&M Agreement and automatically becomes effective, pursuant to its terms, upon the occurrence of certain conditions.

B.    The Parties have worked diligently since the Effective Date of the T&D O&M Agreement to carry out the Front-End Transition and, in accordance with its obligations under the T&D O&M Agreement, Operator has executed the Front-End Transition Plan and completed the Handover Checklist, to ensure an orderly transition of the responsibility for the management, operation, maintenance, repair, restoration and replacement of the T&D System to Operator prior to the Target Service Commencement Date of May 8, 2021 or as soon as practicable thereafter.

C.    Notwithstanding the efforts of the Parties, certain of the documentary conditions precedent to the commencement of the O&M Services have not been satisfied prior to the date hereof, however, the Parties have agreed that (i) such conditions do not impede Operator from providing such services pursuant to the Supplemental Terms Agreement and (ii) the Interim Period Service Commencement Date will be the date hereof in order to enable Operator to begin implementing its emergency response plan for the T&D System at the beginning of the Atlantic hurricane season.

D.    Therefore, Administrator and Owner have determined that it is in the interest of the people of Puerto Rico, to enable Operator to timely commence the vital work of recovering and transforming the T&D System, for which Operator was selected and engaged pursuant to the T&D O&M Agreement, and to avoid unnecessary costs to ratepayers, for the Parties to agree to waive certain documentary conditions precedent set forth in the Transaction Documents to Operator's commencement of O&M Services, which Operator agrees it is prepared to provide pursuant to the terms of the Supplemental Terms Agreement.

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 2 de 33

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 53 of 105

E.     Given that the Title III Exit has not occurred, after giving effect to this Waiver and Administrator's certificate to Operator pursuant to Section 2.3 of the Supplemental Terms Agreement to be delivered on the date hereof, both the Supplemental Agreement Effective Date and the Interim Period Service Commencement Date will be June 1, 2021.

F.     The Parties will continue to work diligently to ensure that each Service Commencement Date Condition waived pursuant to this Waiver for purposes of entering into the Interim Period is satisfied during the Interim Period such that the Service Commencement Date may be achieved, thereby concluding the Interim Period and commencing the 15-year term of the T&D O&M Agreement.

**NOW**, **THEREFORE**, in consideration of the premises and agreements, provisions and covenants herein contained, the undersigned parties agree as follows:

SECTION 1. *Waiver of Service Commencement Date Conditions by Administrator and ManagementCo.*  In accordance with Section 4.5 of the T&D O&M Agreement, ManagementCo and Administrator waive, on the terms set forth below:

(a)     the condition precedent set forth in Section 4.5(d) of the T&D O&M Agreement providing for the finalization of all of the documents and instruments identified in Article IV of the T&D O&M Agreement, to the extent that Sections 4.1(e) and 4.1(f) of the T&D O&M Agreement require ManagementCo to finalize each of the Federal Funding Procurement Manual and the Non-Federal Funding Procurement Manual, it being understood that Operator prepared a consolidated procurement manual, as required by Administrator and the Central Office for Recovery and Reconstruction ("COR3"), that was approved by Administrator and COR3 pursuant to the requirements of the T&D O&M Agreement;

(b)     the condition precedent set forth in Section 4.5(h) of the T&D O&M Agreement related to the approval by PREB of the Performance Metrics, it being understood that (i) prior to and until such time as the PREB issues a resolution and order approving the Performance Metrics, for purposes of the Interim Period the Performance Metrics shall be those approved by Administrator and subsequently filed by Operator with the PREB in docket number NEPR-AP-2020-0025 on February 25, 2021, and (ii) such condition precedent must be satisfied prior to and as a condition to the Service Commencement Date;

(c)     the condition precedent set forth in Section 4.5(k) of the T&D O&M Agreement related to the approval by PREB of the System Remediation Plan, it being understood that (i) prior to and until such time as the PREB issues a resolution and order approving the System Remediation Plan, for purposes of the Interim Period the System Remediation Plan shall be the plan filed by Operator with the PREB in docket number NEPR-MI-2020-0019 on February 24, 2021, and (ii) such condition precedent must be satisfied prior to and as a condition to the Service Commencement Date;

(d)     the condition precedent set forth in Section 4.5(q) of the T&D O&M Agreement related to the finalization of a final plan for the reorganization of Owner into GenCo and GridCo (the "PREPA Reorganization") and effectiveness of the GridCo-GenCo PPOA, it being understood that:

2

i.      a final plan for PREPA Reorganization shall be approved by the applicable Governmental Bodies and implemented pursuant to the plan of reorganization set forth in Exhibit A attached hereto prior to and as a condition to the Service Commencement Date; and

ii.      the GridCo-GenCo PPOA shall become effective upon the completion of the PREPA Reorganization and receipt of any approvals required under Applicable Law prior to and as a condition to the Service Commencement Date, it being further understood that prior to the effectiveness of the GridCo-GenCo PPOA Owner and Operator shall abide by the guidelines set forth in Exhibit B attached hereto; and

(e)      the condition precedent set forth in Section 4.5(u) of the T&D O&M Agreement related to the execution of the FOMB Protocol Agreement by each of Owner, Administrator, Operator and the FOMB, it being understood that the FOMB Protocol Agreement will be executed by Operator and the FOMB, for itself and as representative of Owner under PROMESA.

SECTION 2. *Waiver of Service Commencement Date Conditions by Administrator.* In accordance with Section 4.5 of the T&D O&M Agreement, Administrator partially waives, on the terms set forth below:

(a)      the condition precedent set forth in Section 4.5(a) of the T&D O&M Agreement providing for the fulfillment of all of the ManagementCo Service Commencement Date Conditions, to the extent that Operator has not procured, due in part to market conditions, the specific policies of Required Insurance set forth in Exhibit C attached hereto as required by Section 4.2(d) of the T&D O&M Agreement, it being understood that such condition precedent must be satisfied within the timeframe set forth for each such Required Insurance in Exhibit C, if a timeframe is stated in Exhibit C; and

(b)      the condition precedent set forth in Section 4.5(a) of the T&D O&M Agreement providing for the fulfillment of all of the ManagementCo Service Commencement Date Conditions, to the extent that Operator is unable to make the certification required by Section 4.2(m) of Operator's representations set forth in Section 19.2(e) of the T&D O&M Agreement as a result of the ongoing judicial proceedings set forth in Exhibit D attached hereto, as applicable, it being understood that such condition precedent must be satisfied prior to and as a condition to the Service Commencement Date.

SECTION 3. *Waiver of Service Commencement Date Conditions by ManagementCo.* ManagementCo partially waives the condition precedent set forth in Section 4.5(b) of the T&D O&M Agreement providing for the fulfillment of all of the Owner Service Commencement Date Conditions, to the extent that Owner is unable to make the certification required by Section 4.3(a) of Owner's representations set forth in Section 19.1(e) of the T&D O&M Agreement as a result of the ongoing judicial proceedings set forth in Exhibit D attached hereto, as applicable, it being understood that such condition precedent must be satisfied prior to and as a condition to the Service Commencement Date.

3

SECTION 4. *Interim Period Service Commencement Date Conditions Precedent.*

(a)      In accordance with Section 10.4 of the Supplemental Terms Agreement, ManagementCo and Administrator waive the requirement under Section 2.3 of the Supplemental Terms Agreement that Administrator deliver a certificate to Operator at least three Business Days prior to the Interim Period Service Commencement Date, it being understood that Administrator shall deliver such certificate on or before the date of this Waiver.

(b)      Operator confirms that the order granted by the Title III Court, a copy of which is attached hereto as Exhibit E (the "Administrative Expense Order"), is reasonably acceptable to Operator for purposes of Section 2.3(b) of the Supplemental Terms Agreement.  In accordance with Section 10.4 of the Supplemental Terms Agreement, ManagementCo and Administrator waive, for purposes of the Interim Period, the condition precedent set forth in Section 2.3(b) of the Supplemental Terms Agreement that the Administrative Expense Order be final and non-appealable.

(c)      In accordance with Section 10.4 of the Supplemental Terms Agreement, ManagementCo and Administrator waive the requirement set forth in Section 4.7 of the Supplemental Terms Agreement that all Service Accounts (other than the Contingency Reserve Account) shall have been funded not less than 10 Business Days prior to the Interim Period Service Commencement Date, it being understood that: (i) Administrator and Owner shall irrevocably and unconditionally authorize and instruct the Puerto Rico Fiscal Agency and Financial Advisory Authority and the Puerto Rico Treasury Department (with a copy to Operator) to fund, at or before 9:00 a.m. AST on the date of this Waiver, all Service Accounts (other than the Contingency Reserve Account) in immediately available funds in the amounts required by the Transaction Documents; (ii) evidence of such funding (by way of Federal Reference Number or equivalent) shall be provided to the Parties hereto, as soon as available, on the date of this Waiver; (iii) all Service Accounts (other than the Contingency Reserve Account) must be funded in immediately available funds in the amounts required by the Transaction Documents, within 2 Business Days after the date of this Waiver; and (iv) the Contingency Reserve Account must be funded in immediately available funds in the amounts required by the Transaction Documents, on or before the 10th Business Day after the Interim Period Service Commencement Date.

SECTION 5. *Effect of Limited Waivers; Interim Period Service Commencement Date*. The Parties agree that: (a) after giving effect to this Waiver, the Supplemental Agreement Effective Date is June 1, 2021; (b) after giving effect to this Waiver and Administrator's certificate to Operator pursuant to Section 2.3 of the Supplemental Terms Agreement to be delivered on the date hereof, the Interim Period Service Commencement Date is June 1, 2021; and (c) the waivers set forth herein are for the limited purpose of entering into the Interim Period, and the Service Commencement Date has not occurred and continues to be subject to the satisfaction or subsequent waiver of all Service Commencement Date Conditions, as set forth in Section 6.1 of the Supplemental Terms Agreement.

SECTION 6. *Conditions to Effectiveness*.  This Waiver shall become effective only upon Administrator's receipt of counterparts to this Waiver duly executed by the Parties.

4

SECTION 7. ***Amendment or Modification***.  This Waiver may not be amended or modified except by written instrument signed by all the Parties.  Each such instrument shall be reduced to writing and shall be designated on its face an "Amendment" or an "Addendum" to this Waiver.

SECTION 8. ***Conditional and Limited Waivers***.  The limited waivers set forth in Section 1 (*Waiver of Service Commencement Date Conditions by Administrator and ManagementCo*), Section 2 (*Waiver of Service Commencement Date Conditions by Administrator*) and Section 3 (*Waiver of Service Commencement Date Conditions by ManagementCo*) of this Waiver shall be conditional and effective only in the specific instances described herein and nothing herein shall be construed to limit or bar any rights or remedies of the Parties, except to the extent of the waiver of those certain Service Commencement Date Conditions set forth herein.  For the avoidance of doubt and without limiting the generality of the foregoing, the Parties agree that, other than as expressly contemplated in this Waiver, no change, amendment, covenant, waiver or consent with respect to the terms and provisions of any of the Transaction Documents is intended or contemplated hereby (which terms and provisions remain unchanged and in full force and effect other than as expressly set forth herein).

SECTION 9.***Governing Law***.  This Waiver and all matters, claims, controversies, disputes, suits, actions or proceedings arising out of, or relating to, this Waiver and the negotiation, execution or performance of this Waiver, including all rights of the Parties (whether sounding in contract, tort, common or statutory law, equity or otherwise) in connection therewith, shall be interpreted, construed and governed by and in accordance with, and enforced pursuant to, the internal laws of the Commonwealth (excluding any conflict of laws, rule or principle which might refer such interpretation to the laws of another jurisdiction), except where the federal supremacy clause requires otherwise.

SECTION 10. ***Counterparts***.  This Waiver may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document.  A signed copy of this Waiver transmitted by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Waiver for all purposes.

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, the parties hereto have caused this Waiver to be duly executed and delivered as of the day and year first above written.

**PUERTO RICO ELECTRIC POWER AUTHORITY**

By: _____
Name:         Efrain Paredes Maisonet
Title:                    CEO

**PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY, solely in its capacity as ADMINISTRATOR**

By: _____
Name: _____
Title: _____

**LUMA ENERGY, LLC**

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

**LUMA ENERGY SERVCO, LLC**

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 7 de 33

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 58 of 105

**PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS
AUTHORITY, solely in its capacity as
ADMINISTRATOR**

By:

Name: Fermín E. Fontánes Gómez

Title: Executive Director

[*Signature Page to Waiver*]

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 8 de 33

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 59 of 105

**LUMA ENERGY, LLC**

By: _____

Name:        Darren Miller

Title:        Chief Financial Officer

*Wayne Stensby*
Wayne Stensby (May 28, 2021 17:56 EDT)

By: _____

Name:        Wayne Stensby

Title:        President & CEO

**LUMA ENERGY SERVCO, LLC**

By: _____

Name:        Darren Miller

Title:        Chief Financial Officer

*Wayne Stensby*
Wayne Stensby (May 28, 2021 17:56 EDT)

By: _____

Name:        Wayne Stensby

Title:        President & CEO

[*Signature Page to Waiver*]

## EXHIBIT A

## PLAN OF REORGANIZATION

*The email below was sent by Owner to the Financial Oversight and Management Board for Puerto Rico on May 7, 2021.*

Good evening fiscal plan working group:

Attached is the revised draft for FY22 PREPA fiscal plan (the "Proposed PREPA Fiscal Plan"), which is being resubmitted following the receipt of FOMB's Notice of Violation (NOV) letter dated May 3, 2021 and addressing comments contained therein under section III (i.e. Detailed discussion of required revisions to PREPA's Proposed Plan) as follows. The attached is being submitted by PREPA subject to the comments and clarifications below, and with the intent of continued work and collaboration amongst the FOMB and PREPA teams leading to the certification of the PREPA Fiscal Plan.

A. **Transition to private operator and reorganization**

1. <u>Employee Transition</u> – as set forth in the Proposed PREPA Fiscal Plan, PREPA and AAFAF recently agreed on establishing a voluntary transition program (VTP) for certain PREPA employees. PREPA will submit the VTP details to FOMB for incorporation into the Fiscal Plan to be certified after the AAFAF Board authorizes the proposed VTP.

2. <u>Operating Reserve Accounts</u> – a section with discussion and supporting exhibit has been added to Chapter 3

3. <u>Reorganization</u> – PREPA is committed to achieving the full reorganization envisioned in the Proposed Fiscal Plan. To that end, PREPA has been working closely with the P3A and its advisors on charting a path forward that complies with the 2021 Commonwealth Certified Fiscal Plan, as well as the 2020 PREPA Certified Fiscal Plan.

As a first step, and as set forth in the Proposed Fiscal Plan, PREPA and P3A consider that, weighing the legal complexities and intricacies of the T3 process, it is best to first establish the GenCo subsidiary to legally segregate the generation assets from the T&D assets, which is consistent with the 2021 Commonwealth Certified Fiscal Plan. LUMA is intimately involved in the process to ensure that the adequate operational framework is in place for Service Commencement Date and beyond.

Setting up the GridCo subsidiary involves a host of complexities that would most likely distract LUMA as it commences operations and embarks on the process to transform the T&D System. To that end, PREPA and P3A are evaluating the steps necessary for the establishment of a new subsidiary to hold the T&D assets. The process to establish the GridCo subsidiary is significantly more complex than setting up GenCo, given that, among other things, (1) transferring the T&D assets and the associated revenues and contracts to a subsidiary may have an impact on Title III proceedings, and (2) there are existing gaps in property titles, records and inventories necessary to responsibly undertake the transfer of all

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 10 de 33

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 61 of 105

T&D assets. PREPA proposes to develop a work plan to set up GridCo in close collaboration with LUMA, P3A and FOMB to ensure alignment and a smooth transition that does not impact LUMA's operations or the pending Title III proceedings.

PREPA understands that this two-step approach is entirely consistent with the 2021 Central Government Fiscal Plan, as certified by the FOMB on April 23, 2021, which gives way to PREPA remaining as owner of the T&D Assets (See Exhibit 60 of the 2021 Commonwealth Certified Fiscal Plan, which states that GridCo "refers to PREPA, in its capacity as owner of the T&D assets").

[…]

We look forward to continuing working collaboratively towards achieving the certification of the PREPA Fiscal Plan. Please let us know when you would like to set up a working session to discuss the Proposed Fiscal Plan, and accompanying workbook.

Cordially,

Romano

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 11 de 33

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits    Page 62 of 105

**EXHIBIT B**

## GRIDCO-GENCO GUIDELINES

1.  Subject to paragraph 2 below, PREPA[1] shall continue to operate, maintain and manage the Legacy Generation Assets, including necessary fuel procurement and transportation, based on current procedures and practices.

2.  PREPA shall take such actions as may be necessary to allow LUMA[2] to perform its duties, obligations and responsibilities as Operator of the T&D System[3] pursuant to the Transmission and Distribution System Operation and Maintenance Agreement (the "T&D O&M Agreement"), including Section 5.13(d) therein and the System Operation Principles,[4] in each case, as they relate to the Legacy Generation Assets, including:

    a.  complying with LUMA's dispatch of the Legacy Generation Assets and making available to LUMA all electricity and ancillary services therefrom in accordance with the System Operation Principles;

    b.  providing LUMA with timely data and information and access thereto with respect to PREPA's operation and maintenance of the Legacy Generation Assets, including: (i) such data and information as may be needed for LUMA to manage dispatch operations pursuant to the T&D O&M Agreement and the System Operation Principles and (ii) providing a certificate from an authorized senior executive certifying to LUMA that all fuel costs used to support the quarterly fuel purchase adjustment charge (FCA) submitted to PREB are true and correct to the best of his/her knowledge;

    c.  providing LUMA with access, upon prior notification, to the Legacy Generation Assets, including their premises, as may be needed by LUMA in connection with the demarcation of the T&D System facilities and equipment physically located within or adjacent to the Legacy Generation Assets; and

    d.  providing LUMA with timely and reasonable updates with respect to the requirements for adequate availability of necessary generation resources that can be called upon by LUMA to provide electric service and reactive power as needed to serve the needs of the customers of the Commonwealth of Puerto Rico, all in accordance with the System Operation Principles, including reporting of information that is currently provided, including availability status from daily communications with the Legacy Generation Asset plants, and performance data as

---

[1] All references to PREPA herein refer to PREPA in its capacity as owner and operator of the Legacy Generation Assets.

[2] All references to LUMA herein refer to LUMA in its capacity as Operator under the T&D O&M Agreement.

[3] All capitalized terms used but not defined herein have the meanings specified in the T&D O&M Agreement.

[4] System Operation Principles means those System Operation Principles as delivered to PREB on February 25th and as may be supplemented as part of the PREB proceeding, and once approved by PREB, such approved System Operation Principles.

currently provided via the PI System and other data source, and timely notification when any circumstances affect changes to this information.

3. LUMA shall provide PREPA with reasonable estimates with respect to the requirements for adequate availability of necessary generation resources that can be called upon by LUMA to provide electric service and reactive power as needed to serve the needs of the customers of the Commonwealth of Puerto Rico, all in accordance with the System Operation Principles.

4. PREPA, LUMA and Administrator shall cooperate on negotiating and finalizing (i) the terms of the Gridco-Genco Operating Agreement, including any and all schedules, exhibits and annexes thereto and (ii) a generation interconnection agreement and plant level agreement[5] with respect to the Legacy Generation Assets, in each case, within one hundred twenty (120) days after the Interim Period Service Commencement Date and submit to PREB within ten (10) days thereafter.

5. PREPA and LUMA shall cooperate:

   a. as necessary to ensure that (i) PREPA personnel do not physically interfere with or harass LUMA personnel or its contractors in the performance of LUMA's duties, obligations and responsibilities as Operator of the T&D System pursuant to the T&D O&M Agreement and the System Operation Principles, (ii) LUMA personnel do not physically interfere with or harass PREPA personnel or its contractors in the performance of PREPA's duties, obligations and responsibilities as owner and operator of the Legacy Generation Assets pursuant to the System Operation Principles and (iii) the proper authorities are notified of any attempts by third parties to physically interfere with LUMA's performance of its duties, obligations and responsibilities as Operator of the T&D System pursuant to the T&D O&M Agreement and the System Operation Principles;

   b. in all matters relating to (i) the interconnection points between the T&D System and the Legacy Generation Assets and (ii) common facilities;

   c. with respect to matters pertaining to outage management (planned and unplanned) and emergency response in accordance with the System Operation Principles;

   d. to identify the activities, roles and responsibilities of the parties that will apply with respect to the T&D System facilities and equipment physically located within or adjacent to the Legacy Generation Assets;

---

[5] The plant level agreement will provide for the parties thereto to comply with the requirements of (i) the Agreed Operating Procedures established pursuant to the T&D O&M Agreement and (ii) the generator capability procedures (i.e., the procedures by which PREPA and, once the future operators are in place, such future operators on behalf of PREPA, will provide accurate information regarding the Legacy Generation Assets' performance capabilities that is verifiable based on standard tests), both of which will be attached thereto.

e. by notifying the other party by no later than June 1, 2021, of one or more persons designated as the point of contact for all communications between the parties, including, without limitation, a person designated as the point of contact for all communications with respect to emergency response matters;

f. resolve any disagreements relating to the relationship between LUMA as Operator of the T&D System and PREPA in its capacity as generation operator; and

g. in matters relating to compliance with Puerto Rico energy public policy, statutory and regulatory mandates, including but not limited to, areas such as reserve margins and resource adequacy, including compliance with applicable provisions of the "Puerto Rico Energy Transformation and RELIEF Act" ("Act 57-2014"), as amended, as it relates to LUMA's duties thereunder, the "Puerto Rico Energy Public Policy Act" ("Act 17-2019") and the Integrated Resource Plan and Modified Action Plan, adopted by the Puerto Rico Energy Bureau, Case No. CEPR-AP-2018-0001.

6. PREPA shall continue to be responsible for managing, procuring, nominating, scheduling and coordinating the transportation and delivery of all the fuel requirements of each of the Legacy Generation Assets (all charges in connection with the foregoing, the "Fuel Charges"). PREPA shall provide LUMA with monthly invoices relating to such Fuel Charges. LUMA shall be responsible for the payment of amounts due pursuant to such invoices, only to the extent funds are available for such Fuel Charges in accordance with the T&D O&M Agreement. PREPA shall provide LUMA with timely quarterly fuel reports as agreed to by the Parties to support the submission by LUMA to PREB as well as the underlying data and information on which the fuel reports are based and any additional information requested by PREB.

7. PREPA shall provide LUMA with invoices on a monthly basis that include all generation related expenses, including documented payroll. LUMA shall be responsible for the payment of amounts due pursuant to such invoices in accordance with the T&D O&M Agreement.

**8.** PREPA and LUMA shall perform all the items herein in accordance with the terms and conditions of the T&D O&M Agreement to the extent applicable.

**EXHIBIT C**

**PENDING REQUIRED INSURANCE**

| OUTSTANDING OWNER INSURANCE COVERAGE | OPERATOR'S PLAN ON HOW TO OBTAIN | TIMEFRAME TO COMPLETION |
|---|---|---|
| Cyber insurance required by Section I.D. of Annex XII to the T&D O&M Agreement. | Operator is currently in the market for cyber liability insurance. | July 1, 2021. |
| Builders' risk insurance required by Section 1.J. of Annex XII to the T&D O&M Agreement. | Operator has pricing indications but is in process of evaluating the cost/benefit of this coverage versus reliance upon contractor / subcontractor coverage. | July 15, 2021. |

| OUTSTANDING OPERATOR INSURANCE COVERAGE | OPERATOR'S PLAN ON HOW TO OBTAIN | TIMEFRAME TO COMPLETION |
|---|---|---|
| Professional liability insurance required by Section 2.C. of Annex XII to the T&D O&M Agreement. | Operator is waiting on quotes and expects them shortly. | June 15, 2021. |

| NON-COMPLIANT INSURANCE COVERAGE | OPERATOR'S PLAN ON HOW TO OBTAIN | TIMEFRAME TO COMPLETION |
|---|---|---|
| Pollution legal liability insurance required by Section 1.E. of Annex XII to the T&D O&M Agreement | Coverage is bound and in effect as of the date hereof, but certificate of insurance may not be available to be delivered immediately. | June 4, 2021 |
| Protective liability insurance required by Section 1.K. of Annex XII to the T&D O&M Agreement. | Operator does not intend to pursue this coverage as it is duplicative and not required for the business. | N/A - requirement to obtain this insurance coverage is permanently waived because it is duplicative and not required for Owner's business. |
| Directors and officers liability insurance required by Section 1.L. of Annex XII to the T&D O&M Agreement. | In PREPA's most recent renewal, they were only able to obtain $25MM in coverage versus the $65MM contract | N/A - the requirement to obtain at least US$65 million in wrongful acts coverage for Owner and directors and officers of |

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 15 de 33
Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 66 of 105

| NON-COMPLIANT INSURANCE COVERAGE | OPERATOR'S PLAN ON HOW TO OBTAIN | TIMEFRAME TO COMPLETION |
|---|---|---|
| | requirement. Operator cannot obtain a certificate of insurance for this policy because it cannot be added as a named insured. | Owner is waived until such time as US$65 million in coverage becomes available on commercially reasonable terms, as reasonably determined by Administrator, provided that in the interim Operator shall obtain coverage of not less than US$25 million. The requirement for Operator to provide a certificate of insurance for this policy is permanently waived. |
| Business travel accident insurance required by Section I.M. of Annex XII to the T&D O&M Agreement. | Owner currently has US$2 million in aggregate limits, which Operator intends to increase to US$3 million in aggregate limits. | June 15, 2021. |
| Fiduciary liability insurance required by Section 2.B. of Annex XII to the T&D O&M Agreement. | Process complete. LUMA was only able to obtain $1MM in coverage versus the $5MM contract requirement. Coverage limits are capped based upon plan asset value. | N/A - the requirement to obtain at least US$5 million in coverage is waived until such time as Operator's plan asset value supports such coverage amount, provided that in the interim Operator shall obtain coverage of not less than US$1 million and shall increase such coverage from time to time as plan asset value increases. |

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 16 de 33

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 67 of 105

## EXHIBIT D

## PENDING LITIGATION

A. Affecting the representations and warranties of ManagementCo pursuant to Section 19.2(e) of the T&D O&M Agreement:

1. *In Re: Certificate of Energy Compliance*, Cases no. CC-2020-579 and no. 2020-592, before the Supreme Court of Puerto Rico.

2. *In re: The Financial Oversight and Management Board of Puerto Rico*, Case:17-04780-LTS.

3. *UTIER et al v. Pedro Pierluisi, in his official capacity as Governor of Puerto Rico, et al.*, Adv. Proc. No. 21-00041.

4. *SREAEE et al v. Pedro Pierluisi, in his official capacity as Governor of Puerto Rico, et al.*, Adv. Proc. No. 21-00049.

B. Affecting the representations and warranties of Owner pursuant to Section 19.1(e) of the T&D O&M Agreement:

1. *In Re: Certificate of Energy Compliance*, Cases no. CC-2020-579 and no. 2020-592, before the Supreme Court of Puerto Rico.

2. *In re: The Financial Oversight and Management Board of Puerto Rico*, Case:17-04780-LTS.

3. *UTIER et al v. Pedro Pierluisi, in his official capacity as Governor of Puerto Rico, et al.*, Adv. Proc. No. 21-00041.

4. *SREAEE et al v. Pedro Pierluisi, in his official capacity as Governor of Puerto Rico, et al.*, Adv. Proc. No. 21-00049.

5. *Acevedo Serrano, et. al., v. Autoridad de Energía Eléctrica, et al.,* Civil No. SJ2021CV03043.

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 17 de 33

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 68 of 105

# EXHIBIT E

## ORDER GRANTING ADMINISTRATIVE EXPENSE TREATMENT

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 18 de 33
Case:17-03283-LTS Doc#:06653 Filed:05/03/21 Entered:05/03/21 10:29:26 Desc:Main
Exhibit 3 complaint with exhibits Page 69 of 105
Document Page 1 of 16

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO
RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO
et al.,

     Debtors. [1]

------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO
RICO,

     as representative of

PUERTO RICO ELECTRIC POWER
AUTHORITY,

     Debtor.

------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

PROMESA
Title III

No. 17 BK 4780-LTS

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

210503 MEM ORD RE LUMA ADMIN EXP MOT       VERSION MAY 3, 2021       1

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 19 de 33
Case:17-03283-LTS Doc#:16653 Filed:05/03/25 Entered:05/03/25 11:02:26 Desc:Main
Exhibit 3 complement with exhibits Page 70 of 105
Document Page 2 of 16

MEMORANDUM ORDER GRANTING GOVERNMENT PARTIES' MOTION FOR ORDER ALLOWING ADMINISTRATIVE EXPENSE CLAIM FOR AMOUNTS TO BE PAID TO LUMA ENERGY BY PREPA DURING INTERIM PERIOD UNDER SUPPLEMENTAL AGREEMENT AND THE T&D CONTRACT

Before the Court is the *Government Parties' Motion for Order Allowing Administrative Expense Claim for Amounts to Be Paid to LUMA Energy by PREPA During Interim Period Under Supplemental Agreement and the T&D Contract* (Docket Entry No. 2417 in Case No. 17-4780 and Docket Entry No. 16241 in Case No. 17-3283, the "Motion").[2] Through the Motion, the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), and the Puerto Rico Electric Power Authority ("PREPA" and, collectively with the Oversight Board and AAFAF, the "Government Parties") seek entry of an order allowing an administrative claim in favor of LUMA Energy, LLC and LUMA Energy ServCo, LLC (together, "LUMA Energy") for certain accrued and unpaid amounts required to be paid by PREPA to LUMA Energy under the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement (Docket Entry No. 2053-4, the "T&D Contract"), dated June 22, 2020, and the supplemental agreement thereto (the "Supplemental Agreement"), entered into by and among PREPA, the Puerto Rico Public-Private Partnerships Authority, and LUMA Energy.

The Court heard oral argument with respect to the Motion on April 28, 2021, and has considered carefully all of the submissions and arguments made in connection with the Motion.[3] The Court has subject matter jurisdiction of this contested matter pursuant to section

---

[2]     Unless otherwise specified, all docket entry references in the remainder of this Memorandum Order are to entries in Case No. 17-4780.

[3]     In addition to the Motion, the Court has reviewed (i) the *Limited Objection of Whitefish Energy Holdings, LLC to Government Parties' Motion for Order Allowing Administrative Claims for Amounts to Be Paid to LUMA Energy by PREPA During*

---

210503 MEM ORD RE LUMA ADMIN EXP MOT          VERSION MAY 3, 2021          2

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 20 de 33

Case:17-03283-LTS Doc#:2653 Filed:05/03/21 Entered:05/03/21 11:09:26 Desc:Main
Exhibit 3 continuation Document Page 71 of 105

306(a) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. § 2166.  For the following reasons, the Motion is granted.

BACKGROUND

The Court hereby incorporates by reference the factual summary set forth in the *Memorandum Opinion Granting in Part and Denying in Part PREPA's Motion for Entry of an Order Allowing Administrative Expense Claim for Compensation for Front-End Transition Services Under the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with LUMA Energy* (Docket Entry No. 2258, the "Front-End Administrative Expense Opinion").  See In re Fin. Oversight & Mgmt. Bd. for P.R., 621 B.R. 289 (D.P.R. 2020) ("LUMA Energy").  The following additional facts are drawn from the Government Parties' submissions in support of the Motion and are undisputed, unless otherwise indicated.

---

*Interim Period Under Supplemental Agreement and the T&D Contract* (Docket Entry No. 2436); (ii) *UTIER's Objection to the Government Parties' Motion for Order Allowing Administrative Expense Claim for Amounts to Be Paid to LUMA Energy by PREPA During Interim Period Under Supplemental Agreement and the T&D Contract* (Docket Entry No. 2435, the "UTIER Objection"); (iii) *SREAEE's Objection to the Government Parties' Motion for Order Allowing Administrative Expense Claim for Amounts to Be Paid to LUMA Energy by PREPA During Interim Period Under Supplemental Agreement and the T&D Contract* (Docket Entry No. 2437); (iv) *Cobra Acquisitions LLC's Objection to Government Parties' Motion for Order Allowing Administrative Expense Claim for Amounts to Be Paid to LUMA Energy by PREPA During Interim Period Under Supplemental Agreement and the T&D Contract* (Docket Entry No. 2438); (v) the *Renewed Limited Objection of Official Committee of Unsecured Creditors to Government Parties' Motion for Order Allowing Administrative Expense Claim for Amounts to Be Paid to LUMA Energy by PREPA During Interim Period Under Supplemental Agreement and T&D Contract* (Docket Entry No. 2439); and (vi) the *Omnibus Reply in Support of Government Parties' Motion for Order Allowing Administrative Expense Claim for Amounts to Be Paid to LUMA Energy by PREPA During Interim Period Under Supplemental Agreement and T&D Contract* (Docket Entry No. 2458).

Case:23-80006-LTS Doc#:653 Filed:05/03/22 Entered:05/03/22 11:02:26 Desc:Main
Exhibit 3 complaint with exhibits Page 72 of 105

LUMA Energy's anticipated performance of operational and management services (the "O&M Services") with respect to PREPA's transmission and distribution system (the "T&D System") is a cornerstone of the T&D Contract. (See Mot. ¶¶ 28-29.) One of the original preconditions for LUMA Energy's commencement of the O&M Services was the requirement that PREPA obtain necessary Title III Court approvals, which include confirmation of a plan of adjustment for PREPA. (Mot. ¶ 31 (citing T&D Contract § 4.5(o)).) Because, in negotiating the T&D Contract, the Oversight Board believed that PREPA might not be able to confirm and consummate a plan of adjustment by the time LUMA Energy is otherwise prepared to commence the O&M Services, the Oversight Board requested amendments to the T&D Contract, which were included in the Supplemental Agreement. (Id. ¶¶ 32-33.) Specifically, the Supplemental Agreement provides for the commencement of the O&M Services if all other conditions precedent to the "Service Commencement Date," other than PREPA's exit from Title III and delivery of a certain tax opinion and reliance letter, are satisfied or waived (the "Interim Service Commencement Date"). (Id. ¶¶ 34 (citing Supplemental Agreement §§ 2.2 & 2.3).) The Interim Service Commencement Date begins a period (the "Interim Period") during which the Supplemental Agreement is in effect, and LUMA Energy will assume full control of the T&D System until the earlier of (i) the date on which a plan of adjustment for PREPA is confirmed and (ii) the "Interim Period Termination Date," which, unless extended by agreement of the parties, will occur eighteen months after the Interim Service Commencement Date if no such plan of adjustment has been confirmed. (Id. (citing Supplemental Agreement § 7.1).)

The Supplemental Agreement requires, as a prerequisite to the Interim Service Commencement, that the Title III Court have entered a final and non-appealable order granting administrative expense treatment for any accrued and unpaid amounts required to be paid under

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 22 de 33

Case:23-00061-LTS Doc#:65-3 Filed:05/03/25 Entered:05/03/25 11:02:26 Desc:Main
Exhibit 3 conDocumentith Eagbits oPage 73 of 105

the T&D Contract and the Supplemental Agreement during the Interim Period (the "Interim Obligations"). (Id. ¶ 35 (citing Supplemental Agreement § 2.3(b).) The Interim Obligations consist primarily of: (i) an "Interim Period Service Fee" of $115 million annually, payable in monthly installments, (ii) PREPA's indemnification obligations running in favor of LUMA Energy and its affiliates during the Interim Period, and (iii) a $115 million "Termination Fee," payable upon the occurrence of the Interim Period Termination Date. (Id. ¶ 36 (citing Supplemental Agreement §§ 3.3 & 7.2(c) and T&D Contract § 18.2).)

Relevant Procedural History

On July 7, 2020, the Government Parties filed *PREPA's Motion for Entry of an Order Allowing Administrative Expense Claim for Compensation for Front-End Transition Services Under Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with LUMA Energy* (Docket Entry No. 2053, the "Front-End Administrative Expense Motion"), which sought an order allowing an administrative expense claim for certain fees associated with the transfer of operation and maintenance of the T&D System to LUMA Energy. Several parties filed objections to the Front-End Administrative Expense Motion, including Unión de Trabajadores de la Industria Eléctrica y Riego, Inc. ("UTIER"), Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica ("SREAEE" and, together with UTIER, the "Union Entities"), the Official Committee of Unsecured Creditors (the "UCC"), Cobra Acquisitions, LLC ("Cobra"), and Whitefish Energy Holdings, LLC ("Whitefish").

On October 19, 2020, the Court issued the Front-End Administrative Expense Opinion. The Court held that (i) the Front-End Administrative Expense Motion was ripe for consideration, (ii) operating expenses of PREPA are eligible for administrative expense priority

Case:17-03283-LTS Doc#:06653 Filed:05/03/25 Entered:05/03/25 11:09:26 Desc:Main
Exhibit 3 compliant with exhibits Page 74 of 105

under section 503(b)(1)(A) of the Bankruptcy Code based on the text and structure of

PROMESA, and (iii) the "Front-End Transition Service Fees," except for late fees, qualified for

administrative expense priority. <u>LUMA Energy</u>, 621 B.R. 289. The Court declined to address

the UCC's arguments concerning the Supplemental Agreement, noting that such arguments were

largely irrelevant to the Front-End Administrative Expense Motion and that the UCC would have

the opportunity to raise its arguments in the context of future motion practice. <u>Id.</u> at 302. The

Union Entities appealed certain rulings in the Front-End Administrative Expense Opinion to the

United States Court of Appeals for the First Circuit, and briefing of that matter is ongoing.

Discussion

The Government Parties now seek an order pursuant to sections 503(b) and

507(a)(2) of the Bankruptcy Code allowing an administrative expense claim in favor of LUMA

Energy for the Interim Obligations.[4] Relying on section 503(b)(1)(A) of the Bankruptcy Code,

the Government Parties assert that the Interim Obligations qualify for administrative expense

priority because the O&M Services are beneficial to PREPA. The Union Entities object to the

Motion, arguing that (i) the Motion is unripe for adjudication, (ii) administrative expense priority

treatment is unavailable in Title III cases, and (iii) the Interim Obligations do not qualify as

administrative expenses under section 503(b)(1)(A). The UCC has filed a limited objection to

the Motion, which takes issue with certain specific aspects of the Supplemental Agreement.

Cobra and Whitefish, both of which have sought allowance of their own administrative expense

claims against PREPA in separate contested matters, object to the Motion only insofar as the

---

[4]     Sections 503 and 507(a)(2) of the Bankruptcy Code are made applicable in these Title III
cases by section 301(a) of PROMESA. <u>See</u> 48 U.S.C. § 2161(a).

210503 MEM ORD RE LUMA ADMIN EXP MOT          VERSION MAY 3, 2021                    6

relief sought therein would result in what they deem inequitable treatment of their own claims against PREPA.

Ripeness

The Court begins by addressing the Union Entities' argument that the Motion is unripe for adjudication. Ripeness "has roots in both the Article III case or controversy requirement and in prudential considerations." Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017) (internal quotation marks and citation omitted). The doctrine "seeks to prevent the adjudication of claims relating to contingent future events that may not occur as anticipated, or indeed may not occur at all." Id. (internal quotation marks and citation omitted). "[A] claim is ripe only if the party bringing suit can show both that the issues raised are fit for judicial decision at the time the suit is filed and that the party bringing suit will suffer hardship if 'court consideration' is withheld." Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey, 844 F.3d 318, 326 (1st Cir. 2016) (citation omitted). "The burden to prove ripeness is on the party seeking jurisdiction." Id. (citation omitted).

In the Front-End Administrative Expense Opinion, this Court concluded that the Government Parties had met their burden of showing that the Front-End Administrative Expense Motion was ripe for adjudication notwithstanding pending challenges to the Puerto Rico Energy Bureau's ("PREB") issuance of an Energy Compliance Certificate with respect to the T&D Contract. LUMA Energy, 621 B.R. at 298. The Court reasoned that the T&D Contract was in effect at the time the Front-End Administrative Expense Motion had been filed, and the T&D Contract's terms required the Government Parties to seek the relief requested therein. Id. Although it was "possible that PREB's decision could be reversed at a later date, that

210503 MEM ORD RE LUMA ADMIN EXP MOT          VERSION MAY 3, 2021          7

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 25 de 33
Case:23-00068-LTS Doc#:653 Filed:05/03/25 Entered:05/03/25 11:29:26 Desc:Main
Exhibit 3 containment with exhibits Page 76 of 105

contingency [did] not render unripe a request for administrative expense priority treatment for amounts that are currently accruing and payable under an operative contract." Id. The Court also determined that PREPA "would be harmed if the [Front-End Administrative Expense] Motion were not adjudicated" promptly, because such a delay "would trigger LUMA Energy's right to terminate the T&D Contract, which, if exercised, would indisputably hinder the transformation of PREPA's T&D System." Id.

Here, the Motion is ripe for judicial review for similar reasons. The administrative expense treatment sought by the Government Parties pertains to obligations arising under a binding contract under which both PREPA and LUMA Energy are currently performing. That contract requires the Government Parties to seek administrative expense status for the Interim Obligations as a precondition to LUMA Energy's performance of the O&M Services, which is LUMA Energy's central role under the T&D Contract and which will be performed in furtherance of a transformation of Puerto Rico's power utility that is mandated under Puerto Rico law. The Motion is thus fit for review. Likewise, a failure to adjudicate the Motion would harm PREPA by delaying, if not preventing, performance by LUMA Energy of the O&M Services and create a severe impediment to PREPA's transformation—a "direct and immediate dilemma" for PREPA. Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 9 (1st Cir. 2012) (citation omitted); cf. LUMA Energy, 621 B.R. at 298.

The Union Entities identify several reasons why, in their view, the validity of the T&D Contract is contingent on future events, thereby rendering the Motion unripe. Their arguments are unpersuasive. As the Government Parties point out, the First Circuit has made clear that the "possibility of future mootness" is not the "type of contingency that would create a lack of ripeness." Town of Barnstable v. O'Connor, 786 F.3d 130, 143 (1st Cir. 2015). It

210503 MEM ORD RE LUMA ADMIN EXP MOT            VERSION MAY 3, 2021                    8

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 26 de 33

Case 23-05006-SLT Doc#65 Filed 05/03/25 Entered 05/03/25 11:09:26 Desc Main
Exhibit 3 complaint with exhibits 9 Page 77 of 105

follows that the mere potential future invalidity of the T&D Contract cannot serve as a basis to

conclude that the Motion is not currently fit for review. For this reason, the Union Entities

misplace their reliance on the pending challenges to PREB's approval of the T&D Contract, any

unsatisfied conditions to the commencement of the Interim Period, any possible legislative action

concerning the T&D Contract, and the Union Entities' pending appeal of the Court's Front-End

Administrative Expense Opinion, as bases for challenging the Motion's ripeness.

Nor does the Union Entities' pending appeal of the Front-End Administrative

Expense Opinion otherwise divest this Court of jurisdiction of the Motion. "The test for

determining if a pending appeal divests a lower court of jurisdiction is whether the subject matter

presented in the appeal is so 'closely related' to the issues raised in the motion that the entry of

the order 'impermissibly interfere[s]' with the appellant's rights in its appeal." Mission Product

Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C. (In re Old Cold, LLC), 602 B.R. 798, 823

(B.A.P. 1st Cir. 2019) (quoting In re Whispering Pines Ests., Inc., 369 B.R. 752, 759 (B.A.P. 1st

Cir. 2007)), aff'd, 976 F.3d 107 (1st Cir. 2020). Here, although both the Front-End

Administrative Expense Motion and the Motion relate to the same contract and turn on similar

legal principles, they seek administrative expense treatment for payments associated with

entirely different services: the Front-End Transition Services, on the one hand, and the O&M

Services performed during the Interim Period, on the other hand. Each motion requires an

independent assessment under section 503(b) of the Bankruptcy Code as to whether the amounts

in question qualify for administrative expense priority. Although the First Circuit's ruling will

undoubtedly address certain legal issues that are pertinent to the Motion, nothing about the

Court's adjudication of the Motion now would affect in any way, much less impermissibly

Exhibit 3 complaint with Exhibits Page 78 of 105

interfere with, the Union Entities' rights in its appeal.

Accordingly, the Court rejects the Union Entities' arguments and concludes that the Motion is ripe for adjudication.

## Section 503(b)(1)(A) of the Bankruptcy Code

The Court turns next to whether the Interim Obligations qualify as administrative expenses under section 503(b)(1)(A) of the Bankruptcy Code. That section provides, in relevant part, that "(a) [a]n entity may . . . file a request for payment of an administrative expense" and, "(b) [a]fter notice and a hearing, there shall be allowed administrative expenses . . . including— (1)(A) the actual, necessary costs and expenses of preserving the estate[.]" 11 U.S.C.A. § 503 (Westlaw through PL 117-11 with the exception of PL 116-283). Section 301(a) of PROMESA, 48 U.S.C. § 2161(a), expressly incorporates section 507(a)(2) of the Bankruptcy Code, 11 U.S.C. § 507(a)(2), which gives priority to administrative expenses that are allowed under section 503(b) of the Bankruptcy Code, and section 301(c)(5) of PROMESA provides that "[t]he term 'property of the estate', when used in a section of [the Bankruptcy Code] made applicable in a case under this subchapter by subsection (a), means property of the debtor." 48 U.S.C.A. § 2161(c)(5) (Westlaw through PL 117-11 with the exception of PL 116-283). In the First Circuit, "a request for priority payment of an administrative expense pursuant to Bankruptcy Code § 503(a) may qualify if (1) the right to payment arose from a postpetition transaction with the debtor estate, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the right to payment was beneficial to the estate of the debtor." Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.), 954 F.2d 1, 5 (1st Cir. 1992) (citations omitted). "The burden of proving entitlement to priority payment as an administrative expense . . . rests with the

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 28 de 33
Case:23-00065-LTS Doc#:65-3 Filed:05/23/25 Entered:05/23/25 11:02:26 Desc:Main
Exhibit 3 complaint with Exhibits 1 Page 79 of 105

party requesting it" id. (citations omitted), and the Court has broad discretion in determining whether to grant a request for such priority treatment, see In re Jeans.com, 491 B.R. 16, 23 (Bankr. D.P.R. 2013) (citation omitted).

As they did in opposition to the Front-End Administrative Expense Motion (relying on the same authorities), the Union Entities argue here that there can be no administrative expense priority for the necessary costs and expenses of preserving a Title III debtor because no bankruptcy estate exists in a Title III case. In the Front-End Administrative Expense Opinion, the Court squarely rejected this argument and concluded that the "text and structure of PROMESA compel the conclusion that operating expenses are eligible for administrative expense priority under section 503(b)(1)(A) of the Bankruptcy Code." LUMA Energy, 621 B.R. at 299. No basis to depart from the Court's prior ruling regarding this issue having been raised, the Court rejects the Union Entities' arguments for the reasons set forth in the Front-End Administrative Expense Opinion.

The Union Entities further argue that the Government Parties have failed to demonstrate that the Interim Obligations are necessary costs of preserving PREPA because they do not provide any benefits to PREPA or its creditors. The UCC makes a similar argument as to the Termination Fee only. In the Front-End Administrative Expense Opinion, the Court concluded that the Government Parties had "satisfied their burden of demonstrating that the Front-End Transition Obligations other than any Late Fees associated therewith . . . are, to the extent incurred and payable under the T&D Contract, reasonable and necessary expenses of preserving PREPA under section 503(b)(1)(A)." Id. at 303. The primary rationale underlying that conclusion was that the Government Parties had proffered sufficient evidence, through the *Declaration of Omar J. Marrero in Support of PREPA's Motion for Entry of an Order Allowing*

*Administrative Expense Claim for Compensation for Front-End Transition Services Under*

*Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with*

*LUMA Energy* (Docket Entry No. 2053-2, the "Marrero Declaration") "to support a

determination by this Court that the Front-End Transition Service costs that are properly incurred

and payable under the T&D Contract will benefit PREPA." LUMA Energy, 621 B.R. at 301.

The Court further observed that, "[i]n light of the restrictions on judicial authority and the scope

of PROMESA that are imposed by sections 303 and 305 of the statute, Oversight Board and

debtor consent are also relevant considerations." Id.

   Here, the Government Parties have satisfied their burden with respect any Interim

Obligations that are actually incurred.  They have proffered evidence of their determination that

the O&M Services will benefit PREPA by (i) transforming the T&D System into a "modern,

sustainable, reliable, efficient, cost-effective, and resilient electric system consistent with prudent

utility practices in order to increase electric service quality"; (ii) enabling delivery of low-cost

electricity to ratepayers of Puerto Rico; (iii) increasing T&D System resiliency and reliability;

(iv) deploying new technologies; and (iv) "implementing industry best practices and operational

excellence through managerial continuity and long-term planning." (Marrero Decl. ¶ 12.)

Moreover, the Government Parties have, for purposes of this motion practice, adequately

supported their conclusion that LUMA Energy is well qualified to assist PREPA in

accomplishing these objectives.  (Id. ¶¶ 13-14.)

   The Union Entities contend that the Government Parties are wrong for numerous

reasons, primarily by attacking the propriety of the T&D Contract as a whole and its underlying

goals.  For example, relying heavily on the *Declaration of Mr. Héctor Rosario-Hernández in*

*Support of SREAEE' Objection to the Government Parties' Motion for Order Allowing*

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 30 de 33
Case:23-00063-SLDoc#:Doc#653 Filed:05/03/225 Entered:05/03/2251:02:226 Desc:Main
Exhibit 3 complaint with Exhibits 3 Page 81 of 105

*Administrative Expense Claim for Amounts to Be Paid to LUMA Energy by PREPA During Interim Period Under Supplemental Agreement and the T&D Contract* (Docket Entry No. 2437-2, the "Rosario Declaration"), the Union Entities argue that the T&D Contract will increase PREPA's deficit, increase energy costs in Puerto Rico, jeopardize PREPA's receipt of federal funds, and invite conflicts of interest in connection with contract awards for capital improvement projects. (See UTIER Obj. ¶¶ 84-98 (citing Rosario Decl. ¶¶ 10-12, 22-27, 32, 34, 41).) Like the arguments raised in their objection to the Front-End Administrative Expense Motion, however, the Union Entities' grievances primarily implicate "energy policy and governmental structural issues that are not pertinent to" the determination before the Court, LUMA Energy, 621 B.R. at 301, and are largely irrelevant to the more narrow question at issue here: whether the Interim Obligations benefit PREPA. The Government Parties have made the reasonable determination that they do and, as the Court has previously observed, "PROMESA affords the Government Parties substantial discretion and autonomy in establishing government policy, and expressly precludes the Court from interfering with such efforts." Id. (citing 48 U.S.C. §§ 2163, 2165). Thus, even accepting as true the assertions made in the Rosario Declaration, the differences in views expressed therein as to the merits of the T&D Contract and energy policy issues are insufficient to overcome the Government Parties' proffers as to pertinent matters actually considered, particularly in light of Government Parties' role under PROMESA and their consent to PREPA's payment of the Interim Obligations.

The UCC contends that the Termination Fee component of the Interim Obligations cannot qualify as an administrative expense because it is expressly characterized as "liquidated damages" in the T&D Contract, and that the Termination Fee is not akin to typical break-up fees in the bankruptcy context, which are generally entitled to administrative expense

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 31 de 33
Case:17-03283-LTS Doc#:1653 Filed:05/03/25 Entered:05/03/25 11:02:26 Desc:Main
Exhibit 3 complaint with Exhibits 4 Page 82 of 105

priority status because such fees are designed to encourage bidders or creditors to participate in transactions and thus provide value to the estate. The UCC asserts that the Termination Fee is a true penalty and provides no tangible benefit to PREPA. Additionally, the UCC compares the Termination Fee to the late fees that the Court previously found had not been shown to qualify for administrative expense treatment, at least at the time the Front-End Administrative Expense Motion was filed.

The Court concludes that the Government Parties have met their burden of demonstrating that the Termination Fee qualifies for administrative expense treatment. As a preliminary matter, the fact that the Government Parties agreed to the Termination Fee after the bidding process was completed does not foreclose it from benefiting PREPA. Here, again recognizing that Oversight Board and debtor consent are relevant considerations for purposes of the Court's section 503(b)(1)(A) analysis in the Title III context—and that "PROMESA affords the Government Parties substantial discretion and autonomy in establishing government policy, and expressly precludes the Court from interfering with such efforts," LUMA Energy, 621 B.R. at 301—the Government Parties have made an adequate showing that inclusion of the Termination Fee provision to incentivize LUMA Energy to commence the O&M Services during PREPA's Title III case was beneficial to PREPA in that it enabled the Government Parties to commence a fundamental transformation of an integral component of the Commonwealth's infrastructure before the Title III restructuring is accomplished, thereby furthering the interests of not only PREPA but also of the people of Puerto Rico who rely on its services. The Termination Fee was part of the overall economic package that the Oversight Board found beneficial to PREPA because it it enabled PREPA's transformation to begin prior to confirmation. The Court is persuaded that, unlike the liquidated damages provisions in cases cited by the UCC, which

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 32 de 33
Case:17-03283-LTS Doc#:16653 Filed:05/03/21 Entered:05/03/21 10:29:26 Desc:Main
Exhibit 3 complaint with Exhibits Page 83 of 105

were "not correlated to an actual transactional cost or expense incurred by the negotiating

bidder," In re Hupp Industries, Inc., 140 B.R. 191, 196 (Bankr. N.D. Ohio 1992), the

Termination Fee accounts for the financial and reputational risks assumed by LUMA Energy,

which is actually engaged in work under the contract, associated with termination of the parties'

relationship earlier than anticipated. In being related to costs of services under the T&D

Contract, the Termination Fee essentially makes the pre-confirmation services more expensive if

the parties do not carry out the full 15-year term of the contract; that is, the accrued Interim

Obligations including the Termination Fee will have been paid in aid of a short-term term project

beneficial to the debtor if the agreement is terminated prematurely, whereas the baseline contract

price assumes continuation of the arrangement throughout the contract term. In benefiting the

estate by securing pre-confirmation commencement of the transformation, the Supplemental

Agreement, including the Termination Fee, advances PREPA's long-term prospects and thus

benefits the debtor and its stakeholders. In this context, the Termination Fee provision is

reasonable. The UCC's challenges to the Termination Fee provision are therefore unavailing.

The UCC also objects to what it characterizes as LUMA Energy's "consent right"

over a PREPA plan of adjustment during the Interim Period. Because the Motion does not seek

approval of the T&D Contract or Supplemental Agreement in their entirety, that issue is not

within the scope of issues before the Court, and the UCC's objection with respect to this aspect

of the arrangement is overruled. Whitefish's, Cobra's, and Union Entities' arguments regarding

the effects that granting the Motion will have on their individual interests are similarly irrelevant

to the inquiry before the Court and, as such, are rejected for substantially the reasons set forth in

the Front-End Administrative Expense Opinion. See LUMA Energy, 621 B.R. at 302-03.

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 33 de 33
Case 17-03283-LTS Doc#6653 Filed 05/03/25 Entered 05/03/25 11:02:26 Desc Main
Exhibit 3 Complaint with Exhibits Page 84 of 105

Accordingly, the Court concludes that the Government Parties have satisfied their burden of showing that any Interim Obligations actually incurred are entitled to administrative expense priority under section 503(b)(1)(A) of the Bankruptcy Code. In light of this conclusion, the Court need not address the Government Parties' alternative arguments as to why the Interim Obligations are entitled to administrative expense priority treatment.

## CONCLUSION

For the foregoing reasons, the Motion is granted. This Memorandum Order resolves Docket Entry No. 2417 in Case No. 17-4780 and Docket Entry No. 16241 in Case No. 17-3283.

Dated: May 3, 2021

    /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 1 de 3

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 85 of 105

November 30, 2022

Puerto Rico Electric Power Authority
PO Box 364267
San Juan, Puerto Rico 00936-4267
Attention: Chief Executive Officer

LUMA Energy, LLC
644 Fernandez Juncos Ave., Suite 301
San Juan, Puerto Rico 00907
Attention: President/CEO; General Counsel

Ladies and Gentlemen:

We refer to the Puerto Rico Transmission and Distribution System Supplemental Terms Agreement, dated June 22, 2020 (the "Supplemental Agreement"), among the Puerto Rico Electric Power Authority ("Owner"), the Puerto Rico Public-Private Partnerships Authority ("Administrator"), LUMA Energy, LLC ("ManagementCo") and LUMA Energy ServCo ("ServCo" and, together with ManagementCo, "Operator"). Capitalized terms used but not defined herein shall have the meanings set forth in the Supplemental Agreement.

In accordance with the express terms of Section 7.1(a) of the Supplemental Agreement, Administrator hereby requests an extension of the Interim Period Termination Date to the date on which the following Service Commencement Date Conditions shall have been satisfied or waived: (i) the Title III Exit shall have occurred; and (ii) the Title III Plan and order of the Title III Court confirming same shall be reasonably acceptable to Operator.

By signing below, each of Administrator, Owner and Operator confirms its agreement to the foregoing extension of the Interim Period Termination Date.

Respectfully,

PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY, as Administrator

By: _____
Name: Fermín E. Fontanés Gómez
Title: Executive Director

cc: Puerto Rico Energy Bureau
    268 Avenida Muñoz Rivera
    Edificio World Plaza
    Piso 7, Suite 704
    Hato Rey, Puerto Rico 00918
    Attention: President

Page 1 of 3

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 2 de 3

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 86 of 105

ACKNOWLEDGED AND AGREED:

PUERTO RICO ELECTRIC POWER AUTHORITY

By: _____

Name: Fernando A. Gil-Enseñat
Title: Chairman
PREPA Governing Board

*[Signature Page to Supplemental Agreement Extension]*

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 3 de 3

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 87 of 105

ACKNOWLEDGED AND AGREED:

LUMA ENERGY, LLC

By: _____

Name: Wayne Stensby

Title: President & CEO

By: _____

Name: MARIO HURTADO

Title: VP + Chief Regulatory Officer

LUMA ENERGY SERVCO, LLC

By: _____

Name: Wayne Stensby

Title: President & CEO

By: _____

Name: MARIO HURTADO

Title: VP and Chief Regulatory Officer

Page **3 of 3**

*[Signature Page to Supplemental Agreement Extension]*

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc: Exhibit 3 complaint with exhibits Page 88 of 105

**GOBIERNO DE PUERTO RICO**
AUTORIDAD PARA LAS ALIANZAS PÚBLICO-PRIVADAS DE PUERTO RICO

### JUNTA DE DIRECTORES DE LA
### AUTORIDAD PARA LAS ALIANZAS PÚBLICO-PRIVADAS DE PUERTO RICO

### REUNIÓN EXTRAORDINARIA
### 2022-17

**Fecha**: 28 de noviembre de 2022 y continuación el 29 de noviembre de 2022

**Hora**: 3:00 p.m. y 4:00 pm, respectivamente

**Lugar**: Sede de la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico Centro Gubernamental Roberto Sánchez Vilella Avenida José de Diego Santurce, Puerto Rico

**Directores Presentes:**
Lcdo. Omar J. Marrero Díaz, *Presidente*
(28 y 29 de noviembre de 2022)
CPA Francisco Parés Alicea, *Vicepresidente*
(28 y 29 de noviembre de 2022)
Plan. Julio Lassús Ruiz, *Secretario*
(28 y 29 de noviembre de 2022)
Lcdo. Eduardo Ferrer Ríos
(28y 29 de noviembre de 2022)
Lcda. Liza M. Ortiz-Camacho, *Videoconferencia*
(28 y 29 de noviembre de 2022)

**Gerencia Presente de la AAPP:**
Lcdo. Fermín Fontanés Gómez, *Director Ejecutivo*
(28 y 29 de noviembre de 2022)
Lcda. Isis L. Pérez Vélez, *Subdirectora Ejecutiva*
(28 de noviembre de 2022)
Lcda. Shylene De Jesús Rivera, *Asesora Legal General* (28 y 29 de noviembre de 2022)
Lcda. Angie González Montalvo, *Directora de Administración y Finanzas*
(28 de noviembre de 2022)

**Oficiales de la Junta de Directores**:
Lcda. Janice Ortiz Valentín, *Secretaria Auxiliar*
Srta. Verónica M. Nolla Schell, *Asesora Legal de la AAFAF*

## LLAMADO AL ORDEN Y DETERMINACIÓN DE QUÓRUM

A las 3:38 pm del 28 de noviembre de 2022, el Presidente de la Junta, Lcdo. Omar J. Marrero Díaz, hizo el llamado al orden para comenzar la reunión extraordinaria de la Junta de Directores de la Autoridad para las Alianzas Público-Privadas de Puerto Rico ("AAPP" o "Autoridad") (la "Junta de Directores" o "Junta"). El Secretario de la Junta de Directores, Plan. Julio Lassús Ruiz, certificó el quórum según lo establece el Reglamento.

64686



Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc: Exhibit 3 complaint with exhibits Page 89 of 105

**Junta de Directores AAPP**
**M – 2022-17**

Previo a atender el único asunto en agenda para esta reunión extraordinaria, el Presidente, Lcdo. Omar J. Marrero Díaz recalcó la importancia del asunto que esta Junta de Directores tiene ante su consideración en esta ocasión. Señaló que los materiales a ser considerados por los Directores fueron provistos con anterioridad a la reunión, como de ordinario. Sin embargo, se expresó en cuanto a los acontecimientos ocurridos previo a la reunión, específicamente al hecho de que recién advinieron en conocimiento de que los documentos confidenciales/privilegiados circulados exclusivamente para la consideración de los Directores de esta Junta, fueron objeto de discusión pública. El Presidente Marrero Díaz enfatizó que es la primera vez que ello le ocurre lo que es una situación sumamente lamentable y decepcionante. Además, informó a los miembros de la Junta de Directores que ya se comunicó con el Área de Sistemas de Información de la Autoridad de Asesoría Financiera y Agencia Fiscal ("AAFAF") y se estará comenzando una investigación para poder llegar a la raíz de lo ocurrido y poder tomar medidas correctivas, así como medidas de seguridad en lo relacionado con los documentos que son compartidos con los Directores de la Junta. Señaló, además, que ya se hicieron las gestiones con el personal de la Secretaría de esta Junta de Directores de modo que todas las comunicaciones de las reuniones deberán ser dirigidas exclusivamente a los miembros de la Junta.

La Directora, Lcda. Liza M. Ortiz Camacho expresó de igual manera su molestia al advenir en conocimiento de lo ocurrido y señaló que nunca le había sucedido. La Directora recomendó la contratación de un ente independiente para llevar a cabo la investigación y la preparación de un informe forense. Señaló además y tomando en consideración que la AAPP trabaja con fondos federales, que dicho informe sea referido al Gobierno Federal en caso de que se identifiquen en el mismo violaciones de Ley. La Directora Ortiz Camacho expresó su apoyo al proceso y se puso a la disposición del Presidente para lo que necesitaran.

Por otro lado, el Director, Lcdo. Eduardo Ferrer Ríos, añadió a las expresiones del Presidente y de la Directora Ortiz Camacho que en su caso particular recibió una llamada telefónica de la prensa en la tarde del domingo en la que se le cuestionó sobre el documento, haciendo referencia al memorando circulado. Añadió que, en su caso particular, no es la primera vez que los medios se comunican con él en relación con documentos que son solo para la consideración de esta Junta de Directores. De igual modo, la Directora Ortiz Camacho señaló que en su caso también fue contactada por la prensa.

Los Directores, el Plan. Julio Lassús Ruiz y el CPA Francisco Parés Alicea se unieron a las expresiones del Presidente Marrero Díaz y de los Directores Ferrer Ríos y Ortiz Camacho.

El Director Parés Alicea dio la bienvenida a las investigaciones y señaló que en su experiencia es la primera vez que se enfrenta a un reto de filtración de información como el que aconteció en esta ocasión. Además, puso a la disposición del Presidente los recursos de Sistemas de Información del Departamento de Hacienda.

Por su parte, el Director Lassús Ruiz proveyó sugerencias para tener más seguridad en cuanto al acceso a los documentos compartidos, como por ejemplo, la creación de un enlace que requiera una contraseña para poder acceder a los documentos, y puso a la disposición del Presidente de la Junta los recursos de Informática de la Junta de Planificación.

**ASUNTO OPERACIONAL DE LA AAPP**

*"Authorization to extend the Interim Period Termination Date under the Puerto Rico Transmission and Distribution System Supplemental Terms Agreement."*

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 90 of 105

El Lcdo. Fermín Fontanés Gómez, *Director-Ejecutivo de la AAPP*, presentó ante los Directores de esta Junta una solicitud para extender la fecha de terminación del período interino bajo el *Puerto Rico Transmission and Distribution System Supplemental Terms Agreement* ("Contrato Suplementario").

El licenciado Fontanés Gómez proveyó un trasfondo a los miembros de la Junta de Directores relacionado al Contrato Suplementario y lo que motivó el mismo. Señaló, que el Contrato Suplementario fue firmado el 22 de junio de 2020 entre la AAPP, la Autoridad de Energía Eléctrica de Puerto Rico ("AEE"), LUMA Energy, LLC y LUMA Energy ServCo, LLC (en conjunto, "LUMA"), y que dicho Contrato Suplementario tenía una fecha de terminación de 18 meses a partir del comienzo del período interino (según definido en dicho documento), o sea, 30 de noviembre de 2022. El licenciado Fontanés hizo un recuento del proceso de aprobación del contrato de alianza entre LUMA, la AEE y la AAPP, denominado *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement (*"el Contrato de Operación y Mantenimiento") y del Contrato Suplementario. Aludió al trámite de aprobación establecido en la Ley para las Alianzas Público-Privadas, Ley 29 de 2009 ("Ley 29") e indicó que como parte de ese trámite era requisito también contar con la aprobación de la Junta de Supervisión y Administración Financiera para Puerto Rico ("FOMB, por sus siglas en inglés). Señaló el licenciado Fontanés Gómez que como parte de ese proceso sostuvieron diversas reuniones con los asesores de FOMB y no fue hasta finales del 2019 que el Comité de Alianzas recomendó la selección de LUMA como proponente preferido. El licenciado Fontanés Gómez explicó que durante la última etapa de estos procesos la recomendación de otorgar el Contrato de Operación y Mantenimiento se presentó no solo a la FOMB sino también al Negociado de Energía de PR ("Negociado") y a las correspondientes Juntas de Directores de la AEE y AAPP. Señaló que cuando se presentó la recomendación a FOMB, ésta condicionó la selección de LUMA como proponente preferido a que LUMA comenzara a trabajar con el sistema de transmisión y distribución de energía eléctrica durante el proceso de negociación del proceso de quiebra de la AEE; ello, con el propósito de proveer seguridad y poder atender los riesgos que acarrean el trabajar con una entidad que permanece como deudor dentro de un procedimiento de Título III bajo la Ley PROMESA. Toda vez que no se contaba con una fecha definida y segura del tiempo de duración de este proceso de reestructuración de la AEE bajo el Titulo III, se negoció y se acordó con LUMA una justa compensación y un Contrato Suplementario que culminaría una vez la AEE estuviera fuera del proceso de reestructuración de la deuda bajo Título III. Explicó el licenciado Fontanés Gómez que el contrato suplementario fue diseñado para que, a pesar de que la AEE continuara en el proceso de quiebra al 1 de junio de 2021, fecha en que LUMA asumió la operación del sistema de transmisión y distribución de la AEE, LUMA pudiera comenzar a operar el sistema siempre y cuando cumpliera con ciertos requisitos y condiciones.

El licenciado Fontanés Gómez explicó que, a pesar de que la AEE sigue en proceso de reestructuración de la deuda, no ha finalizado el plan de reorganización y el Negociado solo ha establecido métricas de cumplimiento base (*baseline*) y aún no se ha expresado sobre las aplicables a LUMA bajo el Contrato de Operación y Mantenimiento. Añadió el licenciado que si no se extiende el término del Contrato Suplementario el mismo expirará el 30 de noviembre de 2022 y, además, quedaría sin efecto el Contrato de Operación y Mantenimiento, mediante el cual LUMA se convirtió en el operador del sistema de transmisión y distribución de energía de la AEE. El licenciado Fontanés Gómez aclaró que el Contrato de Operación y Mantenimiento gobierna el Contrato Suplementario y establece todas las responsabilidades y obligaciones de las partes.

A preguntas del Director Ferrer Ríos relacionada con la posibilidad de que durante las negociaciones para la extensión de la fecha de terminación del Contrato Suplementario se haya acordado algún término diferente a lo ya pactado en relación con el Contrato Suplementario, el licenciado Fontanés Gómez indicó que el contrato se mantiene intacto, excepto lo relacionado al término de vigencia del Contrato Suplementario. A preguntas del Director Parés Alicea, el licenciado Fontanés Gómez indicó que bajo el Contrato Suplementario LUMA y el Gobierno tienen las mismas obligaciones que bajo el contrato

"base" (o sea, el Contrato de Operación y Mantenimiento). Además, el licenciado Fontanés Gómez explicó a los Directores que mientras la AEE esté en el proceso de quiebra bajo Título III, LUMA tendría un pago fijo de $115,000,000 y que durante dicho período LUMA no recibiría ninguna bonificación. También, explicó cómo se llegó a la determinación de dicha cuantía y añadió que la misma fue acordada considerando la sugerencia de FOMB quien se expresó a los efectos de que dicha cuantía era una razonable.

A preguntas de los Directores Ferrer Ríos y Ortiz Camacho relacionadas con la falta de presentación de las métricas por parte del Negociado y la falta de cumplimiento con sus obligaciones por parte de la AEE incluyendo en lo relacionado con el plan para su reorganización, así como la falta de tomar acciones correctivas en contra del Negociado y la AEE; el licenciado Fontanés Gómez señaló que la AAPP reconoce la jurisdicción de cada una de las partes contratantes incluyendo al Negociado, lo que siempre se ha respetado. Señaló, que la AAPP está impedida de producir las métricas toda vez que ello no está bajo su jurisdicción. El Director Ferrer Ríos señaló la importancia de las métricas, dado que con ellas se determina el cumplimiento de LUMA para poder pagarle por sus servicios o penalizarlos. El licenciado Fontanés Gómez señaló que la Gerencia de la AAPP ha tomado acción en cuanto a la falta de cumplimiento del Contrato de Operación y Mantenimiento por parte de la AEE. En específico, señaló que la AAPP le ha enviado cartas y otras comunicaciones al Negociado y a LUMA y la AEE recordándoles sobre sus obligaciones. Explicó que las obligaciones del Negociado incluyen la aprobación de la reorganización de la AEE y la producción de las métricas. La Gerencia de la AAPP añadió que el Negociado se encuentra trabajando con el establecimiento de métricas y que hay un procedimiento abierto con LUMA ante el Negociado en cuanto a las métricas, el cual es uno público.

A preguntas del Director Ferrer Ríos en cuanto a si el resultado de las métricas pudiera dar razón para la cancelación del contrato, el licenciado Fontanés Gómez contestó en la afirmativa. Explicó que el Contrato de Operación y Mantenimiento provee para que, si LUMA se mantiene en incumplimiento de ciertas métricas claves por un término de tres (3) años consecutivos, se pueda cancelar el contrato.

El licenciado Fontanés Gómez continuó con su exposición señalando que la extensión del Contrato Suplementario es por un término indefinido porque está vinculado a la restructuración de la AEE. Explicó que hacerlo así era la forma más responsable toda vez que dentro de ese proceso hay un itinerario establecido para la reestructuración de la AEE. Recordó a los Directores que no pueden pasar por alto que el Contrato Suplementario fue creado específicamente en consideración al hecho de que la AEE se encuentra bajo un proceso de quiebra. Añadió que no se presenta un término fijo ya que existen otras condiciones que se encuentran fuera de su total control. La Directora Ortiz Camacho expresó su preocupación en cuanto a la extensión del Contrato Suplementario sin término definido considerando que una de las partes se encuentra en incumplimiento, refiriéndose a la AEE. Explicó que lo anterior sería como darle una carta blanca a la entidad para seguir incumpliendo con sus obligaciones sin tener ninguna repercusión y mientras otras entidades gubernamentales sí tienen que cumplir con sus obligaciones. El Presidente Marrero Díaz aclaró que se debe referir a un alegado incumplimiento de la AEE.

Continuó con su exposición el licenciado Fontanés Gómez, y explicó que cuando LUMA se percató que los procedimientos de Título III no iban a haber culminado para la fecha en que culminaba el término del Contrato Suplementario, envió una comunicación a la AAPP solicitando la extensión de éste. Así las cosas, LUMA, representantes de la FOMB y de la AAFAF se reunieron para discutir la extensión del Contrato Suplementario y sus condiciones. El licenciado Fontanés Gómez explicó a los miembros de la Junta de Directores que la posición de LUMA durante este proceso, era extender el Contrato Suplementario ya que el mismo proveía para una extensión, la que a juicio de LUMA sería automática, interpretación que no fue compartida por la FOMB, ni la AAPP. El licenciado explicó que tenían ante su consideración dos alternativas, a saber, la extensión del Contrato Suplementario o dejar

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 92 of 105

que transcurriera el término del contrato suplementario hasta su eventual cancelación, lo que iniciaría un nuevo proceso de alianza público-privada. Sin embargo, el licenciado Fontanés Gómez explicó que la segunda opción sería muy costosa y resultaría en un estado de inseguridad en cuanto a las implicaciones que conllevaría nuevos términos y condiciones en un contrato con un proponente nuevo. Añadió, que LUMA no ha incurrido en un incumplimiento material bajo los términos del Contrato de Operación y Mantenimiento que conlleve su cancelación.

Culminada la exposición del licenciado Fontanés Gómez, y abierto el piso para preguntas y comentarios, el Director Ferrer Ríos señaló que cerca de las 2:10 pm del día de hoy recibió de parte de la Gerencia de la AAPP una comunicación mediante la cual se le proveyó una opinión legal relacionada al asunto ante su consideración en esta reunión. Sin embargo, indico, que no ha tenido la oportunidad de verla en su totalidad. Señaló que entiende que la misma hace referencia a la aplicabilidad de las disposiciones de la Ley 120 de 2018 ("Ley 120").

A preguntas del Director Ferrer Ríos relacionadas a si es aplicable la Sección 10(b) de la Ley 120 a la extensión de la fecha de terminación del Contrato Suplementario, el licenciado Fontanés Gómez señaló que la Ley 120 está diseñada para que sea la AAPP quien corra estos procesos. Explicó que la Ley 29 es la que dispone sobre cómo son los procesos de la AAPP, y añadió que el lenguaje de esta ley está atado al establecimiento de las alianzas público-privadas. Señaló que todo aquello que no está contenido en la Ley 120 se rige bajo la Ley 29 y así lo indica la Ley 120. El licenciado Fontanés Gómez hizo hincapié en que la extensión de la fecha de terminación del Contrato Suplementario no se trata de una transacción de la AEE bajo la Ley 120 y que las enmiendas y extensiones de los contratos son atendidas por las disposiciones dentro del mismo contrato, según dispone la Ley 29. Señaló que la AAPP forma parte del Contrato de Operación y Mantenimiento y del Contrato Suplementario exclusivamente en carácter de administrador y que de no ser así no participaría en el proceso de extensión de la fecha de terminación del Contrato Suplementario. Añadió que la AAPP es parte contratante y no estamos ante el establecimiento de la selección de un proponente o el establecimiento de una nueva alianza, por lo que a la extensión de la fecha de terminación del Contrato Suplementario no le es de aplicación las disposiciones establecidas en la Sección 10 (b) de Ley 120.

El Director Ferrer Ríos expresó que, aunque entiende la explicación ofrecida por el licenciado Fontanés Gómez no está de acuerdo con la misma y que entiende que se encuentran ante un nuevo contrato con nuevos términos. Añadió, que la Ley 120 tiene supremacía sobre la Ley 29 por tratarse de una ley especial y que la misma debe prevalecer sobre cualquier otra. También señaló que el memorando dirigido a los Directores de la Junta fue circulado el sábado mientras que la opinión legal se produjo en el día de hoy. A preguntas del Director Ferrer relacionada a si el Director Ejecutivo de la AAPP tuvo acceso a la opinión legal previo al sábado, el Director Ejecutivo de la AAPP contestó en la negativa. No obstante, aclaró, que la opinión legal estaba en proceso de redacción, aunque no fue finalizada antes del sábado.

La Directora, Lcda. Ortiz Camacho señaló, haciendo referencia a la sección 7.1(a) del Contrato Suplementario, que lo que tienen ante su consideración es un acuerdo nuevo entre las partes y que por tratarse de un nuevo acuerdo tiene que atenderse bajo las disposiciones de la Ley 120. Explicó que, bajo esa prerrogativa, la votación que se fuera a llevar a cabo en la Junta de Directores tendría que ser conforme a las disposiciones de la mencionada Ley 120. La Directora Ortiz Camacho añadió que mediante el Contrato Suplementario se están añadiendo términos no contemplados en la aprobación previa de esta Junta de Directores y que se están sometiendo ahora con la intención de que no se pase por la Ley 120. El Presidente de la Junta de Directores, así como el Director Ejecutivo de la AAPP señalaron que las expresiones de la Directora Ortiz Camacho no son correctas.

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 93 of 105

Junta de Directores AAPP
M – 2022-17

Añadió la Directora Ortiz Camacho que la opinión legal debe ser una aceptable para todos los miembros de la Junta de Directores. Y que haber enviado a esta Junta una recomendación mediante la cual solicita la extensión del contrato sujeta a una opinión legal sometida con posterioridad a dicho hecho, lo único que le demuestra es que la determinación fue tomada sin contar con dicha opinión legal.

Nuevamente señaló el licenciado Fontanés que lo que tienen ante su consideración es la solicitud de extensión de la fecha de terminación del Contrato Suplementario, y que no se está aprobando en esta Junta una Transacción de la AEE.

El Presidente Marrero Díaz señaló que si bien una opinión legal ayuda en el proceso, no es requerida para que la Junta tome una decisión.

El Presidente Marrero señaló que tienen ante su consideración una extensión del contrato y que cónsono con ello es la Ley 29 la que regula estos procedimientos y enfatizó que no se trata del primer contrato de alianza público-privada sobre este asunto. El Presidente explicó que cónsono con la sección 10(a) de la Ley 29 el contrato debe contener disposiciones sobre cómo extender el acuerdo. Añadió, además, haciendo referencia a la sección 10 de la Ley 120, que es la selección del proponente y la adjudicación del contrato de alianza lo que requiere la aprobación de los compañeros que representan al interés público. El Presidente recalcó que no se encuentran ante la consideración de la selección del proponente o la adjudicación de una Transacción de la AAE, tampoco se trata de la adjudicación del contrato de alianza. Se trata únicamente de una extensión, exclusivamente en atención a que la AEE no ha salido de la quiebra aún. Añadió que no se trata de una transacción adicional, de un activo adicional, de una concesión adicional o la selección de un proponente. Además, añadió que la jueza del Tribunal de Quiebras se ha expresado reiteradamente a los efectos de que LUMA es esencial para la restructuración de la AAE. El Presidente enfatizó que se trata de una extensión de vigencia de un acuerdo a tenor con las disposiciones de la sección 10 de la Ley 29 y lo que establece el contrato entre las partes.

En lo que respecta a los materiales circulados a los Directores, el licenciado Fontanés Gómez señaló que no es la práctica circular opiniones legales relacionadas con los temas que se discuten en las reuniones, y que la opinión legal fue circulada tomando en consideración el debate público, pero ni la ley 29, ni los estatutos corporativos requieren que se emita la misma. Añadió que se trata de una opinión legal que se *solicitó motu propio* por la Gerencia de la AAPP. El licenciado Fontanés Gómez añadió que si la AAPP no fuera parte de este contrato no estaría ante la consideración de esta Junta de Directores este asunto.

La Directora Ortiz Camacho solicitó a la Gerencia que se le provea lo siguiente:

1. Copia de las comunicaciones enviadas por la AAPP relacionadas al incumplimiento de la AEE. Además, la Directora solicitó que ello fuera provisto de manera confidencial.
2. Informes de cumplimiento de AEE con sus obligaciones.
3. Informes sobre cumplimiento de LUMA, incluyendo métricas de desempeño.

A preguntas del Presidente en cuanto a cuan rápido la Gerencia de la AAPP puede producir esta documentación, la Gerencia aclaró que la documentación solicitada e identificada en el #2 no existe.

Acto seguido, el Plan. Lassús Ruiz solicitó a la Gerencia de la AAPP proveer un resumen de las implicaciones y consecuencias de no extender la fecha de terminación del Contrato Suplementario.

A preguntas del Director Ferrer Ríos, la Gerencia de la AAPP señaló que además de los documentos a los que han hecho referencia en esta reunión no hay documentos adicionales que no hayan sido provistos para la consideración de los Directores.

El Director Ferrer Ríos sugirió pasar a la votación toda vez que la documentación solicitada por la Directora Ortiz-Camacho, a su entender, no incide sobre la votación pues no están relacionados con la controversia sobre la aplicabilidad de la Ley 120.

La Directora Ortiz Camacho señaló que 1 hora antes de la hora en la que estaba convocada la reunión no puede con seriedad ver la opinión legal que se le hizo llegar. Además, expresó preocupación en cuanto a la extensión de un contrato en el que una de las partes se encuentra en incumplimiento. El Presidente de la Junta de Directores aclaró que se trata de una alegación de incumplimiento.

A preguntas del Director Parés Alicea sobre cuál es la posición de FOMB, indicó el licenciado Fontanés Gómez que FOMB está a favor de la extensión del Contrato Suplementario y que FOMB ha estado presente y ha participado durante todo el proceso de negociación de la extensión. Además, el Director Parés Alicea solicitó conocer si la Gerencia ha recibido por parte de alguna institución fiscalizadora, incluyendo las federales, alguna solicitud de información o *subpoena* sobre el contrato de LUMA. El licenciado Fontanés Gómez indicó que al momento no tiene información sobre el particular, es decir, que desconocen de la existencia de ese tipo de solicitud y que LUMA no tiene señalamientos de incumplimiento. Aclaró, que tiene conocimiento únicamente de la investigación de la Cámara de Representantes tanto a nivel local como Federal.

A preguntas de la Directora Ortiz Camacho con relación a la carta de FOMB en cuanto a su aprobación, la Gerencia señaló su entendimiento de que la misma está atada a la aprobación de la AEE y que dicha comunicación no se ha recibido.

El Presidente Marrero Díaz inquirió a la Gerencia sobre cuan rápido pueden proveer a la Gerencia la documentación requerida por la Directora Ortiz Camacho. Requirió que dicha documentación se provea en el día de hoy de modo que puedan recesar los trabajos y dar continuidad a los mismos en el día siguiente. El receso de la reunión se estaría decretando a tenor con las disposiciones del *Robert's Rules of Order*, cónsono con las disposiciones de los estatutos corporativos de la propia Junta de Directores de la AAPP, a lo cual los miembros de la Junta dieron su anuencia de forma unánime.

Ante ello, el Director Parés Alicea presentó moción a los efectos de recesar durante el día de hoy los trabajos de la Junta de Directores hasta el día siguiente, 29 de noviembre de 2022. La moción de receso presentada por el Director Parés Alicea, fue secundada, sin objeción. Siendo así, a las 3:00pm la reunión extraordinaria sería reanudada el 29 de noviembre de 2022 a las 3:00 pm de manera presencial. No obstante, se indicó que se estaría proveyendo un enlace para aquel Director que se le pueda presentar inconveniente para estar de manera presencial a la reunión y pueda participar de la misma mediante videoconferencia.

El Presidente Marrero Díaz, decretó un receso hasta las 3:00 pm del siguiente día, 29 de noviembre de 2022, según moción presentada por el Director Parés Alicea y aprobada por todos los Directores. A tales efectos, recesaron los trabajos a las 5:47 pm.

*********************************************

A las 3:35 pm del día 29 de noviembre de 2022, el Presidente de la Junta, Marrero Díaz, hizo el llamado al orden para continuar la reunión extraordinaria 2022-17 de la Junta de Directores de la AAPP. El Secretario de la Junta de Directores, Lassús Ruiz, certificó la continuación de los procedimientos con quórum perfecto, contando con la asistencia de todos los Directores. El Director Lassus Ruiz y la

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc: Exhibit 3 complaint with exhibits Page 95 of 105

Junta de Directores AAPP
M – 2022-17

Directora Ortiz Camacho se encontraban presentes por videoconferencia. Por parte de la Gerencia de la AAPP estuvieron presentes el licenciado Fontanés Gómez y la Lcda. Shylene De Jesús Rivera, *Asesora Legal General*.

Previo a la continuación de la discusión del asunto operacional de la AAPP en agenda, el Director Ferrer Ríos, presentó moción a los efectos de que la sesión y procedimientos de la Junta de Directores fueran grabados. La moción presentada por el Director Ferrer Ríos fue objetada por el Presidente, licenciado Marrero Díaz, ya que los procedimientos de la primera reunión no habían sido grabados, ni tampoco era la norma hacerlo. No obstante, estaban las minutas como récord. La Directora Ortiz Camacho emitió su voto a favor de la moción presentada por el Director Ferrer Ríos. Los Directores procedieron a emitir sus votos en cuanto a la moción presentada. El Presidente Marrero Díaz y los Directores Lassús Ruiz y Parés Alicea emitieron sus respectivos votos en contra de la Moción presentada por el Director Ferrer Ríos. Siendo el voto de la mayoría de los Directores uno en contra de la moción presentada por el Director Ferrer Ríos, la misma no fue aprobada por la Junta de Directores.

Acto seguido, la Directora Ortiz Camacho presentó una moción a los efectos de que la minuta de la reunión fuera transcrita en un término de 24 horas. El Director Ferrer Ríos secundó la moción presentada por la Directora. El Presidente Marrero Díaz objetó la moción de la Directora Ortiz Camacho. Ante la solicitud del Director Ferrer Ríos de que se llevara el asunto a votación, los Directores Ferrer Ríos y Ortiz-Camacho presentaron su voto a favor de que se transcribiera la minuta de la reunión en un término de 24 horas. Los Directores Marrero Díaz, Parés Alicea y Lassús Ruiz emitieron su voto en contra. Toda vez que el voto de la mayoría de los Directores fue en contra de la moción presentada la misma no fue aprobada por la Junta de Directores.

Continuados los procedimientos, la Directora Ortiz Camacho preguntó a los miembros de la Junta de Directores si habían recibido el documento de FOMB aprobando la transacción. La Directora solicitó que de haberse recibido la misma se circulara a todos los Directores. El licenciado Fontanés Gómez señaló que recibió la misma en esa misma fecha y poco antes de la reunión pautada.

El Presidente, Marrero Díaz recordó para efectos de récord que se estaban reanudando los trabajos de la reunión extraordinaria 2022-17 que fue convocada para el día de ayer 28 de noviembre de 2022 a las 3:00 p.m. y en la que se decretó un receso a las 5:47 pm. Esto con el propósito de que se continuaran los procedimientos en el día de hoy, luego de que la Gerencia proveyera la información/documentación solicitada por la Directora Ortiz Camacho. La Gerencia confirmó haber producido y compartido la misma al igual que la opinión legal que ya había sido provista previo a iniciar los procedimientos en el día de ayer. También de la información solicitada por el Plan. Lassús Ruiz. El Presidente Marrero Díaz expresó estar en posición de considerar el asunto.

El Director Ferrer Ríos presentó moción relacionada con el mecanismo de votación a ser utilizado en la reunión. Especificó el Director Ferrer Ríos que su moción es a los efectos de que la determinación que en el día de hoy tome esta Junta de Directores se realice a tenor con las disposiciones de la Ley 120. La Directora Ortiz Camacho secundó la moción. La Directora Ortiz Camacho emitió su voto a favor de la moción presentada por el Director Ferrer Ríos mientras que los Directores Marrero Díaz, Parés Alicea y Lassus Ruiz emitieron su voto en contra. Siendo el voto emitido por los Directores en su mayoría en contra de la moción presentada por el Director Ferrer Ríos la misma no fue aprobada.

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc: Exhibit 3 complaint with exhibits Page 96 of 105

El Presidente Marrero Díaz presentó moción a los efectos de que se aprobara el asunto ante su consideración en el día de hoy, así como la resolución según fue presentada por la Gerencia durante la reunión del día de ayer. La moción fue secundada por los Directores Parés Alicea y Lassús Ruiz. El Director Ferrer Ríos objetó la moción presentada por el Presidente Marrero Díaz y la Directora Ortiz Camacho solicitó que se le permitiera emitir un voto explicativo. A esos efectos el Presidente de la Junta de Directores dio la oportunidad de expresarse a la Directora Ortiz Camacho.

La Directora Ortiz Camacho expuso que la votación que se encuentra efectuando esta Junta de Directores se realiza a tenor con las disposiciones de la Ley 29 cuando entiende que debe ser realizada a tenor con las disposiciones de la Ley 120. Señaló, que a su juicio la votación es contraria a derecho porque no hace referencia a la Sección 10(b) de la Ley 120, la Sección 19 de la Ley 120 sobre Separabilidad, así como la Sección 20 de la Ley 120 sobre Supremacía. Por lo tanto, por entender que la votación es una contraria a derecho se abstiene.

El Director Eduardo Ferrer se unió a las expresiones de la Directora Ortiz Camacho y se abstuvo de emitir su voto.

Los Directores Marrero Díaz, Parés Alicea y Lassús Ruiz emitieron sus correspondientes votos, cada uno a favor de la resolución según presentada por la Gerencia a la Junta de Directores.

El Presidente Marrero Díaz expuso que respeta la opinión de los compañeros Directores, sin embargo, señaló que, la recomendación de la Gerencia y a favor de la cual ha emitido su voto en esta ocasión está sustentada por una opinión legal. Señaló además que no se trata de una selección de un proponente o de un contrato de alianza según requerido por la Ley 120, por lo que los requisitos de dicha Ley no son de aplicación. La Gerencia aclara para récord que no se ha obviado la Ley 120 como parte del trámite, que los documentos presentados a la Junta así lo reflejan, y reitera que en lo pertinente a este tema la Sección 10(b) de la Ley 120 alude específicamente al proceso de aprobación de una Transacción de la AEE y que esto es un término definido específicamente por la Ley 120 como el establecimiento de una alianza, lo cual no aplica a la extensión del Contrato Suplementario.

El Director Lassús Ruiz se unió a las expresiones del Presidente de la Junta.

Ante moción presentada por el Presidente, Lcdo. Omar J. Marrero Díaz, secundada por los Directores Francisco Parés Alicea y Julio Lassús Ruiz, y con la abstención de los Directores Eduardo Ferrer Ríos y Liza M. Ortiz-Camacho, se adoptó la siguiente resolución.

## RESOLUTION 2022-60

**TO AUTHORIZE AND APPROVE THE EXTENSION OF THE INTERIM PERIOD TERMINATION DATE UNDER THE PUERTO RICO TRANSMISSION AND DISTRIBUTION SYSTEM SUPPLEMENTAL TERMS AGREEMENT ("SUPPLEMENTAL AGREEMENT"), DATED AS OF JUNE 22, 2022, BY AND AMONG THE PUERTO RICO ELECTRIC POWER AUTHORITY ("PREPA"), AS OWNER, THE PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY ("AUTHORITY"), AS ADMINISTRATOR, AND LUMA ENERGY, LLC AND LUMA ENERGY SERVCO, LLC (COLLECTIVELY, "LUMA")**

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 97 of 105

Junta de Directores AAPP
M – 2022-17

**WHEREAS,** pursuant to the provisions of Act No. 29-2009, as amended, also known as the Public-Private Partnerships Act (the "P3 Act") and Act No. 120-2018, as amended ("Act 120"), on June 22, 2020, PREPA, the Authority and LUMA executed (i) the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement (the "O&M Agreement"), making LUMA responsible for providing operation and maintenance services related to PREPA's transmission and distribution system ("T&D System"), and (ii) a Supplemental Agreement, establishing certain special provisions applicable during an interim period (the "Interim Period") while PREPA's debt restructuring process under Title III of the Puerto Rico Oversight, Management and Economic Stability Act is ongoing;

**WHEREAS,** LUMA began operations of the T&D System pursuant to the Supplemental Agreement on June 1, 2021, with the Interim Period beginning on such date (the "Interim Period Termination Date");

**WHEREAS,** Section 7.1 (a) of the Supplemental Agreement provides that the Supplemental Agreement and the O&M Agreement shall automatically terminate without further action by LUMA, and without need for a court decision or arbitral award confirming such termination, in the event that PREPA's debt restructuring process has not concluded on or prior to eighteen (18) months after the Supplemental Agreement Effective Date of June 1, 2021 (the "Interim Period Termination Date"); that is to say, November 30, 2022;

**WHEREAS,** Section 7.1 (a) of the Supplemental Agreement also provides that the Interim Period Termination Date may be extended, if requested by the Authority, by agreement between the "Parties" (defined in the Supplemental Agreement as PREPA, LUMA and the Authority);

**WHEREAS,** given that PREPA's debt restructuring process has not concluded and is not expected to conclude by the Interim Period Termination Date, and in order to secure continuation of electricity services to the residents of Puerto Rico, carry on with PREPA's transformation, as envisioned by Act 120 and to comply with the requirements in PREPA's Certified Fiscal Plan, the Authority requested to extend the Interim Period Termination Date in accordance with Section 7.1 of the Supplemental Agreement (the "Extension"), and;

**WHEREAS,** the Authority is a counterparty to the Supplemental Agreement and, as such, must execute the Extension along with PREPA and LUMA.

**NOW, THEREFORE, BE IT RESOLVED** by the Board of Directors of the Puerto Rico Public-Private Partnerships Authority, to authorize the Executive Director or his delegate, to enter into an extension of the Supplemental Agreement's Interim Period Termination Date, and to carry out any other action and execute all such documents, notices, certificates or instruments necessary or desirable to give effect to the provisions of this Resolution, including, but not limited to, any documents, certificates or other instruments related to the tax status of the T&D System, such as the Supplemental Extension Certificate related to the Useful Life Assessment, and any other such action is hereby authorized and ratified.

This Resolution shall take effect immediately upon its adoption.

\*\*\*\*

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 98 of 105

Junta de Directores AAPP
M – 2022-17

**CLAUSURA**

Terminada la discusión de los asuntos incluidos en la agenda de la reunión extraordinaria 2022-17, el Presidente, Lcdo. Omar J. Marrero Díaz, presentó moción de clausura de la reunión, la cual fue secundada, sin oposición. A tales efectos, se dieron por concluidos los trabajos a las 3:52 pm del 29 de noviembre de 2022.

_____
Julio Lassús Ruiz
Secretario

_____
Francisco Parés Alicea
Vicepresidente

_____
Eduardo Ferrer Ríos
Director

_____
Liza M. Ortiz Camacho
Directora

_____
Omar J. Marrero Díaz
Presidente

--/--

## GOVERNMENT OF PUERTO RICO
### PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY

## CERTIFICATE AS TO RESOLUTION

I, **JANICE V. ORTIZ VALENTÍN**, Assistant Secretary of the Board of Directors of the Puerto Rico Public-Private Partnerships Authority ("Authority"), **DO HEREBY CERTIFY** that attached hereto is a true, correct and complete copy of **Resolution 2022-60** which was duly adopted by the Board of Directors of this Authority at a special meeting duly called and held on November 28, 2022, and continued on November 29, 2022 at which quorum was present and acting throughout. Said Resolution has not been repealed, revoked, rescinded or amended, and is in full force and effect.

## RESOLUTION 2022-60

**TO AUTHORIZE AND APPROVE THE EXTENSION OF THE INTERIM PERIOD TERMINATION DATE UNDER THE PUERTO RICO TRANSMISSION AND DISTRIBUTION SYSTEM SUPPLEMENTAL TERMS AGREEMENT ("SUPPLEMENTAL AGREEMENT"), DATED AS OF JUNE 22, 2022, BY AND AMONG THE PUERTO RICO ELECTRIC POWER AUTHORITY ("PREPA"), AS OWNER, THE PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY ("AUTHORITY"), AS ADMINISTRATOR, AND LUMA ENERGY, LLC AND LUMA ENERGY SERVCO, LLC (COLLECTIVELY, "LUMA")**

**WHEREAS,** pursuant to the provisions of Act No. 29-2009, as amended, also known as the Public-Private Partnerships Act (the "P3 Act") and Act No. 120-2018, as amended ("Act 120"), on June 22, 2020, PREPA, the Authority and LUMA executed (i) the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement (the "O&M Agreement"), making LUMA responsible for providing operation and maintenance services related to PREPA's transmission and distribution system ("T&D System"), and (ii) a Supplemental Agreement, establishing certain special provisions applicable during an interim period (the "Interim Period") while PREPA's debt restructuring process under Title III of the Puerto Rico Oversight, Management and Economic Stability Act is ongoing;

**WHEREAS,** LUMA began operations of the T&D System pursuant to the Supplemental Agreement on June 1, 2021, with the Interim Period beginning on such date (the "Interim Period Termination Date");

**WHEREAS,** Section 7.1 (a) of the Supplemental Agreement provides that the Supplemental Agreement and the O&M Agreement shall automatically terminate without further action by LUMA, and without need for a court decision or arbitral award confirming such termination, in the event that PREPA's debt restructuring process has not concluded on or prior to eighteen (18) months after the Supplemental Agreement Effective Date of June 1, 2021 (the "Interim Period Termination Date"); that is to say, November 30, 2022;

**WHEREAS,** Section 7.1 (a) of the Supplemental Agreement also provides that the Interim Period Termination Date may be extended, if requested by the Authority, by agreement between the "Parties" (defined in the Supplemental Agreement as PREPA, LUMA and the Authority);

---

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907 I PO Box 42001, San Juan, PR 00940-2001
64601

787.722.2525          info@p3.pr.gov          p3.pr.gov

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 2 de 2

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 100 of 105

Resolution 2022-60
Page 2

WHEREAS, given that PREPA's debt restructuring process has not concluded and is not expected to conclude by the Interim Period Termination Date, and in order to secure continuation of electricity services to the residents of Puerto Rico, carry on with PREPA's transformation, as envisioned by Act 120 and to comply with the requirements in PREPA's Certified Fiscal Plan, the Authority requested to extend the Interim Period Termination Date in accordance with Section 7.1 of the Supplemental Agreement (the "Extension"), and;

WHEREAS, the Authority is a counterparty to the Supplemental Agreement and, as such, must execute the Extension along with PREPA and LUMA.

NOW, THEREFORE, BE IT RESOLVED by the Board of Directors of the Puerto Rico Public Private Partnerships Authority, to authorize the Executive Director or his delegate, to enter into an extension of the Supplemental Agreement's Interim Period Termination Date, and to carry out any other action and execute all such documents, notices, certificates or instruments necessary or desirable to give effect to the provisions of this Resolution, including, but not limited to, any documents, certificates or other instruments related to the tax status of the T&D System, such as the Supplemental Extension Certificate related to the Useful Life Assessment, and any other such action is hereby authorized and ratified.

This Resolution shall take effect immediately upon its adoption.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Puerto Rico Public-Private Partnerships Authority, this 30th day of November, 2022.

JANICE V. ORTIZ VALENTÍN
ASSISTANT SECRETARY

(SEAL)

64601



Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 101 of 105



# FINANCIAL OVERSIGHT & MANAGEMENT BOARD
## FOR PUERTO RICO

David A. Skeel, Jr.
Chair

Members
Andrew G. Biggs
Arthur J. González
Antonio L. Medina
John E. Nixon
Justin M. Peterson
Betty A. Rosa

**BY ELECTRONIC MAIL**

November 29, 2022

Mr. Fermín Fontanés Gómez
Executive Director
Puerto Rico Public-Private Partnerships Authority

**Re: LUMA Supplemental Agreement Extension**

Dear Mr. Fontanés Gómez,

In accordance with the contract review policy of the Financial Oversight and Management Board for Puerto Rico ("FOMB") established pursuant to Section 204(b)(2) of PROMESA, we have reviewed the proposed amendment to the Puerto Rico Transmission and Distribution ("T&D") System Supplemental Terms Agreement dated as of June 1, 2021 (the "Supplemental Agreement") executed by, on the one hand, the Puerto Rico Public-Private Partnerships Authority (the "P3A"), as administrator, and the Puerto Rico Electric Power Authority ("PREPA"), as owner; and, on the other hand, LUMA Servco, LLC and LUMA Energy Servco, LLC (together, "LUMA") (the "Proposed Amendment").

After reviewing the Proposed Amendment, the FOMB concludes "Approved with Observations." Observations related to the Proposed Amendment are set forth in Appendix A attached hereto.

Our review is solely limited to compliance of the Proposed Amendment with Section 204(b)(2) of PROMESA, which seeks to ensure proposed contracts promote market competition and are not inconsistent with approved Fiscal Plans. For the avoidance of doubt, the review performed by the FOMB does not cover a legal review of the contractual documentation or the contracting process, including without limitation: (i) compliance with contracting requirements under applicable laws, rules, and regulations, both federal and local; and (ii) compliance with applicable laws, rules, and regulations governing procurement activities, both federal and local.

In addition, the FOMB has not engaged in any due diligence or background check with respect to the contracting parties nor whether the contracting parties comply with the requirements under the

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 2 de 5

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 102 of 105

Mr. Fermín Fontanés Gómez
November 29, 2022
Page 2 of 2

applicable contract. Any material changes to the Proposed Amendment or the original contract must be submitted to the FOMB for review and approval **prior to execution**.

This letter is delivered as of the date hereof and we reserve the right to provide additional observations and modify this letter based on information not available when the review was conducted. In addition, during the course of our review, we may receive information which we may refer to the relevant authorities.

This letter is issued only to the P3A and solely with respect to the Proposed Amendment.

Sincerely,

Jaime A. El Koury
General Counsel

SJ2025CV11202 16/12/2025 03:00 pm Entrada Núm. 1 Página 3 de 5

Case:25-00062-LTS Doc#:1-3 Filed:12/17/25 Entered:12/17/25 10:27:16 Desc:
Exhibit 3 complaint with exhibits Page 103 of 105

# APPENDIX A
(Page A-1)

PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY/PUERTO RICO ELECTRIC POWER AUTHORITY – LUMA ENERGY, LLC/LUMA ENERGY SERVCO, LLC

## Fiscal Plan Alignment

This review covers the proposed Amendment to the Supplemental Agreement executed by, on the one hand, the P3A, as administrator, and PREPA, as owner; and, on the other hand, LUMA.

The Proposed Amendment arises from the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement dated as of June 22, 2020 (the "O&M Agreement") and the Supplemental Agreement signed by the P3A, PREPA, and LUMA.

Pursuant to the Supplemental Agreement, as of June 1, 2021, LUMA assumed interim operational control of PREPA's T&D System, in advance of the Service Commencement Date (as defined in the O&M Agreement) and has been providing operation and maintenance services since that time. PREPA's Title III exit and the confirmation of a Plan of Adjustment for PREPA that is reasonably acceptable to LUMA are the only remaining conditions precedent to the occurrence of the Service Commencement Date and LUMA's 15-year term under the O&M Agreement. The Supplemental Agreement was executed to allow LUMA to assume operational control of the T&D System before PREPA exits Title III, and to give the FOMB and PREPA more time to obtain a favorable resolution of PREPA's Title III case.

Pursuant to their respective terms, the O&M Agreement and the Supplemental Agreement will expire on **November 30, 2022**, unless the Supplemental Agreement is extended in accordance with its terms. The Proposed Amendment extends the term of the Supplemental Agreement, pursuant to its Section 7.1(a), until the following Service Commencement Date Conditions (as defined therein) are satisfied or waived: (i) PREPA's Title III exit; and (ii) LUMA's acceptance of the Title III Court's confirmation of PREPA's Plan of Adjustment. Upon the occurrence of these events, the Supplemental Agreement will permanently expire, and the Service Commencement Date under the O&M Agreement shall occur.

Regarding Fiscal Plan compliance, we note that PREPA's 2022 Certified Fiscal Plan (the "Fiscal Plan") highlights that Puerto Rico's energy infrastructure and operations lag far behind national standards due to decades of operational and financial mismanagement by PREPA. Consequently, the Fiscal Plan requires, among other things, that PREPA enter into and maintain operation and maintenance contracts with private operators for both its generation assets and T&D System, such as the O&M Agreement with LUMA. Further, the O&M Agreement is the result of more than four years of efforts by the P3A, the FOMB, and the Government of Puerto Rico to select a private operator for the T&D System, implement the transaction, and transform PREPA's T&D System through a competitive process.

The FOMB is aware of the debate that has surrounded LUMA's O&M Agreement since its execution, and how it has developed during LUMA's operation. However, while customers and stakeholders are entitled to continually demand improvements from its service providers, including LUMA, we also note the poor state of the T&D System when LUMA took over. Decades of underinvestment, deferred maintenance and lack of long-term planning resulted in one of the worst

PO Box 192018 San Juan, PR 00919-2018; www.oversightboard.pr.gov; comments@promesa.gov

# APPENDIX A

(Page A-2)

performing and least reliable energy systems in the United States, with customers experiencing 8 times more outages than customers of median U.S. utilities, and such outages lasting 10 times longer than those experienced by customers of median U.S. utilities. Addressing these fundamental deficiencies requires time and cannot be reasonably expected to be fully corrected within just 18 months of operations.

In addition, while certain metrics, such as outage duration, are areas LUMA must be required to improve, we note those areas where LUMA has achieved clear progress over the last 18 months, such as lower outage frequency, lower call wait times, increased number of answered calls, increased vehicle availability and improved workplace safety standards. Taken together, these metrics suggest that, during its first 18 months, customers and employees have seen their customer service and workplace experience improved when compared to pre-LUMA statistics. Perhaps more importantly, LUMA's greatest achievement has been its ability to exponentially accelerate the integration of distributed renewable generation resources, more than doubling the number of solar rooftop installations (from 25,820 in May 2021 to 59,168 in September 2022) and increasing total rooftop renewable energy capacity by 78%. We also note that LUMA has shown to be better equipped than PREPA to meet basic performance targets, as evidenced by the fact that, when comparing LUMA and PREPA's performance between June 2021 and May 2022, the Puerto Rico Energy Bureau ("PREB") determined that LUMA was able to meet 84% of its baseline performance targets, while PREPA only achieved 50% of its baseline performance targets.

Accordingly, an objective review of LUMA's performance over its first 18 months supports the conclusion that extending the Supplemental Agreement is consistent with PREPA's Fiscal Plan and provides Puerto Rico's residents and businesses with the best opportunity to achieve a reliable, modern and affordable energy system.[1]

According to the P3A, the amount allocated for the Supplemental Agreement and the O&M Agreement in PREPA's Fiscal Year 2023 Certified Budget is **$121,785,000**. As such, the amount that will be spent from the Proposed Amendment's effective date (December 1, 2022) until the end of Fiscal Year 2023 will be **$71,041,250**. The P3A has confirmed that the Proposed Amendment shall be payable from PREPA's "Operator Service Fees" Certified Budget line item under heading "D. Gridco – Operating and Maintenance Expenses."

**Therefore, the FOMB approves the Proposed Amendment. However, the P3A or PREPA must submit a Fund Availability Certification in the format required by the FOMB's contract review policy**.

In the event that the Proposed Amendment causes PREPA to exceed its Fiscal Year 2023 Certified Budget, it must find savings in other areas to cover any overbudgeted amounts and request a reapportionment of any identified funds to the FOMB, in order to ensure compliance with the same.

---

[1] Nonetheless, we encourage the P3A and PREB to continue to enhance their oversight of LUMA, establishing rational expectations for LUMA's performance such that its customers can be well informed and their needs and expectations can be reasonably met.

PO Box 192018 San Juan, PR 00919-2018; www.oversightboard.pr.gov; comments@promesa.gov

## APPENDIX A

(Page A-3)

The P3A is expected to inform the FOMB of any budgetary differences other than those specified in Appendix A (Contract Submission Questionnaire) and to request a re-review of the Proposed Amendment should any changes occur.

*This review was conducted on the basis of information submitted by the P3A. The FOMB has not independently verified the information included in the submission. Should the FOMB become aware of any inaccuracies or misrepresentations – whether intentional or not – it would re-evaluate its assessment.*